**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

---

ANGELA GLODOWSKI, as the Representative                     Case No.:  18-cv-151
of the Estate of AMANDA GLODOWSKI, Deceased,
and as Next Friend of R.G., a minor,

                Plaintiffs,

v.

KRISTIN M. PAGELS, L.P.N.,
ADVANCED CORRECTIONAL HEALTHCARE, INC.,
TERRY JOHNSON, CASSI YOUNG,
SHERIFF THOMAS REICHERT, and
WOOD COUNTY,

                Defendants.

---

**TERRY JOHNSON, CASSI YOUNG, THOMAS REICHERT, AND WOOD COUNTY'S**
**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

The defendants, Terry Johnson, Cassi Young, Thomas Reichert, and Wood County, by their attorneys, Crivello Carlson, S.C., submit the following Brief in support of their Motion for Summary Judgment.

## PRETEXT

The plaintiff ("the Estate") filed an Amended Complaint on May 21, 2019. (Dkt. 47).  The Estate alleges that the Wood County defendants acted with deliberate indifferent and failed to provide medical care to Glodowski resulting in her death. *Id.* Because the Estate cannot substantiate these claims, dismissal of its claims is warranted.

## FACTUAL HISTORY

Defendants' factual history is set forth in their proposed Findings of Facts in Support of their Motion for Summary Judgment and are referred to as "Wood County's  Proposed Findings of

Fact ("WCPFOF").

## ARGUMENT

### I.    SUMMARY JUDGMENT STANDARD

Terry Johnson, Cassi Young, Thomas Reichert, and Wood County seek dismissal of the Estate's claims pursuant to Federal Rule of Civil Procedure 56(c).  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Summary judgment is not a disfavored remedy, but rather, "an integral part of the federal rules as a whole which are designed to secure the just, the speedy and inexpensive determination of every action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  A plaintiff cannot rest on the pleadings, but must demonstrate the existence of sufficient evidence that if believed by a jury, would support a verdict in his or her favor.  *Jelinak v. Greer*, 90 F.3d 242, 243-44 (7th Cir. 1996).  Absent a showing that a defendant may be liable, the defendant should not be required to undergo the considerable expense of preparing for and participating in trial.  *Anderson*, 477 U.S. at 256-57.

In ruling on a motion for summary judgment, the district court's role is to determine whether there is a genuine dispute as to a fact that is material and outcome determinative.  *See Vasquez v. Hernandez*, 60 F.3d 325, 328 (7th Cir. 1995).  It is not enough to raise a "metaphysical doubt" with respect to the existence of a genuine issue of triable fact.  *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Nor does the mere existence of a factual dispute defeat summary judgment.  Rather, the requirement is that there be a *genuine* issue of *material* fact.  *Anderson*, 477 U.S. at 248.  "The days are gone, if they ever existed, when the nonmoving party could sit back and simply poke holes in the moving party's summary judgment motion."  *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990).  The Court, when faced with a summary judgment motion, must decide whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict.  If not, the motion must be granted and the case dismissed.  *Palucki v. Sears Roebuck & Co.*, 879 F.2d 1568, 1572-73 (7th Cir. 1989).  In this case, the

Estate cannot establish proof which would impose liability on the Wood County Defendants. The failure of proof on the elements of plaintiff's claims makes all other facts immaterial. *Celotex*, 477 U.S. at 323.

## I.      CLAIM AGAINST SHERIFF REICHERT MUST BE DISMISSED

### A.      Official Capacity Claims Must be Dismissed

The Estate has sued Sheriff Reichert in his official capacities in addition to Wood County. (Amd. Complaint, Dkt. 47, ¶ 18). An official capacity claim is the equivalent to a claim against the County. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). When faced with an action alleging both municipal and official capacity claims, the latter are properly dismissed as redundant. *Smith v. Metro. Sch. District*, 128 F.3d 1014, 1020 n. 3 (7th Cir. 1997); *Tabor v. City of Chicago*, 10 F.Supp. 2d 988, 991 (N.D. Ill. 1998). Since Wood County is already a defendant in the case, any official capacity claims against Sheriff Reichert must be dismissed as redundant.

## II.     PLAINTIFFS' STATE LAW CLAIMS OF NEGLIGENCE AND WRONGFUL DEATH MUST BE DISMISSED

### A.      Wood County Defendants' Acts Were Discretionary, Not Ministerial.

Municipal entities, officials and employees are granted immunity by Wisconsin Statute Sec. 893.80(4), Stats., for acts done in the exercise of legislative, quasi-legislative, judicial, or quasi-judicial functions. *Kimps v. Hill*, 200 Wis. 2d 1, 10, n.6, 546 N.W.2d 151 (1996); C.L. v. Olson, 143 Wis. 2d 701, 710, 422 N.W.2d 614 (1988). Section 893.80(4) provides in relevant part:

> No suit may be brought against any . . . political corporation, governmental subdivision, or any agency thereof . . . or against its officers, officials, agents, or employees for acts done in the exercise of legislative, quasi-legislative, judicial, or quasi-judicial functions.

The terms "quasi-judicial" and "quasi-legislative" are synonymous with "discretionary." *Johnson v. City of Edgerton*, 207 Wis. 2d 345, 355, 558 N.W. 2d 653 (Ct App 1996). An act is quasi-judicial or quasi-legislative or discretionary if it "involves the exercise of discretion and judgment." *Kimps,* at 23-

24 quoting *U.S. v. Gilbert*, 499 U.S. 315, 325 (1991). Similarly, "judicial" and "legislative" may be thought of as synonymous with "ministerial." *Id.* A purely ministerial duty is:

> absolute, certain, and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode, and occasion for its performance with such certainty that nothing remains for judgment or discretion.

*Santiago v. Ware*, 205 Wis. 2d 292, 335, 556 N.W.2d 356 (Ct. App. 1996) review denied, citing *Lister v. Board of Regents*, 72 Wis. 2d 282, 301, 240 N.W.2d 610, 622 (1976).

Under *Swatek v. County of Dane*, 192 Wis.2d 47, 531 N.W. 2d 45, 49-50 (1995), there may be a ministerial duty on the part of the County to provide a prisoner with medical care or treatment, but the manner in which the municipality provides this care is discretionary. *Swatek*, 192 Wis. 2d at 58-59. While the County's duty to provide appropriate care or treatment may be ministerial, nothing specifies the manner of determining whether an inmate needs care or treatment, or what type of care or treatment is required. Therefore, the manner in which care is provided to an inmate is purely discretionary.

Assessing the likelihood that Glodowski would commit suicide was clearly not a ministerial duty according to this definition. Wood County personnel were required to make a determination based on her actions and assertions. "Merely because [an officer] may have been required to exercise her judgment, or that she may have done so wrongly, does not transform her exercise of judgment into a ministerial act" *Santiago* at 337. Because the actions of Wood County employees in this instance were discretionary, Wood County Defendants are entitled to immunity under sec. 893.80, Stats., and dismissal of the Estate's state law claims as a matter of law.

> **B.    The District Court Can Decline To Exercise Supplemental Jurisdiction Over The Claims.**

Where all federal claims are dismissed, the district court and this court may chose not to exercise jurisdiction over remaining state law claims. *Maguire v. Marquette University*, 814 F.2d 1213,

1218 (7th Cir. 1987). This is an additional ground allowing for dismissal of the state law claims assuming the federal claims against Wood County Defendants are dismissed as discussed below.

## III.   PLAINTIFFS' CLAIM OF DELIBERATE INDIFFERENCE AGAINST OFFICERS JOHNSON AND YOUNG MUST BE DISMISSED

The Estate claims that Johnson and Young acted with deliberate indifferent to Glodowski's medical and mental health needs while she was incarcerated at the Wood County jail.  In particular, the Estate alleges that Johnson and Young knew of  Glodowski's risk of suicide, her medical condition, and her need for proper medical care and they intentionally disregarded that risk. (Amd. Complaint, Dkt. 47, ¶ 99-100).  In order to establish a cause of action under Section 1983, two factors must be established:  (1) that the harm to the inmate was objectively, sufficiently serious and a substantial risk to her health and safety; and (2) that the individual defendants were deliberately indifferent to the inmate's health and safety.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Collins v. Seeman*, 462 F.3d 757 (7th Cir. 2006); *Thomas v. Cook County Sheriff's Dep't.*, 588 F.3d 445, 452 n. 1 (7th Cir. 2009).

In addition to establishing that there was a substantial risk of serious harm as an objective matter, the Estate must also show that Johnson and Young were deliberately indifferent to that risk and that such indifference caused the injury.  *Estelle v. Gamble*, 429 U.S. 97 (1976); *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008).  The "deliberate indifference standard imposes a 'high hurdle' for a plaintiff to overcome".  *Collins*, 462 F.3d at 762, citing to *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002).  The Seventh Circuit Court has defined deliberate indifference as the "functional equivalent of intentional and reckless conduct in a criminal sense - conduct that reflects complete indifference to risk - when the actor does not care whether the other person lives or dies, despite knowing there is a significant risk of death." *Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991), quoting *Archie v. City of Racine*, 847 F.2d 1211, 1219 (7th Cir. 1988) cert. den. 498 U.S. 1065; *Johnson v. Snyder*, 444 F.3d

579, 585 (7th Cir. 2006)(deliberate indifference "is more than negligence and approaches intentional wrongdoing"). Before liability can be imposed, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837 (Emphasis added). This was reaffirmed by the Seventh Circuit decision in *Collins*, which explained that the subjective component of an Eighth Amendment claim requires the plaintiff to establish 2 factors: (1) that the defendant subjectively knew that the prisoner was at substantial risk of injury and (2) that the defendant intentionally disregarded that risk. *Collins*, 462 F.3d at 61; *Matos*, 335 F.3d at 557; *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 529 (7th Cir. 2000)(the officer must not only be aware of the significant likelihood that an inmate may injure himself but also the officer must have failed to take reasonable steps to prevent the inmate from that injury); *Gayton v. McCoy*, 593 F.3d 610 (7th Cir. 2010)

Negligence, gross negligence, medical malpractice or lack of due care is insufficient to establish deliberate indifference. *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992). Rather, an inmate's claim of deliberate indifference must be supported by facts from which it can reasonably be inferred that the response of jail officials to a serious safety or health need was more than negligence, and was so inadequate that it amounted to a complete and intentional disregard for the inmate's well-being. This has been characterized as "something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks." *Duane v. Lane*, 959 F.2d 673-677 (7th Cir. 1992).

The proper inquiry is what the Officer understood and whether his or her response was reckless in light of that knowledge. As the Supreme Court explained in *Farmer*, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838. "All that can be expected is that guards act responsibly under the circumstances that confront them." *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004). Thus a prison official's conduct

need not be perfect or even reasonable. *Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003). As the *Riccardo* court observed, "[t]he eighth amendment does not demand that guards perform [their duties] flawlessly." *Riccardo*, 375 F.3d at 525. In fact, strange behavior by an inmate may not be sufficient to impute subjective knowledge that an inmate was in immediate need of medical or other attention. This is true since "[a]bnormal behavior in jails and prisons is…common." *Jutzi-Johnson v. United States*, 263 F.3d 753, 757 (7th Cir. 2001). Given a jail setting, jailors "must discriminate between serious risks of harm and feigned or imagined ones, which is not an easy task given the brief time and scant information available to make each of the many decisions that fill every day's work." *Riccardo*, 375 F.3d at 525.

Furthermore, Johnson and Young are entitled to rely on the assessments and evaluations by medical and mental health care professionals.. While Johnson and Young may be provided general training to identify some serious medical conditions, they are not a medical or mental health care provider and do not have the same training. This is why the Courts have deemed it reasonable for Officers to rely on the medical opinions and evaluations of other health care providers. *Greeno v. Daley*, 414 F.3d 645 (7th Cir. 2005); *Foelker v. Outagamie County*, 394 F.3d 510, 512 (7th Cir. 2005). The Court in *Greeno* explained:

> If a prisoner is under the care of medical experts…<u>a non-medical prison official will generally be justified in believing that the prisoner is in capable hands</u>. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. <u>Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor</u>.

*Greeno*, 414 F.3d at 656 (emphasis added)(citing to *Spruill v. Gillis*, 372 F.3d 218, 236 (3rd Cir. 2004)). *See also*, *Johnson v. Doughty*, 433 F.3d 1001 (7th Cir. 2006). The court in *Johnson* explained that it was not unreasonable for a jail officer to defer to the opinions of medical personnel.

Nevertheless, <u>Curll did not disregard Johnson's complaints. He investigated the</u>

> situation, made sure that the medical staff was monitoring and addressing the
> problem, and reasonably deferred to the medical professionals' opinions. See
> Greeno, 414 F.3d at 656 ("Perhaps it would be a different matter if [the non-medical
> prison official] had ignored [the plaintiff's] complaints entirely, but we can see no
> deliberate indifference given that he investigated the complaints and referred them to
> the medical providers who could be expected to address [the plaintiff's] concerns.").

*Johnson*, 433 F.3d at 1010. (Emphasis added).  The Seventh Circuit in *Berry v. Peterman*, 604 F.3d 435,

440 (7th Cir. 2010) reaffirmed the long standing rule that non-medical jail officers are "encouraged"

to defer to the professional judgments of professionals.  The Court explained that Officers are

permitted to rely on such expertise "without fear of liability for doing so".  The Court explained:

> Berry failed to present sufficient evidence to support a reasonable jury finding that
> jail administrator Peterman acted with deliberate indifference.  **As a nonmedical
> administrator, Peterman was entitled to defer to the judgment of jail health
> professionals so long as he did not ignore Berry**.  See Hayes v. Snyder, 546 F.3d
> 516, 527-28 (7thCir. 2008); Johnson v. Doughty, 433 F.3d 1001, 1010-11 (7th Cir.
> 2006); Greeno v. Daley, 414 F.3d 645, 655-56 (7th Cir. 2005); Spruill v. Gillis, 372
> F.3d 218, 236 (3rd Cir. 2004).  The undisputed facts show that Peterman met this
> standard.  He consulted with the medical staff, forwarded Berry's concerns to the
> DOC, and timely responded to Berry's complaints.  That he took no further action
> cannot be seen as deliberate indifference.  As a practical matter, it would be unwise
> to require more of a nonmedical staff member like Peterman.  As Hayes, Johnson,
> Greeno, Spruill, and a host of other cases make clear, **the law encourages non-
> medical security and administrative personnel at jails and prisons to defer to
> the professional medical judgments of the physicians and nurses treating the
> prisoners in their care without fear of liability for doing so**.  The district court
> properly granted summary judgment to defendant Peterman.

*Berry*, 604 F.3d at 440. (Emphasis added).

When compared to other precedent in the Seventh Circuit, the failure of the Estate to meet

its burden of establishing deliberate indifference by any of the individual defendants is apparent. In

*Collins v. Seeman, 462 F.3d 757 (7th Cir.2006)*  the inmate requested to see a crisis counselor and

specifically told one correctional officer that he was "feeling suicidal." 462 F.3d at 759. The inmate's

claim to be feeling suicidal was apparently not passed on to other officers in the unit or the crisis

counselor. *Id.,* at 759–60. The inmate also had medical records indicating that he had been

consulting with the prison psychologists and reported feeling "scared, anxious, and depressed." *Id.*,

at 761. The Seventh Circuit found that the inmate's request to see the crisis counselor, standing alone, was not sufficient to place these officers on notice that the inmate posed a substantial and imminent risk of suicide. *Id.,* at 761. Nor was the fact that the inmate's medical records contained the above-mentioned information, as there was no evidence in the record revealing that the officers were aware of that information. *Id.*

In *Minix v. Canarecci, 597 F.3d 824 (7th Cir. 2010)*, the booking officer noted that the inmate had self-inflicted scars on his arms and neck and, after interviewing him, discovered that he was a mental patient at the state hospital, had suicidal thoughts, was on medication to inhibit suicidal thoughts, and had attempted suicide a month earlier. 597 F.3d at 828. When interviewed by Lonz, an employee of the jail's contract mental health provider, the inmate denied having suicidal thoughts and appeared generally polite and cooperative; Lonz did not review the inmates medical chart or medications, speak with any jail personnel regarding his condition, or learn that he had been placed on suicide watch. *Id.* Based on this assessment, the nurse requested that the inmate be taken off suicide watch and returned to the general population. *Id.* A month later, the inmate refused his medications, and officers noticed a blade missing from his razor; the inmate was returned to medical segregation for a suicide watch. *Id.* After two days of observation finding the inmate to be alert, polite, and denying suicidal thoughts, the same nurse again recommended his transfer out of medical segregation. *Id.,* at 829. That evening, the inmate hung himself. *Id.* The Seventh Circuit found that summary judgment was properly granted in favor of Lonz, as she had found him to be polite, cooperative, and denying any thoughts of suicide. *Id.,* at 831. Despite the information in the inmate's records, there was no evidence that Lonz was actually aware of the inmates suicidal history or placement on suicide watch, and absent such knowledge, she could not have been deliberately indifferent to the risk. *Id.* The Court of Appeals further found a lack of actual knowledge that the inmate would "imminently seek to take his own life" by the nurse based on inmates denial of

suicidal thoughts and lack of "strange behavior or any obvious signs that he was an imminent suicide risk." *Id.*, at 833.

Johnson and Young did not ignore Glodowski's medical or mental health conditions. Johnson was aware Glodowski had been treated for seizures while she was incarcerated at the Jail in April 2017; on April 22, 2017, he spoke with her about her behavior and seizures, the most recent of which she experienced earlier that day. (WCPFOF ¶158) In his conversation with her on April 22, 2017, Johnson discussed with Glodowski that she was being moved to a holding cell temporarily for yelling at officers and so that he could more closely monitor her seizures. (WCPFOF ¶159) Glodowski told Johnson she wished her seizures would stop and that she felt they were punishing her by moving her to a holding cell. (WCPFOF ¶160) Officer Johnson explained to her the decision to move her was to keep a closer eye on her seizures.  (WCPFOF ¶160)

Johnson was not aware that a neurologist recommended Glodowski for psychiatric treatment in April 2017 because medical and mental health treatment of inmates was the responsibility of medical and mental health professionals; correctional officers relied on those professionals since they did not have the training and experience to evaluate inmates from those perspectives. (WCPFOF ¶167)

On the evening of May 6, 2017, at approximately 7:08 p.m. Johnson was performing cell checks and observed that Glodowski appeared to be upset during a telephone call. (WCPFOF ¶202) Johnson then later saw Glodowski crying uncontrollably. (WCPFOF ¶203) Johnson attempted to speak with Glodowski but she would not respond to his questions. (WCPFOF ¶203-204) When Glodowski would not respond to Johnson he called for backup assistance. (WCPFOF ¶204) Shortly thereafter, Young arrived. (WCPFOF ¶206) Young observed Glodowski  to be visibly upset in her cell. (WCPFOF ¶206) Young saw her initially dry-heaving and bent over the toilet in her cell but then Glodowski sat down on her bed. (WCPFOF ¶205) Young attempted to speak with Glodowski

asking her what was wrong and if she could do anything to help. (WCPFOF ¶207) Glodowski did not respond to Johnson's questions. (WCPFOF ¶207) Johnson believed Glodowski was upset from her previous telephone call. (WCPFOF ¶205) As a courtesy, Young offered Glodowski the opportunity to use the telephone in the conference room. (WCPFOF ¶205) Glodowski accepted the offer and was escorted to the conference room. (WCPFOF ¶209) Glodowski was able to converse on the telephone for approximately 45 minutes (from approximately 7:21pm until 8:06pm). (WCPFOF ¶219) Glodowski was subsequently escorted back to her cell by Johnson. (WCPFOF ¶202) Glodowski appeared much calmer, was not crying, and was speaking freely with Johnson. (WCPFOF ¶230)  Glodowski then accepted her medications. (WCPFOF ¶231)  According to Johnson, "I asked inmate Glodowski if she was doing better, to which she replied yes. (WCPFOF ¶232) She also thanked us for letting her use the phone. (WCPFOF ¶233) I asked her if she needed anything else besides new toilet paper to which she replied no.  (WCPFOF ¶234)  I left to get toilet paper and returned. (WCPFOF ¶235) I then asked inmate Glodowski that if due to her earlier emotional state if she had any thoughts of harming yourself. (WCPFOF ¶235) Inmate Glodowski stated no and she was fine at this time and would let us know if she did. (WCPFOF ¶235)

After Glodowski returned to her cell with Johnson, Young also went to the cell to check on her while Johnson was still at her cell; she appeared to have calmed down and took her snack and medications, and nodded or gestured yes to Young when Young asked her if she was ok. (WCPFOF ¶220)

Approximately 30 minutes later at 8:37pm, Young conducted rounds of the housing unit and observed Glodowski to be calmly sitting on her bunk. (WCPFOF ¶221) Young did not observe a sheet or other material hanging from the bars of her cell door or any other concern, so she continued with outside checks on other inmates.  (WCPFOF ¶221)

However, when again conducting rounds less than 30 minutes later at approximately

11

9:04pm, Young observed Glodowski hanging from the bars of her cell by a bedsheet. (WCPFOF ¶238) Young immediately called for backup assistance and went to her body to lift it up in an attempt to save her before backup arrived. (WCPFOF ¶238)

Both Officers Thomas Woloskek and Johnson arrived to assist in the emergency response. (WCPFOF ¶239) When Johnson heard Young's elevated voice over the radio he grabbed the medical shears on his way. (WCPFOF ¶239) Life-saving measures were initiated by the officers. (WCPFOF ¶239)

There is no evidence whatsoever to suggest that Johnson or Young displayed any apathy or unconcern for Glodowski, ignored any known current medical condition or suicide risk, or displayed any behavior whatsoever that could be associated with ignoring a known current risk for suicide. In fact, both Johnson and Young were first responders to her suicide attempt on May 6, 2017 and displayed great empathy when, a few hours earlier, she was observed to be distraught following a telephone call.

Most importantly, none of these defendants were aware that Glodowski was threatening suicide during her telephone calls with her fiancé, Cody Duerr or was displaying any current suicidal ideation or behavior. (WCPFOF ¶216) Despite Glodowski threatening suicide to Duerr even he believed he would speak with her again, even that evening, and was not worried that she was going to commit suicide that night. (WCPFOF ¶215)

Johnson and Young plainly lacked any actual knowledge of any imminent threat that Glodowski would cause serious harm to herself.

## IV.    PLAINTIFFS' *MONELL* CLAIM FAILS AS A MATTER OF LAW.

As a threshold matter, there can be no municipal liability where claims fail against the individual employee. *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 597–98 (7th Cir. 1997);

*Sallenger v. City of Springfield, Ill.*, 639 F.3d 499, 504 (7th Cir. 2010). As plaintiffs cannot establish their claim against Johnson and Young, the claim against Wood County likewise must fail.

A municipality can be found liable under § 1983 only if the governmental body itself "subjects" a person to a deprivation of constitutional rights or "causes" a person "to be subjected" to such deprivation. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 692 (1978). Local governments are responsible only for "their own illegal acts." *Id.* at 665-83. They cannot be held vicariously liable for the acts of their employees. *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997).

### A.    There is No Evidence of an Unconstitutional Policy, Practice or Procedure

A municipality (here Wood County) may be liable for harm to persons incarcerated under its authority "if it maintains a policy that sanctions the maintenance of conditions that infringe upon the constitutional rights of prisoners." *Estate of Novack v. County of Wood*, 226 F.3d 525 (7th Cir. 2000) citing *Payne v. Churchich*, 161 F.3d 1030 (7th Cir. 1999). This liability is not founded on a theory of vicarious liability or respondeat superior that holds a municipality responsible for the misdeeds of its employees. Rather, a municipal policy or practice must be the "direct cause" or "moving force" behind the constitutional violation. *Estate of Novack v. County of Wood*, 226 F.3d 525 (7th Cir. 2000) citing *City of Oklahoma v. Tuttle*, 471 U.S. 808 (1985). It is when the execution of a government's policy or custom...inflicts the injury that the government as an entity is responsible under Section 1983. *Estate of Novack v. County of Wood*, 226 F.3d 525 (7th Cir. 2000) citing *Monell v. Department of Soc. Servs.*, 436 U.S. 658 (1978).

That a constitutional injury was caused by a municipality may be shown directly by demonstrating that the policy itself is unconstitutional. *Estate of Novack v. County of Wood*, 226 F.3d 525 (7th Cir. 2000) *citing Monell v. Department of Soc. Servs.*, 436 U.S. 658 (1978). Municipal liability may also be demonstrated indirectly by showing a series of bad acts and inviting the court to infer from

them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting the misconduct of subordinate officers. *Estate of Novack v. County of Wood*, 226 F.3d 525 (7th Cir. 2000) *citing Jackson v. Marion County*, 66 F.3d 151 (7th Cir. 1995). A single instance of allegedly unconstitutional conduct does not demonstrate a municipality's deliberate indifference to the constitutional rights of its inhabitants. *Estate of Novack v. County of Wood*, 226 F.3d 525 (7th Cir. 2000) *citing City of Oklahoma v. Tuttle*, 471 U.S. 808 (1985).

A plaintiff can establish a "policy or custom" by showing: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Klebanowski v. Sheahan*, 540 F.3d 633, 637 (7th Cir. 2008).

Count II of the Amended Complaint hinges on the allegation that Wood County, acting with deliberate indifference, among other things, failed to develop and implement adequate policies and procedures with the foreseeable result that inmates with mental health and medical issues like Glodowski would not be identified and would not receive appropriate treatment and monitoring. The policies, customs and procedures of Wood County for identification and handling of inmates who have serious medical and mental conditions are simple, straightforward and effective: (1) screen; (2) monitor; (3) refer to medical and/or mental health staff as needed; (4) report observations; (5) confer and defer to medical and/or mental health staff as needed; and (6) call emergency services when needed.

**Screen**

Upon arrival at the jail, inmates are asked a series of intake questions. (WCPFOF ¶25) These questions include inquiries of the inmate about their medical and mental health history, current

medical and mental health conditions and other questions geared to learn information to assist in determining inmates' risk levels. (WCPFOF ¶15) The purpose of the booking screening questions is to gather information to help the correctional officers determine if additional steps are necessary, like referral to medical or mental health professionals, placement on a medical, mental health, or suicide watch, or some other action to help ensure the safety and security of the subject inmate, other inmates, and Jail staff.  (WCPFOF ¶26)

**Monitor**

Depending on the intake assessment, correctional officers would determine if the inmate should be placed on a special watch. (WCPFOF ¶27) If an inmate reports having suicidal thoughts or is perceived by the staff to be a suicidal risk, they are placed on suicidal watch. (WCPFOF ¶32) This special watch requires that the inmate is checked on every 15 minutes by personal observation. (WCPFOF ¶32) Suicide watch also involves placing the inmate in a suicide smock and taking their undergarments and Jail uniform and placing them in a suicide watch cell which had only a bar-gated front door for easier monitoring of the inmate, provide the inmate with an orange flexi rubber cup so they can drink water, provide them with safe ways to use toilet paper.  (WCPFOF ¶32)

If correctional officers identified an inmate as potentially suicidal but the inmate denies they are having threats of self-harm, the could rely on their training and experience in considering the totality of circumstances for the inmate to determine whether to proceed with suicide prevention protocol or allow the inmate to proceed in general population or some other housing or security, like a mental health watch, which may or may not be on 15 minutes checks, dependent on our evaluation of the circumstances.  (WCPFOF ¶8)

Even if an inmate were removed from a suicide or mental health watch, correctional officers continued to monitor the inmate, like they did with all inmates, for signs of risk and potential need for additional safety steps like referrals to mental health or medical professionals or placement upon

special watches.   (WCPFOF ¶33)

**Report Observations**

A copy of the intake screening forms would be forwarded to the Jail nurse by staff. (WCPFOF ¶28) While officers did not have access to medical or mental health records of inmates kept in the inmate's medical files they would receive information from those records by medical or mental health professionals as deemed necessary by those professionals. (WCPFOF ¶29) Correctional officers would also be notified when coming on shift of inmates on mental health or suicide watches. (WCPFOF ¶31)

When an inmate was placed on a special watch, their name was written on an erasable white board in the booking area to notify mental health staff of who was on a suicide watch and who was on a mental health watch or had requested to speak with a mental health professional. (WCPFOF ¶20, 21) Staff could also send an email request to DHS or make an oral request. (WCPFOF ¶83)

Correctional officers passed inmate medical requests to the Jail nurse. (WCPFOF ¶11) In addition, Jail nursing staff and correctional officers communicated about inmate medical requests and issues and what instructions, if any, the medical staff gave to correctional officers for administration of medications or other significant information to be mindful of regarding inmates. (WCPFOF ¶10) The Jail nurse would receive copies of incident reports that pertained to inmate medical issues and copies of suicide or mental health watch forms when submitted by correctional officers. (WCPFOF ¶44)

Correctional officers and mental health professionals from DHS would communicate about inmate mental health issues and any feedback the mental health providers had regarding inmates. (WCPFOF ¶12) After the mental health counselors saw inmates on Fridays, the counselors would send their progress notes to the Jail – to the Jail nurse and also a copy for correctional officers to have access to.  (WCPFOF ¶49)

Mental health workers from DHS would ask correctional officers or the Jail nurse for information and updates on inmates regarding mental health issues to get additional background on inmates for their mental health sessions. (WCPFOF ¶108)

**<u>Confer and Defer</u>**

In 2007, DHS provided mental health care to the jail. DHS was at the jail Friday mornings for counseling sessions. (WCPFOF ¶54) Counselors would see inmates in order of priority for individual consult sessions. (WCPFOF ¶61) After the consult sessions the attending therapist would meet with available correctional staff to brief them on the individual consults and raise concerns or recommendations. (WCPFOF ¶82)

DHS's Crisis Team would attend to the Jail on Tuesdays to assess inmates on suicide watch. DHS outpatient clinic therapists and Crisis Team workers were the only County staff who could remove an inmate from suicide watch. (WCPFOF ¶24)  DHS outpatient clinic therapists were the only ones who could remove an inmate from mental healthcare watch. (WCPFOF ¶10) Inmates could also speak with the Crisis Team by phone if necessary.  (WCPFOF ¶101)

In 2017, medical care at the Jail was provided by Advanced Correctional Healthcare (ACH), by Dr. Daniel Hekman and onsite Nurse Kristin Pagels. (WCPFOF ¶35) Dr. Hekman was onsite at the Jail once per week and available by phone otherwise.  (WCPFOF ¶36)

At the Jail, correctional officers provide security, and the medical and mental health professionals provided medical and mental health services. It was the policy of the jail to defer to the mental health and medical judgment of the mental health and medical staff.  Correctional officers could not remove inmates from watches – only a mental health professional could remove an inmate from a mental health or suicide watch and only a medical professional could remove an inmate from a medical watch.  (WCPFOF ¶24)

Additionally, the Wood County Sheriff's Department's did not have an officially adopted policy of acting with deliberate indifference to arrestees' risk of suicide. To the contrary, Wood County Sheriff's Department's suicide prevention policies, entitled "Jail Operations: 211.12 Medical Care and Health Services, Sub-Section G. Suicide Prevention," and "Jail Medical: 235-G-05, Suicide Prevention Program," were very detailed. (WCPFOF ¶60)

Correctional officers at Wood County Jail received training that included: a) 160 hours of certified jail training, which included suicide prevention training; b. Training with the National Alliance of Mental Illness, which involved how to communicate with a person in crisis or with mental health issues; c. Annual training as a correctional officer on how to identify and respond to inmates who are potentially suicidal; d. Additional training through the County on identifying and responding to situations involving crisis and mental health issues; e. Specific training on identification of potential risk factors for suicide, including, substance abuse history, giving away belongings, suicide history, mental health history, mood swings, emotional distress, personal relationship stresses, and emotions relating to holidays or important family dates. (WCPFOF ¶2)

During booking at the Wood County Jail on April 7, 2017, following her arrest, correctional officers did not observe any signs of suicide risk, medical conditions, substance abuse or other problems of Glodowski, aside from Glodowski stating she recently used drugs. (WCPFOF ¶126)

When Jail staff observed Glodowski having seizures they contacted the Jail nursing staff. (WCPFOF ¶10) The Jail nursing staff and correctional officers communicated with each other regarding the apparent seizures Amanda Glodowski suffered at times during her incarceration. (WCPFOF ¶132) The communications between Jail nursing staff and correctional officers regarding Amanda Glodowski's seizures included reports of her seizures by correctional officers to nursing staff, and medical staff's recommendations for how to deal with the seizures or what steps to take, like sending her to a hospital. (WCPFOF ¶133)

The only time Glodowski expressed suicidal thoughts to a correctional officer she was placed on a mental health watch by Officer Johannes. (WCPFOF ¶135) Glodowski was referred to the mental health staff who acknowledged the referral and visited and assessed her on multiple occasions. (WCPFOF ¶180-198) In addition, the correctional staff monitored Glodowski throughout her incarceration.

### B.       Wood County was Not Aware of Eminent Constitutional Deprivations

Municipal liability requires awareness of actual constitutional deprivations or strong likelihood of eminent, though unrealized, deprivations. *Jones*, 787 F.2d at 205. The Amended Complaint lists a number of suicides, suicide attempts, and suicide threats in the years leading up to and following Glodowski's suicide in the complaint. (Amended Complaint, Dkt. 47, ¶85) Of those events listed, prior to Glodowski's suicide on May 6, 2017, only one suicide occurred. *Id.*

The argument of the Estate appears to be that Wood County was aware of the need for appropriate policies and procedures concerning the identification and handling of inmates suffering serious medical conditions given these prior incidents. These cited prior incidents are irrelevant to this case and the analysis of liability. The number of suicides, suicide attempts, and suicide threats from 2011 through May 6, 2017 does not imply a policy of deliberate indifference. See *Boncher ex rel. Boncher v. Brown Cty.*, 272 F.3d 484, 487 (7th Cir. 2001) (It is not the number of suicides that is a meaningful index of suicide risk and therefore of governmental responsibility, ... but the suicide rate; ... and it is not even the rate by itself, but rather the rate relative to the "background" suicide rate in the relevant free population (the population of the area from which the jail draws its inmates) and to the rate in other jails.) *See Lapre v. City of Chi*cago., 911 F.3d 424 (7th Cir. 2018) (describing the detailed and extensive statistical evidence necessary in a jailhouse suicide deliberate indifference case).

The Estate does not point to empirical studies or statistical evidence indicating that the

number of suicides in a given facility is indicative of poor policy, practice or custom regarding suicide detection. The Estate does not allege Wood County had a statistically significantly higher number of suicides than other jails of its size from 2011 through May 6, 2017. There is no evidence that any of the prior suicides, suicide attmepts, or threats of suicide that may have occurred at the jail had anything to do with treatment (or lack thereof) offered to inmates. The Estate is unable to connect similarities between the suicide of Glodowski and the one prior suicide nor say that the same policy, practice or custom was causally related to both suicides.

### C.    Use of DHS to Provide Mental Health Services Did Not Create An Obvious Constitutional Deprivation

The Estate contends the jail's policy of trying to meet the mental health needs of inmates through the county Department of Human Services denied Glodowski access to timely mental health care and treatment and at-risk inmates not being timely assessed for suicide risk.

The agreement between DHS and the Jail allowed the Jail to meet standards under the Department of Corrections Chapter 350.17 and other state standards, like having inmates evaluated by qualified mental health professionals. DHS therapists' primary goal in providing services at the Jail was to assess suicidality or risk of harm; after that, the priority with inmates was to provide or discuss coping skills or ways to reduce anxiety or stress, like, for example, reorienting an inmate's perspective on problems, providing exercises like writing or drawing to deal with stressors, and other coping skills.

All available facts in this case indicated that, the only time when Glodowski expressed suicidal ideation was to a jail officer (Steven Johannes) on April 16, 2017 while at a local hospital for examination of possible seizures. On that occasion, she was placed on Mental Health Watch and referred to a mental health clinician following her return to the Wood County Jail that same day. After receiving mental health watch forms from April 16, 2017, regarding Glodowski's placement on

a mental health watch, DHS mental health therapist Constance Virnig met with Glodowski on April 21, 2017, during the Friday sessions at the Jail. (WCPFOF ¶145)

From the special watch forms from April 16th Virnig was aware Glodowski had been sent to the emergency room for concerns the Jail had about her, that she told a correctional officer she felt no one cared about her and that she did not have support from any family or friends, that she felt threatened by other inmates, and that she was emotional when she was at the emergency room. (WCPFOF ¶146) Correctional officers also informed Virnig on April 21, 2017, that Glodowski had been struggling with anxiety and other issues and had been having seizures; she was listed on the dry erase board as being on a mental health watch. (WCPFOF ¶147) Virnig's primary focus for meeting with Glodowski on April 21st was to assess her risk of suicide, which included assessing whether Glodowski had any active plans for self-harm, which she denied.  (WCPFOF ¶148)

Virnig responded to Glodowski's concerns expressed during the April 21st session by stating Glodowski could go on suicide watch if she felt she needed closer monitoring, to which Glodowski responded "Been there, done that, won't do it again," and continued to shut down her communication with Virnig.  (WCPFOF ¶154)   Though Glodowski had calmed down by the end of the session and had declined the need to go on suicide watch, Virnig did not take her off the mental health watch.  (WCPFOF ¶156)

Since Glodowski remained on a mental health watch, the process was for the Jail and DHS to automatically put her name on the board to be seen by DHS the following Friday, April 28, 2017. (WCPFOF ¶173) Demaris Losinski saw Glodowski during a session at the Jail on April 28, 2017, during which Glodowski presented as emotional and somewhat scattered in her speaking. (WCPFOF ¶173)  During the individual session with Losinski Glodowski said she was "broken," that she had given up on everything, that she needed psychiatric hospitalization to be fixed and that she spoke with her probation officer and neurologist about hospitalization, though she denied

having any suicidal thoughts and would tell staff if that changed.  (WCPFOF ¶174)

During her session with Losinski, Glodowski discussed her substance abuse history, including heroin and methamphetamine use, her past medications which she claimed to no longer be taking, and her past diagnoses of bipolar disorder, anxiety, ADHD, and posttraumatic stress disorder.  (WCPFOF ¶175)    Losinski discussed with Glodowski that she would not be recommending psychiatric hospitalization and the prospect of putting her on a mental health watch, to which she responded she was comfortable staying in general population.  (WCPFOF ¶176)

During the session on April 28th, Glodowski stated she wanted psychiatric hospitalization immediately; after Losinski suggested she could pursue that after her release, she stated that if she was not going to be hospitalized now, she would not pursue it once released.  (WCPFOF ¶179) After the individual inmate sessions on April 28th, Losinski met with correctional officers and asked that the Jail nurse and lieutenant also be in attendance to get feedback from the group and to provide them on any concerns or significant information she felt they should know, as was her practice after sessions with inmates.  (WCPFOF ¶180)

Losinski assessed Glodowski for a suicide risk throughout the April 28th session, and ultimately concluded that Glodowski did not need to be on a mental health or suicide watch. (WCPFOF ¶181) The DHS therapists were not aware of any requests by Glodowski for additional mental healthcare, or that she was recommended for inpatient psychiatric care by neurologist Sandok, or that Glodowski had requested to see mental health in May 2017.

Glodowski did have access to timely mental health care and treatment and when she presented as an at-risk inmate she was timely assessed for suicide risk.

Additionally, there is nothing to indicate meeting the mental health needs of inmates through the county Department of Human Services was a known cause of prior suicides, such that the failure to seek outside services made the risk of a constitutional deprivation obvious. Yet this is what is

required to show that the lack of a policy allowing access may be unconstitutional. *Cornfield v. Cons. High Sch. Dist.*, 991 F.2d 1316, 1327 (7th Cir. 1993); *Oviatt v. Pearce*, 954 F.2d 1470, 1477-78 (9th Cir. 1992).

In *Estate of Novack ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 532 (7th Cir. 2000) the plaintiffs presented expert testimony from a psychiatrist who pointed out numerous flaws in the jails policies for treating mentally ill inmates and stated the opinion that these deficiencies contributed to Novack's death. The court held that:

> While the expert's opinion may demonstrate that WCJ personnel could have done more to become aware of the danger that Novack posed to himself based on the strange behavior that he was exhibiting, that opinion does not indicate that WCJ policies caused jail personnel to be deliberately indifferent in the face of a patently obvious suicide risk. In other words, the evidence presented by the plaintiffs has not shown that but for WCJ policies, WCJ personnel would have been aware that Novack posed a high risk of suicide and would have taken reasonable steps to prevent him from taking his own life. We have found that WCJ officers in this case were not deliberately indifferent to the suicide risk posed by Novack, and we cannot conclude that the officers would have been aware of that risk had it not been for the County policies that caused their deliberate indifference.

Here, there is no evidence of any express policies or customs or widespread practices leading to any constitutional injuries.  In this case, the Estate cannot establish that Wood County was deliberately indifferent to a known risk of suicide.

**2.     Failure to Implement a System of Communication Did Not Cause A Constitutional Violation**

The failure to develop or implement necessary policies and procedures can constitute a policy or custom for purposes of a *Monell* claim, but only if that failure causes a constitutional violation. *Harris v. City of Marion, Indiana*, 79 F.3d 56, 58 (7th Cir. 1996). "In those situations, however, the plaintiff generally must allege a pattern or series of incidents of unconstitutional conduct or a clear constitutional duty to take action because the situation was certain to recur." *Harris*, 79 F.3d at 58-59 (citation omitted). "In addition, the municipality's inaction must amount to

23

deliberate indifference, so that it is fair to infer that the inaction is itself a 'policy.' " *Id.* at 59 (citations omitted).

An "extremely high degree" of municipal culpability is required to hold a municipality liable for a policy that is not itself unconstitutional. *Jones v. City of Chicago*, 787 F.2d 200, 205 (7th Cir. 1986) (citations omitted). The municipality must be "aware either of actual deprivations or of such a strong likelihood of imminent (though unrealized) deprivations that any reasonable person would have taken preventative measures." *Jones*, 787 F.2d at 205 (citation omitted). Thus, before municipal liability may be imposed for a violation of a plaintiff's constitutional rights, a plaintiff must show that the municipality's "policy" of failing to do something was implemented in spite of its awareness, whether actual or imputed, that the likely consequences of that failure would be a violation of a plaintiff's rights. *Jones*, 787 F.2d at 204.

Plaintiff alleges that the Jail failed to implement a system of communication between correctional officers, the site nurse, the site doctor, and HSD to identify and monitor inmates with serious mental health needs at risk of committing suicide.

Although not formal, there was a system of communication between correctional officers, the site nurse, the site doctor, and HSD to address identify and monitor inmates at risk of committing suicide. The following communications occurred: a) A copy of the intake screening forms would be forwarded to the Jail nurse by correctional officers; b) While correctional officers did not have access to medical or mental health records of inmates they would receive information from those records by medical or mental health professionals as deemed necessary by those professionals; c) Correctional officers would also be notified when coming on shift of inmates on mental health or suicide watches; d) When an inmate was placed on a special watch, their name was written on an erasable white board in the booking area to notify mental health staff of who was on a suicide watch and who was on a mental health watch or had requested to speak with a mental health

professional; e) Email or oral requests to DHS could also be made; f) Correctional officers passed inmate medical requests to the Jail nurse; g) .Jail nursing staff and correctional officers communicated about inmate medical requests and issues and what instructions, if any, the medical staff gave to correctional officers for administration of medications or other significant information to be mindful of regarding inmates; h) The Jail nurse would receive copies of incident reports that pertained to inmate medical issues and copies of suicide or mental health watch forms when submitted by correctional officers; i) Correctional officers and mental health professionals from DHS would communicate about inmate mental health issues and any feedback the mental health providers had regarding inmates; j) After the mental health counselors saw inmates on Fridays, the counselors would send their progress notes to the Jail – to the Jail nurse and also a copy for correctional officers to have access to; and k) Mental health workers from DHS would ask correctional officers or the Jail nurse for information and updates on inmates regarding mental health issues to get additional background on inmates for their mental health sessions.  (WCPFOF ¶13, 40-44, 53)

Given this level of communication, the Jail was not aware either of actual deprivations or of such a strong likelihood of imminent (though unrealized) deprivations prompting any reasonable person to have taken preventative measures. *See also Estate of Novack*, 226 F.3d at 531 (finding no liability for an inmate suicide where the plaintiff failed to show a pattern of suicide at the jail from which the finder of fact could draw an inference that the county was aware that its policies for treating mentally ill inmates at risk for suicide were inadequate and chose to do nothing in the face of this knowledge).

Additionally, the Estate has presented no evidence that the policy itself led to additional suicides or that suicides would have been prevented by a different policy. Nor has it shown that the Jail was aware that this policy was leading to an increase in suicides, for example, and yet persisted in

continuing the practice.

The estate is unable to establish that the policies and procedures of the Wood County Jail were so inadequate that Wood County was put on notice that at the time Glodowski was detained there was a substantial risk that she would be deprived of necessary medical care in violation of her Eighth Amendment Rights. Without anything more than conclusory allegations the Estate's claim must be dismissed.

## XIII.   JOHNSON AND YOUNG ARE ENTITLED TO QUALIFIED IMMUNITY

The Supreme Court has "repeatedly stressed the importance of resolving immunity questions at the earliest possible stage of litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). Courts have explained that "government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of qualified immunity is to allow for reasonable errors "because officials should not err always on the side of caution [for the] fear of being sued." *Humphrey v. Staszek*, 148 F.3d 719, 727 (7th Cir. 1998). The defense "erects a substantial barrier for plaintiffs, and appropriately so because qualified immunity is designed to shield from civil liability all but the plainly incompetent or those who knowingly violate the law." *Kernats v. O'Sullivan*, 35 F.3d 1171, 1177 (7th Cir. 1994).

A two-part test exists to determine whether qualified immunity applies. First, a court must determine "whether the plaintiff's allegations, if true, establish a constitutional violation." *Rakovich v. Wade*, 850 U.S. 1180, 1209 (7th Cir. 1988). Second, if the plaintiff can show a constitutional deprivation, a court must then examine whether that constitutional right was "clearly established" at the time. *Id.* The plaintiff bears the burden of establishing both elements. *Id.*

"Clearly established law" at the time of the incident cannot be shown with "high levels of generality." *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014). Rather, it is shown by presenting "controlling authority" or "a robust consensus of cases of persuasive authority" as of the date of the incident in question. *Id.* at 2023; *see also Wood v. Moss*, 134 S.Ct. 2056, 2067 (2014) (deciding in part that a constitutional right not clearly established without previous case law); *Stanton v. Sims*, 134 S.Ct. 3, 5, 7 (2013) (reversing in favor of qualified immunity where prior case law "did not lay down a categorical rule for all cases" involving Fourth Amendment issue at stake, where Ninth Circuit read earlier precedent "too broadly," and where "[i]t is especially troubling that the Ninth Circuit would conclude that Stanton was plainly incompetent – and subject to personal liability for damages - based on actions that were lawful according to courts in the jurisdiction where he acted."); *Reichle v. Howards,* 132 S.Ct. 2088, 2093-94 (2012)(rejecting "clearly established" argument where Supreme Court had "never recognized" similar arguments before).

Johnson and Young are entitled to qualified immunity because there was no underlying constitutional deprivation. Qualified immunity is also warranted because the Estate cannot demonstrate – with the requisite level of specificity – a clearly established right at the time of the alleged deprivation. The Seventh Circuit recently provided a summary of what "clearly established" law currently exists in this jurisdiction in relation to the use of a taser:

> In 2009, we found that it had been clearly established in 2006 that a TASER could not be used against a prone, weakened, and docile prisoner who had been told to rise one time, had not been warned that failure to comply would result in use of a TASER, and had been zapped before having a chance to comply with the order to rise. If it was clearly unlawful in 2006 to use a TASER on a moving prisoner who had been ordered to rise, then it surely was clearly unlawful a year later to use a TASER on a noncompliant, nonmoving misdemeanor arrestee who had already been immobilized by an initial TASER jolt. And more recently, we held that it was clearly established in 2005 that officers could not repeatedly use an impact weapon to beat into submission a person who was not resisting or was merely passively resisting officers' orders. Additionally, since 2007, many of our sister circuits have found the use of a TASER against nonviolent, nonresisting misdemeanants to violate clearly established law, the absence of TASER case law notwithstanding.

*Abbot*, 705 F.3d at 733. (internal citations omitted).

During the early evening of May 6, 2017, Johnson observed that. Glodowski appeared to be upset during a telephone call, and then later "sitting on her bunk hunched over sobbing and crying uncontrollably." The inmate would not respond to Johnson who then called for backup assistance. Shortly thereafter, Young arrived and tried to console Glodowski. The inmate was apparently upset from the previous telephone call. Young offered an additional free telephone call to Glodowski by using the telephone in the conference room (because her phone card had run out of money). Glodowski accepted the offer and was escorted to the conference room. Glodowski was able to converse on the telephone for approximately 45 minutes (from approximately 7:21pm until 8:06pm. Glodowski was subsequently escorted back to her cell by Johnson. The inmate appeared much calmer and was no longer crying she accepted her medication and evening snack. According to Johnson, "I asked inmate Glodowski if she was doing better, to which she replied yes. She also thanked us for letting her use the phone. I asked her if she needed anything else besides new toilet paper to which you replied no. I left to get toilet paper and returned. I then asked inmate Glodowski that if due to her earlier emotional state if she had any thoughts of harming yourself. Inmate Glodowski stated no and she was fine at this time and would let us know if she needed anything."

Approximately 30 minutes later at 8:37pm, Young conducted rounds of the housing unit and observed Glodowski to be calmly sitting on her bunk. However, when again conducting rounds less than 30 minutes later at approximately 9:04pm, Young observed Glodowski hanging from the bars of her cell by a bedsheet. Young immediately called for backup assistance and both Officers Thomas Woloskek and Johnson arrived to assist in the emergency response.  Life-saving measures were initiated by the officers until relieved by paramedics from the Wisconsin Rapids Fire Department.

There is no evidence whatsoever to suggest that Johnson or Young displayed any apathy or

unconcern for Glodowski, ignored any known current suicide risk, or displayed any behavior whatsoever that could be associated with ignoring a known current risk for suicide. In fact, both Johnson and Young were first responders to her suicide attempt on May 6, 2017 and displayed great empathy when, a few hours earlier, she was observed to be distraught following a telephone call. Most importantly, none of these defendants were aware that Glodowski was threatening suicide during her telephone calls or was displaying any current suicidal ideation or behavior.

Johnson and Young plainly lacked any actual knowledge of any imminent threat that Glodowski would cause serious harm to herself. What other actions beyond calming Glodowski, asking if she had thoughts of self harm, and checking on her where required from Johnson and Young. The relevant question is not what would Johnson and Young have done if they had actual knowledge about an imminent threat, one can summon other actions they may have taken, but the relevant question is what actions were required by the Constitution. Plaintiff cannot conceivably meet the first part of the test.

Similarly, no clearly established law would have alerted Johnson and Young, at the time, that any alleged actions attributed to them violated Glodowski's constitutional rights. Given the state of their actual knowledge, no decisional law would have conveyed to a reasonable person in their shoes that they had any obligation relevant to the Eighth Amendment claims made in this case. Compare *Gregoire v. Class*, 236 F.3d 413, 417-19 (8th Cir. 2000) ("Even if an official knows of a risk of suicide, and suicide does occur, the official is entitled to qualified immunity if he could reasonably believe that his response to the risk was not deliberately indifferent (or reckless) to that risk").

Compare Young and Johnson's responses here with the facts in *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006), where the Court confirmed there was no Eighth Amendment liability:

> Ricky Collins committed suicide in his prison cell at the Sheridan Correctional Center in Sheridan, Illinois. Approximately fifty-five minutes before the suicide was discovered, Collins told a correctional officer that he wanted to see the

prison crisis counselor because he was feeling suicidal. The officer relayed the request up the chain of command, but as it was passed along, the information that Collins was feeling suicidal was apparently dropped and the message was transmitted as a generic request to see the crisis counselor. In the meantime, however, the officer returned to Collins's cell and told him the counselor had been called and would respond as soon as she could. Collins told the officer that he was all right and could wait until the counselor arrived. Correctional officers checked on Collins twice more in the intervening thirty minutes and nothing was amiss. At some point before the next cell check-about twenty minutes after the last-Collins hanged himself in his cell using a bed sheet.

*Collins*, 462 F.3d at 759.

All individual capacity federal law claims against Johnson and Young are barred by qualified immunity.

## CONCLUSION

Based upon the foregoing arguments and authorities, it is respectfully requested that this Court grant Wood County Defendants' motion for summary judgment dismissing the Estate's Complaint upon its merits, together with the costs and disbursements of this action.

Dated this _____ day of _____, 2020.

By: __s/ Timothy M. Johnson_____
           TIMOTHY M. JOHNSON
           State Bar No. 1052888
           Attorneys for Defendants, Cassi Young, Terry Johnson, and Thomas Reichert, and Wood County
           CRIVELLO CARLSON, S.C.
           710 N. Plankinton Avenue, Suite 500
           Milwaukee, WI  53203
           Phone: (414) 271-7722
           Fax: (414) 271-4438
           E-mail: tjohnson@crivellocarlson.com