IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ANGELA GLODOWSKI, as the Representative of the Estate of AMANDA GLODOWSKI, Deceased, and as Next Friend of R.G., a minor,

Plaintiffs,

DEPOSITION OF:

-VS- TERRY JOHNSON

CASE NO. 18-cv-151-bbc

DANIEL HEKMAN, M.D., et al.,

Defendants.

---

Deposition examination of TERRY JOHNSON, taken at the instance of the Plaintiffs, under and pursuant to Rule 30 of the Federal Rules of Civil Procedure and the acts amendatory thereof and supplementary thereto, pursuant to Notice upon the parties, before Monica M. Hunkins, RPR, a Notary Public in and for the State of Wisconsin, at the Wood County Courthouse, 400 Market Street, Room 210B, Wisconsin Rapids, Wisconsin, on the 17th day of May, 2019, commencing at 9:12 a.m. and ending at 1:47 p.m.

A P P E A R A N C E S

APPEARING ON BEHALF OF THE PLAINTIFFS, ANGELA GLODOWSKI, as the Representative of the Estate of AMANDA GLODOWSKI, Deceased, and as Next Friend of R.G., a minor:

NICHOLAS CURRAN, ESQUIRE
Kathleen T. Zellner & Associates, P.C.
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515

Appearing telephonically.

APPEARING ON BEHALF OF THE DEFENDANTS, TERRY JOHNSON, THOMAS WOLOSEK, CASSIE YOUNG, SHEENA LUBE, SHERIFF THOMAS REICHERT, and WOOD COUNTY:

TIMOTHY M. JOHNSON, ESQUIRE
Crivello Carlson, S.C.
710 North Plankinton Avenue
Suite 500
Milwaukee, Wisconsin 53203-2404

APPEARING ON BEHALF OF THE DEFENDANTS, DANIEL HEKMAN, M.D., and KRISTIN M. PAGELS:

DOUGLAS S. KNOTT, ESQUIRE
Leib Knott Gaynor, LLC
219 North Milwaukee Street
Suite 710
Milwaukee, Wisconsin 53202

APPEARING ON BEHALF OF THE DEFENDANT, DANIEL HEKMAN, M.D.:

PATRICIA J. EPSTEIN PUTNEY, ESQUIRE
Bell, Moore & Richter, S.C.
345 West Washington Avenue
Suite 302
Madison, Wisconsin 53703

ALSO PRESENT: None.

The original transcript of the deposition of TERRY JOHNSON was filed with Attorney Nicholas Curran.

I N D E X   P A G E

E X A M I N A T I O N

| | PAGE |
|---|---|
| TERRY JOHNSON | |
| EXAMINATION BY MR. CURRAN | 8 |
| EXAMINATION BY MR. JOHNSON | 176 |
| EXAMINATION BY MR. KNOTT | 179 |
| EXAMINATION BY MS. EPSTEIN PUTNEY | 182 |
| EXAMINATION BY MR. CURRAN | 184 |

---

E X H I B I T S

| | | MARKED |
|---|---|---|
| Exh. 1 | Letter to Wood County Human Resources from Terry Johnson | 8 |
| Exh. 2 | Wood County Jail Incident Report dated 2/14/16 | 8 |
| Exh. 3 | Special Watch Form dated 2/12/16 | 8 |
| Exh. 4 | Request for Evaluation of Inmate at Wood County Jail | 8 |
| Exh. 5 | Special Watch Form dated 4/16/17 | 8 |
| Exh. 6 | Wood County Jail Incident Report dated 4/22/17 | 8 |
| Exh. 7 | Progress Note dated 4/28/17 | 8 |
| Exh. 8 | Wood County Jail Incident Report dated 5/6/17 | 8 |
| Exh. 9 | Transcript of Radio Communications | 8 |
| Exh. 10 | Schedules; Biweekly Time Reports | 8 |

(The originals of the above exhibits were included in the original transcript, and copies thereof were included with transcript copies, as requested. Electronic pdf files of the exhibits were also provided to counsel, as requested.)

---

**EXHIBIT 60**

OBJECTIONS

PAGE LINE
BY MR. JOHNSON .......................... 22 6
BY MR. JOHNSON .......................... 23 15
BY MS. EPSTEIN PUTNEY ................... 26 8
BY MS. EPSTEIN PUTNEY ................... 27 4
BY MR. JOHNSON .......................... 27 5
BY MR. JOHNSON .......................... 27 20
BY MS. EPSTEIN PUTNEY ................... 27 21
BY MR. JOHNSON .......................... 28 9
BY MS. EPSTEIN PUTNEY ................... 28 11
BY MR. JOHNSON .......................... 28 21
BY MS. EPSTEIN PUTNEY ................... 30 11
BY MR. JOHNSON .......................... 36 4
BY MR. JOHNSON .......................... 36 15
BY MR. JOHNSON .......................... 37 14
BY MS. EPSTEIN PUTNEY ................... 38 25
BY MR. JOHNSON .......................... 39 22
BY MR. JOHNSON .......................... 41 17
BY MR. JOHNSON .......................... 46 8
BY MS. EPSTEIN PUTNEY ................... 46 10
BY MR. JOHNSON .......................... 47 20
BY MR. JOHNSON .......................... 48 4
BY MS. EPSTEIN PUTNEY ................... 48 6
BY MR. JOHNSON .......................... 49 18
BY MR. JOHNSON .......................... 55 12
BY MR. JOHNSON .......................... 55 22
BY MR. JOHNSON .......................... 57 21
BY MR. JOHNSON .......................... 58 6
BY MR. JOHNSON .......................... 61 16
BY MS. EPSTEIN PUTNEY ................... 61 19
BY MR. KNOTT ............................ 63 25
BY MR. JOHNSON .......................... 64 2
BY MS. EPSTEIN PUTNEY ................... 65 12
BY MR. JOHNSON .......................... 66 5
BY MS. EPSTEIN PUTNEY ................... 71 24
BY MR. KNOTT ............................ 73 2
BY MS. EPSTEIN PUTNEY ................... 73 3
BY MR. KNOTT ............................ 73 15
BY MS. EPSTEIN PUTNEY ................... 73 17
BY MR. JOHNSON .......................... 74 12
BY MR. KNOTT ............................ 74 24
BY MS. EPSTEIN PUTNEY ................... 76 11
BY MS. EPSTEIN PUTNEY ................... 82 10
BY MR. JOHNSON .......................... 86 16
BY MS. EPSTEIN PUTNEY ................... 86 18
BY MR. JOHNSON .......................... 87 3

BY MS. EPSTEIN PUTNEY ................... 87 4
BY MR. JOHNSON .......................... 87 12
BY MR. JOHNSON .......................... 90 21
BY MS. EPSTEIN PUTNEY ................... 91 1
BY MR. KNOTT ............................ 91 3
BY MR. JOHNSON .......................... 91 12
BY MR. KNOTT ............................ 91 13
BY MR. JOHNSON .......................... 93 9
BY MR. JOHNSON .......................... 94 4
BY MR. JOHNSON .......................... 94 11
BY MR. JOHNSON .......................... 95 7
BY MS. EPSTEIN PUTNEY ................... 95 9
BY MR. KNOTT ............................ 95 12
BY MR. JOHNSON .......................... 95 23
BY MS. EPSTEIN PUTNEY ................... 96 14
BY MR. JOHNSON .......................... 96 21
BY MR. JOHNSON .......................... 97 10
BY MS. EPSTEIN PUTNEY ................... 97 11
BY MR. JOHNSON .......................... 101 3
BY MR. JOHNSON .......................... 102 8
BY MS. EPSTEIN PUTNEY ................... 102 11
BY MR. JOHNSON .......................... 106 24
BY MS. EPSTEIN PUTNEY ................... 107 20
BY MR. JOHNSON .......................... 108 6
BY MS. EPSTEIN PUTNEY ................... 109 4
BY MR. JOHNSON .......................... 109 6
BY MS. EPSTEIN PUTNEY ................... 110 1
BY MR. KNOTT ............................ 110 3
BY MS. EPSTEIN PUTNEY ................... 110 10
BY MR. KNOTT ............................ 110 12
BY MR. JOHNSON .......................... 110 17
BY MS. EPSTEIN PUTNEY ................... 110 19
BY MR. JOHNSON .......................... 111 1
BY MS. EPSTEIN PUTNEY ................... 111 3
BY MR. KNOTT ............................ 111 5
BY MR. KNOTT ............................ 111 24
BY MR. JOHNSON .......................... 120 18
BY MR. KNOTT ............................ 120 19
BY MR. JOHNSON .......................... 120 20
BY MR. KNOTT ............................ 127 20
BY MS. EPSTEIN PUTNEY ................... 127 22
BY MR. JOHNSON .......................... 127 23
BY MR. KNOTT ............................ 128 14
BY MS. EPSTEIN PUTNEY ................... 128 15
BY MR. JOHNSON .......................... 128 16
BY MR. JOHNSON .......................... 128 25
BY MR. JOHNSON .......................... 129 6
BY MS. EPSTEIN PUTNEY ................... 129 8
BY MR. KNOTT ............................ 129 17

BY MR. JOHNSON .......................... 129 18
BY MR. JOHNSON .......................... 130 12
BY MR. JOHNSON .......................... 131 3
BY MR. KNOTT ............................ 131 4
BY MR. JOHNSON .......................... 131 12
BY MR. JOHNSON .......................... 131 19
BY MR. JOHNSON .......................... 156 8
BY MR. JOHNSON .......................... 157 3
BY MR. JOHNSON .......................... 157 9
BY MR. JOHNSON .......................... 158 13
BY MR. JOHNSON .......................... 159 5
BY MR. KNOTT ............................ 159 7
BY MR. JOHNSON .......................... 160 4
BY MR. JOHNSON .......................... 168 7
BY MR. JOHNSON .......................... 184 21
BY MR. JOHNSON .......................... 185 10
BY MS. EPSTEIN PUTNEY ................... 185 12
BY MR. JOHNSON .......................... 186 2
BY MR. KNOTT ............................ 186 5

------------------------------

PRODUCTION REQUESTS

NONE

PROCEEDINGS

(Deposition Exhibit Nos. 1 through 10 marked for identification.)

TERRY JOHNSON, after having been first duly sworn, was examined and testified as follows:

THE WITNESS: I do.

EXAMINATION BY MR. CURRAN:

Q. Sir, could you please state your name for the record.

A. Terry Johnson.

MR. CURRAN: Let the record reflect this is the deposition of Terry Johnson taken pursuant to notice and continued to today's date by agreement of the parties. This deposition will be taken in accordance with all applicable rules.

BY MR. CURRAN:

Q. Mr. Johnson, since we are on the phone, I think it's very important, even more so than normal in a deposition, for us to try to wait for each other to be done talking before the other starts talking. Just, that way, it's -- it's easier for the court reporter to take us both down. And that way, we can both hear each other. Does that sound okay?

A. Yes.

Page 9

Q. If, at any time, you need a break, please let me know. I'll be more than happy to accommodate you. My only request is that you don't ask to take a break while a question is pending. Is that fair?
A. Yes. It is.
Q. And also, in that vein, since I'm not present in the same room as you, just as a gentlemen's agreement, I would ask that you refrain from any form of nonverbal communication with your attorney while a question is pending as that would be improper. Does that sound fair?
A. Yes.
Q. And at the same time, again, should you ever need a break to communicate with your attorney, by all means, just feel free to let me know, and I'd be more than happy to take a break. Okay?
A. Sounds good.
Q. Finally, if, for whatever reason, you don't understand a question that I ask, please just let me know, and I'll be more than happy to rephrase it. Conversely, if you answer a question, I will assume that you understood it. Is that fair?
A. Yes.
Q. Sir, did you graduate from high school?
A. Yes.

Page 10

Q. When?
A. 2008.
Q. And did you obtain any formal education beyond high school?
A. I received an associate's degree in criminal justice/corrections from Mid-State Technical College.
Q. And when did you receive that degree?
A. December of 2011.
Q. And how were you employed after you obtained your degree?
A. After my degree, I obtained employment with the Shawano County Sheriff's Office as a corrections officer.
Q. And how long were you employed as a correctional off- -- officer at that location?
A. From December of 2011 until August of 2014.
Q. And at that time, did you begin work at the Wood County Jail?
A. Yes. Then I started at Wood County.
Q. Are you currently employed by Wood County?
A. Yes, I am.
Q. And are you still a correctional officer?
A. Yes.

Page 11

Q. Do you have any other title or designation?
A. I'm now currently the field training supervisor, was promoted to sergeant within the last couple weeks, and I also am a POSC instructor and general jail instructor.
Q. How long -- I'm sorry. You may have said this. But how long have you been a field -- you said a field training supervisor?
A. That started last fall. I'm not sure about the exact date, but it was last fall.
Q. And what are your duties and responsibilities as a field training supervisor?
A. My duties and responsibilities are to help ensure that any new staff that's hired do the basic duties set forth by Wood County as a corrections officer to including booking and releasing inmates, pat-downs, cell searches, cell checks. Just -- just the basic duties that we need them to be able to do at the -- at the Wood County Sheriff's Department.
Q. You know, in looking through some of the documents that were tendered to me through the course of discovery, it looks like some correctional officers are designated as a lead correctional officer. Are you familiar with that term?

Page 12

A. Yes.
Q. What -- what is a lead correctional officer?
A. Lead correctional officer used to be the officer who would be in charge of the shift. We've since done away with leads and now have the sergeant position, but it's -- basically, the lead was in charge of the shift, and we'd make the final decision on -- if there's any major decisions to be made, they'd make the final decision from the point of contact to getting questions answered if a lieutenant was not available.
Q. And now it's the -- in effect, the sergeant who filled that role; is that correct?
A. Correct.
Q. Do you remember approximately when the switch was made from the term "lead correctional officer" to the sergeant?
A. I know we just -- the last two sergeants became active May 5th. And then they had -- maybe for a couple weeks before that, they had sergeants in place. So it's a relatively new switch.
Q. Were you ever a lead correctional officer prior to becoming a sergeant?
A. No, I was not.

Q. Is that something you have to apply for, or is it, you know -- your supervisor just elevates you to that rank? How does that work?
A. For the lead position or the sergeant position?
Q. Let's go with the lead position first.
A. For the lead position, it was -- I believe that was something that was appointed by the supervisor. It was appointed.
Q. And so that's not something you necessarily apply for. It's just -- someone would appoint you?
A. Yep. It was appointed. And a lot of times, it was based off of seniority.
Q. Now, what about becoming a sergeant? Is that a position you had to apply for?
A. Yes. A sergeant position was an applied position.
Q. And then do you know who made the final determination whether or not to elevate you to the rank of sergeant?
A. The final -- it was based off of a written test, an outside panel interview, an inside panel interview. And then after the inside panel interview, they made their final decisions. And it was the jail administration and the sheriff.

Q. So that would be -- Captain Ashbeck would be the current captain at the jail; is that correct?
A. Correct.
Q. And then who is the current sheriff?
A. Shawn Becker.
Q. Now, you received specialized training to become a correctional officer; is that correct?
A. Correct.
Q. Just generally describe for me the training that you received before becoming a correctional officer.
A. My training was -- coincided with my associate's degree. So it was extended over the two years during my associate's degree program. But in that, you learn professional communication skills, CPR, First Aid, principles of subject control, how to search an individual, how to search a cell block, basic -- I think I said basic First Aid. You learn the basics of what -- how a jail is laid out and how the court system works. That's the gist of what the specialized training consists of. I believe now it's up to 200 hours in the state. When I went through, it was 170 hours, 160.
Q. And did you obtain all of that training before becoming employ- -- employed by -- you -- you

said it was Shawano County --
A. Correct.
Q. -- Sheriff's Office?
A. Correct. I received my basic jail certification prior to being hired by Shawano.
Q. And that -- again, that was all through your education that was involved in obtaining your associate's degree; is that correct?
A. Correct. That was all done through Mid-State Technical College.
Q. I noticed that at some point you received training from the National Alliance on Mental Illness before your employment with Wood County; is that correct?
A. Correct.
Q. And what did your training consist of in that regard?
A. To my recollection, the NAMI training involved how to communicate with someone who is in crisis was the main focus of it. So instead of just assuming that they're being aggressive or agitated towards somebody, being able to talk to them and calm them down without having to use physical force was the main focus of the training, if I recall.
Q. Do you recall approximately when you

received that training?
A. I do not recall.
Q. Do you think it was before or after you became a correctional officer?
A. It was during my employment with Shawano County.
Q. Was that something that Shawano County paid for you to do, or did you go out and seek that training on your own?
A. That was paid for by the sheriff's department.
Q. Do you recall how long that training lasted?
A. I want to say it was five days or three days. Three or five days.
Q. And do you recall where you attended that training?
A. Fox Valley Technical College.
Q. Did that training involve the identification of potentially suicidal inmates?
A. Not to my recollection. Again, it was just noticing when someone was in crisis and being able to talk to them and get through to them what they were responding.
Q. Did you receive any certification as a

Page 17

result of that training?
A. Not that I can remember.
Q. Do you have any sort of documentation reflecting your attendance at that course?
A. I believe there was a certificate of completion that was handed out. I don't know if I have that still or if the Shawano County Sheriff's Office would have that.
Q. And is that the only time you've received training through NAMI?
A. Yes.
Q. Do you recall sending a cover letter along with your application for employment at Wood County?
A. Yes.
Q. Do you remember mentioning in the letter that you had attended NAMI training?
A. Not off the top of my head, no.
MR. CURRAN: Monica, could we go ahead and show him Exhibit 1.
THE COURT REPORTER: He's got it.
MS. EPSTEIN PUTNEY: And, Nick, this is Patti. If you could, identify what pages from the Wood County records you're showing him since there are not extra copies here.

Page 18

MR. CURRAN: Sure. I can do that.
MS. EPSTEIN PUTNEY: Thanks.
BY MR. CURRAN:
Q. Sir, you've been handed Exhibit 1, which, for the record, is Bates-stamped Wood County 1115. Do you recognize that exhibit?
A. Yes, sir.
Q. And is that your signature at the bottom of that exhibit?
A. Yes, sir.
Q. What is this exhibit?
A. It's my cover letter to gain initial employment to Wood County.
Q. And to the best of your knowledge, absent the redactions on that letter, is that a true and correct copy of the letter you sent along with your application for employment?
A. Yes.
Q. So I see in there that - I think it's maybe the third full paragraph - you mention your NAMI training; is that correct?
A. Yes, I do see that.
Q. And I take it you referenced your NAMI training because it relates -- or related at the time to your employment as a correctional officer; is that

Page 19

correct?
A. Yes.
Q. So how is it your NAMI training relates to your duties as a correctional officer?
A. We -- as a corrections officer, we do deal with people who are in crisis and are sometimes hard to communicate with. So having that extra training at that time being up to date, it was a bonus to be able to communicate with someone who may be going through something more than just wanting to be difficult.
Q. What do you mean by that?
A. I mean, working as a corrections officer, we -- we deal with people who come in. They just don't like us to begin with and don't want to talk with us, which sometimes results with us - getting them to do what we want to do - having to use physical force where, having the NAMI training, to avoid that physical force option and being able to communicate with them and get through whatever they're going through at that time to get our objective met, it was a -- it was a bonus to have that.
Q. Was your NAMI training related at all to intervening in the crisis?

Page 20

A. What do you mean by "intervening in the crisis"?
Q. Sure. So I'm just trying to distinguish between whether your NAMI training was aimed at just achieving your objectives as a correctional officer versus actually trying to help the inmate through the crisis. Does that make sense?
A. Our training was to help gain our objective of being able to communicate to them. It was nothing to do with trying to counsel them or bring them through the crisis. It was to -- hopefully -- hopefully, by talking to us, they would calm down a little bit. But it was nothing to do with trying to intervene and make them -- or unders- -- I -- I -- I guess it was nothing to do with trying to intervene in any way and know exactly what was going on with the crisis. It was to help them just to kind of calm down, if we can get communication going so someone could come in and talk to them, who would --
Q. Okay. That's fair. Is it fair to say that, through the course of working at the county jail, you work with many inmates with mental illness?
A. That's fair.
Q. Can you give me an example of some of the kinds of mental health issues you deal with as a

correctional officer?
A. Drug addiction, schizophrenia. There -- I guess there will be -- be depression and stuff. It runs the gamut, really, of mental illness in the jails nowadays so...
Q. Would that include things like bipolar?
A. Yes.
Q. Do you encounter inmates who struggle with anxiety issues?
A. Correct, yes.
Q. And I think you mentioned schizophrenia. So various forms of psychosis; is that fair?
A. Yes.
Q. Describe for me what kind of training you've received in how to manage inmates with mental illness.
A. I -- the NAMI training was one of them.
Other trainings, I can't recall what the titles of them would be or what it would be, but almost kind of the same thing. Just basically trying to be able to break through to that person and communicate with them and then referring them off to our medical and mental health services.
Q. Would you agree with me that one of the things you're trained to do is recognize when an

inmate might be at risk of attempting suicide?
A. Yes.
Q. And you were trained that jail inmates are at a much greater risk of attempting suicide than the general population; correct?
MR. JOHNSON: Objec- -- objection. Form. Foundation.
Go ahead, Officer.
THE WITNESS: I would say that it's not -- we're not trained that jail inmates are at a greater risk. That's not something that's told all the time that, yeah, they're at greater risk. It's expected - you're dealing with a smaller population; you're basically a city within a city - that you're going to have inmates who are suicidal at that time.
BY MR. CURRAN:
Q. Sir, did you receive training in how to identify inmates who might be at risk of suicide in connection with your employment at Wood County?
A. Yes.
Q. And did part of that training consist of -- I think it's a video; is that correct?
A. Yes.
Q. And I think, if -- if memory serves, the

instructor in that video is -- it might be Dr. Caldwell (phonetic). I could be wrong on the name. Does that sound familiar?
A. It does sound familiar.
Q. Okay. Do you recall her stating in that video that jail inmates are four times more likely to attempt suicide than a person in the general population?
A. I do not recall from the video, but I would assume it's in there.
Q. Okay. Do you have any reason to dispute with my statement that jail inmates are as much as four times more likely to attempt suicide than people in the general population?
MR. JOHNSON: Same objections.
Go ahead.
THE WITNESS: No, I do not.
BY MR. CURRAN:
Q. Were you trained that there are certain risk factors that put an inmate at greater risk of attempting suicide?
A. Yes.
Q. And what are some of those risk factors?
A. Age, severity of the crime, mental health status, if it's closer to their -- an anniversary of

some sort or holiday.
Q. What about a person's age makes them more susceptible to attempting suicide?
A. With the age, it would be -- if it's -- they're young, if it's their first time ever being in jail.
If they're older, it's the fact that they might think they're losing the rest of their lives in what's going on in it. It makes them see that they, you know -- there's no future for them.
Q. And what about the severity of the crime relates to a suicide risk?
A. Coming on rape charges or something after they sexually assaulted somebody, that's much more severe than coming on a disorderly conduct because they were yelling and screaming outside. So people realize, you know, the severity of what they did. It kind of goes along the same thing where, all of a sudden, they don't know what's going to happen to the rest of their lives.
Q. So you're saying the more severe the crime is, that could potentially make someone more at risk of committing suicide; is that fair?
A. Yes. That's fair.
Q. You indicated mental health status. What do

you mean by that?
A. If they have previous -- I guess previous mental health issues that they let us know at during booking. So if they're coming in through the booking process, during our screening process, and they let us know that they've had previous bouts of depression or currently depressed or previous suicide attempts, those are all some red flags that we look for to help further assess their suicidal status, I guess, or potential.
Q. What about a prior history of psychiatric hospitalizations? Is that something you're trained is a risk factor?
A. Yes. We do ask about that and take that into consideration.
Q. A history of anxiety?
A. Yep.
Q. Prior acts of self-harm? I think that somewhat falls under the same umbrella as suicide attempts. But acts of self-harm would also increase the risk of suicide; is that correct?
A. Yes.
Q. So, for example, if -- if someone comes in and they have a history of cutting themselves on the wrists or forearms, that would be a red flag for a

suicide risk; is that correct?
A. It could be poss- -- yes.
Q. Feelings of hopelessness? Is that a risk factor for suicide?
A. Yes.
Q. Frequent bouts of crying? Is that an indicator of potential suicide risk?
MS. EPSTEIN PUTNEY: I'll object -- I'll object as overbroad.
But you can answer.
THE WITNESS: Frequent bouts -- I -- for suicide risk, you said?
MR. CURRAN: Yes.
THE WITNESS: I would say that would involve me asking further questions to see why they have the bouts of crying.
MR. CURRAN: That's fair.
BY MR. CURRAN:
Q. Have you been trained that prolonged physical illness can increase a person's risk of suicide?
A. What's a prolonged typical illness?
Q. Physical illness.
A. Would that be, like, a cancer or something like that?

Q. Any kind of physical ailment that's chronic. Have you been trained that can make a person more susceptible to committing suicide?
MS. EPSTEIN PUTNEY: Same objection.
MR. JOHNSON: I'll join. Vague.
Go ahead, Officer.
THE WITNESS: I would say that's not something that I was trained on. I mean, I guess I would look at, like, if they had cancer or something, it might be something. But if it was just a prolonged -- they had a flu for a month, I wouldn't --
MR. CURRAN: That's fair.
BY MR. CURRAN:
Q. Have you been trained that barriers to accessing mental health treatment can increase a person's risk of suicide?
A. I have not been trained that, no.
Q. Does that sound reasonable to you?
MR. JOHNSON: Objection. Vague.
MS. EPSTEIN PUTNEY: Object.
MR. JOHNSON: Foundation.
Go ahead.
MS. EPSTEIN PUTNEY: Join.
THE WITNESS: I would say the acc- --

not having access I don't think would be something that would make them more suicidal.
BY MR. CURRAN:
Q. So I just want to be clear. You don't think that a person's inability to access mental health treatment could increase their risk of suicide?
A. Increase their risk of suicide?
Q. Correct.
MR. JOHNSON: Same objections.
Go ahead, Officer.
MS. EPSTEIN PUTNEY: I'll object as overbroad as well.
THE WITNESS: I would say, yes, that would increase their risk of suicide but wouldn't make them more suicidal.
BY MR. CURRAN:
Q. What about wide mood swings, going from extremely happy to extremely sad in a short amount of time? Is that something you're trained to look for in terms of an increased risk of suicide?
MR. JOHNSON: Same objections.
Go ahead.
THE WITNESS: That is one of the -- one of the things that, yeah, we can look for for suicide.

BY MR. CURRAN:

Q. Suppose that you believe an inmate is an imminent suicide risk. As a correctional officer, how are you supposed to respond in that situation?

A. If they're an imminent suicide risk, we complete our booking process or fin- -- finish talking with them.

And then we place them on a 15-minute suicide watch, which involves placing them in a suicide smock and taking all their undergarments and uniform.

We provide them with an orange flexi rubber cup so they can receive water. And depending if they were using the toilet paper in a negative way, we provide them with a toilet paper roll or toilet paper upon request. And then we begin 15-minute checks on them.

And then complete an incident report and request for eval report and a special watch form. And we submit those and email them off to our Crisis Watch group, which includes jail administration, the nurse, our qualified mental health professional who's on staff now, and the -- the crisis team in -- at Wood County.

Q. If you believe that an inmate is at risk of

attempting suicide, are you trained to ask if -- ask them if they're having thoughts of harming themselves?

A. Yes.

Q. Do you know why that is?

A. You want to verify and validate that they're actually suicidal.

Q. And if the inmate says, no, they're not thinking about harming themselves, what do you do then?

MS. EPSTEIN PUTNEY: Object as overbroad.

THE WITNESS: If the inmate says no, I said, that's -- that -- then we fall back on our training experience and our instincts and kind of go with our gut on stuff.

If we feel that, yeah, there's still a suicide risk or they're not being forthcoming and a hundred -- a hundred percent honest, we'll continue with the suicide protocol.

And if we feel that they're being forthcoming and honest with us, after we go through the questions with them, we return them to general pop- -- return them to general population.

BY MR. CURRAN:

Q. And when you say you fall back on your training and experience and instincts, can you be a little bit more specific what you mean by that?

A. It would be reverting back to previous experiences. Working in corrections, a big part of it is kind of going with what your gut tells you.

So, at times, people come in, and they say -- answer no to every single question when it comes to being suicidal or anything, but something still just feels kind of off, so then we put them on a -- maybe not a suicide watch. Put them on a mental health watch.

And then other times where people come in and they answer no to everything and everything feels normal and okay and we have no reason to believe that they're suicidal going off of our gut, and they never answered that they were -- even though we may have experienced or seen something that -- a mood swing or whatever else, something that -- something that would usually be a red flag and help us determine that, we may have seen that, but our gut and everything else, everything feels okay and normal, and they -- we have no reason to believe they're going to try to hurt or harm themselves.

Q. Do you have an independent recollection of

Amanda Glodowski?

A. What do you mean by "independent recollection"?

Q. Sure. Without looking at any documents, do you remember interacting with her, speaking with her, that kind of thing?

A. Interacting and speaking with her -- not really beyond my reports. Yeah. That's about -- yeah.

Q. Okay. Well, I'll -- I'll ask you some other questions. Then we'll see, you know, just kind of what your -- your memory might be. I'm just trying to figure out, you know, how much you might remember versus how much you just sort of can reconstruct based from your incident reports.

So I think the answer to this is obvious, but you never interacted with Amanda outside of the Wood County Jail; is that correct?

A. Correct.

Q. Now, my understanding is that Amanda had been incarcerated at the Wood County Jail prior to the incarceration that ended with her suicide. Is -- is that consistent with your understanding?

A. Yes.

Q. Do you have any memory of her being an

inmate at the jail before April of 2017?
A. Yes. I know she was.
Q. And again, focusing on those prior incarcerations, do you remember having any interactions with her?
A. I'm sure there were interactions daily with her, but nothing that's standing out in my mind.
Q. Do you recall being present when Amanda reported to Correctional Officer Laura Grode that she tried to cut herself with a partial denture? Does that sound familiar?
A. It's not ringing a bell to me right now.
MR. CURRAN: Monica, could we go ahead and show the witness Exhibit 2?
And for the record, that is Wood County 138.
BY MR. CURRAN:
Q. Sir, could you go ahead and review that exhibit?
A. Yes.
Q. Okay. What is Exhibit 2?
A. It's a Wood County Jail incident report.
Q. And it looks like it was filled out by Correctional Officer Laura Grode; is that correct?
A. Correct.

Q. And I take it you've worked with Officer Grode for a number of years; is that fair?
A. Yes.
Q. Are you familiar with her signature?
A. Yes.
Q. Does that appear to be her signature at the bottom of the report?
A. Yes, it does.
Q. Have you had a chance to read the incident report?
A. I have skimmed over it. I haven't read --
Do you want me to read the whole thing?
MR. JOHNSON: Take as much time as you need to look through it.
MR. KNOTT: What's the page number again?
MR. JOHNSON: 138.
THE WITNESS: Okay.
BY MR. CURRAN:
Q. And does reading that report refresh your recollection at all as to this incident?
A. It -- it's -- I was there, but I don't have a vivid memory of it.
Q. Do you have any basis to dispute the fact that you were present on February 13th, 2016, at

approximately 2145?
What time is that, I guess? Can you figure that out for me?
A. 9:45.
Q. 9:45? Okay.
A. At night.
Q. Do you have any basis to dispute that on that date and at that time, Amanda asked you to talk to CO Miller or CO --
Is that Habeck?
A. Habeck.
Q. Habeck, H-A-B-E-C-K --
A. Yes.
Q. -- correct?
A. Yes.
Q. And when you asked Amanda why, Amanda wouldn't tell you? Do you have any reason to dispute that?
A. No.
Q. Okay. Do you have any basis to dispute that Laura Grode went into Holding Cell 4 and asked Amanda what she wanted, and Amanda started crying? Do you have any basis to dispute that?
A. Not according to the report.
Q. Okay. And do you have any reason to dispute

that Amanda said she couldn't get her denture partial to cut her arm deep enough, so she broke it in half and swallowed it?
MR. JOHNSON: Objection. Form.
THE WITNESS: That's what the report states, yes.
BY MR. CURRAN:
Q. Okay. And you agree that, in this report, Laura Grode documented that she observed one large superficial scrape and a couple of small scrapes to her left wrist, that it started to bleed?
A. Yes.
Q. And again, you don't have any basis to dispute that; correct?
MR. JOHNSON: Objection. Form.
Go ahead.
THE WITNESS: No, I do not.
BY MR. CURRAN:
Q. Moving down, Laura Grode states in her report that, "CO Terry Johnson stood outside Holding 3 and kept an eye on Inmate Glodowski and took her vitals as I called our jail doctor, Dr. Butler." Do you see that?
A. Yes, I do.
Q. Do you have any basis to dispute what Laura

Grode indicates in the -- the report regarding you keeping an eye on Amanda and taking her vitals?
A. No, I do not.
Q. So Laura Grode reports later on in this incident report that she went to the emergency room with Amanda, and x-rays were done of her entire abdominal area, and they couldn't find anything. Do you agree that that's what the report reflects?
A. Yes.
Q. And then apparently Laura Grode reported this to Amanda, and Amanda told her it was just lodged right in the back of her throat; is that correct?
MR. JOHNSON: Objection. Form.
THE WITNESS: Yes. That's what the report states.
BY MR. CURRAN:
Q. And then the report also indicates that the doctor came in and was able to remove the denture partial with a pair of forceps; is that correct?
A. Yes. That's what the report states.
Q. To your knowledge, did you write up an incident report concerning this incident?
A. No, I do not believe I did.
Q. Do you know why you wouldn't have?

A. I -- I was not the main contact officer. I was -- once I was asked to talk -- or once she asked me to ask another officer to come over.
Q. Is it always only the main contact officer who does an incident report?
A. Not always. It would depend on the incident and what the other officers put in their report.
Q. What do you mean it would depend on the incident?
A. It would depend on the -- if it was with an inmate being sent to the ER, it was usually whoever took the report and did the majority of the investigating as to why they had to go to the ER would do the incident report. If there -- someone was standing by to assist with that officer, they -- they usually would not do an incident report as the main officer would include their actions in their incident report.
Q. Does whether or not you, as a correctional officer, write up an incident report depend on the severity of the situation?
A. Yes.
Q. Did you -- in reading this report, do you foresee this to have been a serious situation?
MS. EPSTEIN PUTNEY: Object to form.

THE WITNESS: With my involvement in it, it -- I -- my involvement, I did not see it as a serious situation with my involvement.
BY MR. CURRAN:
Q. You would agree with me that communication between correctional officers is important; true?
A. Yes.
Q. That's part of the training you receive; correct?
A. Yes.
Q. And part of the reason that communication between correctional officers is important is to maintain the safety of inmates in your custody; is that correct?
A. Yes.
Q. So would Laura Grode have told you that -- and it's -- strike that.
You would agree with me that, based on the incident report, it's not clear if you were standing there as Laura Grode was speaking to her; correct?
MR. JOHNSON: Objection. Form.
Go ahead, Officer.
THE WITNESS: Correct.
BY MR. CURRAN:

Q. But do you think that, in a situation like this, Laura would have told you what happened?
A. Yes.
Q. So it says at the end of this incident report that Amanda was placed in Holding Cell 5 so she could be better monitored. What is Holding Cell 5?
A. Holding Cell 5 is our suicide watch cell. It's got a bar-gated front and now has a video monitor in it. I'm not sure if there's a video camera in there at -- when this incident occurred. And it's open in the front besides the bars, and so it's easier to see in there and complete 15-minute checks.
Q. There are other holding cells; is that correct?
A. Correct. They -- we have six total.
Q. Are the holding cells all located next to each other?
A. Yes.
Q. In terms of the bar-gated front, just sort of the -- the way the cell looks like, do the other holding cells look like Holding Cell 5?
A. They all look like Holding Cell 5 minus having the bars on the gate -- or on the door.

Q. So instead of having bars that -- it's a solid door with a window?
A. Solid door with a viewing port and a food trap.
Q. Could you describe the physical layout of the jail for me just a little bit? So one question I have is, there's a booking area; correct?
A. Correct.
Q. Where are the holding cells in relation to the booking area?
A. The holding cells are right up in the booking area in a straight linear line down the hallway. There's a hallway that runs north and south in the jail. And the holding cells are closest to the booking area as possible, 1 through 6.
Q. And what does the booking area look like?
MR. JOHNSON: Objection. Vague.
Go ahead.
THE WITNESS: It's a -- there's a secured entrance, 3 and 4. That comes from the sally port.
You walk into the hallway that runs north and south. And there's one -- a short hallway that runs east.
At the corner of the north hallway in

the -- hallway that runs east, it's a square countertop with a computer and an opening on one end of the counter that goes back into a mudroom area.
On the wall behind -- or, I guess, in the front of the booking is where the holding cells are: 1, 2, 3, 4, 5, and 6, with 1, 2, and 3 being towards the north end of the facility; 4, 5, and 6 being down the south side of the hallway going from the division of the east/west hallway.
There's a Door Control bubble that's secured with windows all around it. And that's where all our video monitoring equipment is.
And as you go down that east hallway, you run into two conference rooms, two offices, and then the visiting booths.
And if you go down the south hallway, it ends up being the south end of the jail and the Huber section.
BY MR. CURRAN:
Q. This is kind of a funny question, but it -- it's because I've been watching some video of this incident. And there's some video that shows, like, a map with footprints on it almost. That's kind of what they look like in the video, at least. And that mat is positioned in front of sort of a counter, and

then there's a computer behind the counter. Does that sound like the booking area?
A. No. The only thing we have behind the booking counter area would be a -- it's a big map of the jail, and it's got a bunch of name tags on it that shows where inmates are housed. That may be down by the short hallway down on the north end, which would have X, Y, Z. There's a map there that's got our fire escape plans.
Q. Okay. So that's different from the booking area, what you just described?
A. Yes. It's just a -- just right after Holding Cell 1, so not far -- not far from booking, though.
Q. Okay. This is jumping ahead a little bit, but my understanding is that prior to Amanda's suicide, you escorted her to a conference room. Does that sound correct?
A. I did not escort her to a conference room.
Q. Okay. Some other correctional officers escorted her to the conference room; is that fair?
A. Yes.
Q. Would they, to your knowledge, have walked by the booking area to get to that conference room?
A. Yes.

Q. Have you ever encountered a situation during your time at the jail where you had multiple inmates on suicide watch at the same time?
A. Yes.
Q. And in that situation, what do you do? Do you put them each in a different holding cell?
A. Yes.
Q. What -- for what other reasons would the other holding cells be used?
A. Besides for suicide watches, they'd be used for intoxicated persons or aggressive and uncooperative individuals or if they were being placed on a medical watch.
Q. Going back to this situation where Amanda swallowed her partial denture, do you recall, after reviewing that incident report, that she was on suicide watch at that time?
A. According to the report, it said she lifted her smock. So I would assume she was on suicide watch.
MR. CURRAN: Monica, could we go ahead and show him Exhibit 3?
And, for the record, this is Wood County 400.
BY MR. CURRAN:

Page 45

Q. Sir, have you had a chance to look at Exhibit 3?
A. Yes.
Q. And Exhibit 3 indicates that it's a special watch form; is that correct?
A. Yes.
Q. And are you familiar with special watch forms?
A. Yes.
Q. What is a special watch form used for?
A. That's used to document if we're placing someone on a mental health watch, suicide watch, medical watch, or other watch, some other reason for putting them on a watch.
Q. So in reviewing this form, it appears to me that it pertains to Amanda J. Glodowski; is that correct?
A. Correct.
Q. And under "Name and Badge Number of Officer Initiating Watch," it states "AM 718" --
A. Yes.
Q. -- correct?
A. Yes.
Q. Is that -- is that Correctional Officer Amanda Miller?

Page 46

A. Yes.
Q. And she no longer works at the Wood County Jail; correct?
A. Correct.
Q. And the form indicates that Amanda was placed on suicide watch because she stated that she was suicidal. Do you agree with that?
MR. JOHNSON: Objection. Form. Go ahead.
MS. EPSTEIN PUTNEY: And foundation.
THE WITNESS: Yes. I agree with that.
BY MR. CURRAN:
Q. And I guess the time indicates 1815, which would be 6:15 p.m.; is that correct?
A. Yes.
Q. And does that time approximate when Amanda would have been placed in a holding cell?
A. That time would have -- say when we put them on a watch and placed them in a holding cell.
Q. Is someone placed in a holding cell every time they're placed on suicide watch?
A. Yes.
Q. What's the difference between a suicide watch and a mental health watch?

Page 47

A. Suicide watch we usually do if they were actively suicidal or actively had thoughts of hurting or harming themselves.
A mental health watch, we put them on that if, after screening with them or talking with them, we felt that they just needed to have a closer eye placed on them. We weren't -- weren't comfortable putting them on a full suicide watch, but we weren't comfortable putting -- placing them back in general population. We place them on a mental health watch so they could get someone to talk to.
Q. When you say "get someone to talk to," what do you mean by that?
A. At the time of this, it would be our crisis -- the crisis intervention team.
Q. If an in- -- inmate indicates that they're having thoughts of suicide and they feel like they have no hope, is that a situation where an inmate should be placed on a suicide watch?
MR. JOHNSON: Objection. Form. Go ahead.
THE WITNESS: Yes. I would agree so.
BY MR. CURRAN:
Q. Okay. What if you take that same inmate and they're -- they're saying they're having suicidal

Page 48

thoughts and they feel like they have no hope, but they also say that they don't want to hurt themselves? What would you do in that situation?
MR. JOHNSON: Objection. Form. Go ahead.
MS. EPSTEIN PUTNEY: Object as overbroad and speculative.
THE WITNESS: In that instance, I'd probably put them on a mental health watch.
BY MR. CURRAN:
Q. Okay. How were you, as a correctional officer, trained to distinguish between an inmate who should go on a suicide watch versus one that should go on a mental health watch?
A. We're trained to go over the screening questions and ask if they're suicidal, if they have a plan, if they have means, and then to go with our experience and what the totality of the circumstances would be.
Q. When you say "go over screening questions," do you mean that there are certain questions that you are trained to ask?
A. It would --
Q. I'm sorry.
A. Yeah, yeah.

Q. Could you state --

A. Yeah. Trained -- trained to ask would just be, like -- almost just like our screening questions at booking, which would be, are you having thoughts of hurting yourself, harming yourself; do you have a plan on how to commit suicide? And then, depending on their answers there, you can ask follow-up questions if you're comfortable asking follow-up questions just to further direct us in one way or the other.

But we're -- we're still not -- we're not trained to make the diagnosis on it. We're just trained to kind of hopefully catch the red flags on it.

Q. So in other words, you're trained to find out the information you need to make a decision; is that fair?

MR. JOHNSON: Objection. Form. Go ahead.

THE WITNESS: We're trained to collect information to formulate an opinion.

BY MR. CURRAN:

Q. Who can take an inmate off of a mental health watch?

A. A mental health professional.

Off a mental health watch, you said?

Q. Yes.

A. I'm sorry. A mental health watch? I believe nursing staff can take care of a mental health watch, if need be.

Q. Can a correctional officer take an inmate off of a mental health watch on their own?

A. No.

Q. So going back to this Exhibit 3, this special watch form, there's a section that says, "Name of Mental Health Provider Contacted." Do you see that?

A. Yep.

Q. And it states, "Crisis Watch."

A. Yes.

Q. What -- what is Crisis Watch?

A. Crisis Watch is our -- our group email that sends off to our crisis and mental health providers so they get the reports and know they have to come see someone and talk to them.

Q. So you're saying that an email is sent?

A. Yes.

MR. JOHNSON: Nick, are you asking about today, or are you asking about in 2016, which is the date of the exhibit?

MR. CURRAN: That -- that's a fair distinction.

BY MR. CURRAN:

Q. So what you just described to me, Officer Johnson, is -- is, I take it, how it's done now; is that correct?

A. No. That's how 2016 was, looking at the --

Q. Okay.

A. -- special watch form.

Q. So back in 2016, at the time that this special watch form was filled out, there would have been a group email that was sent out with the special watch form attached; is that fair?

A. Correct.

Q. And to whom was that email sent again?

A. It was sent to the -- I believe it was the crisis team and jail administration, and I think the nurse was included in that too.

Q. Who's part of the crisis team?

A. Members of crisis, I think it's the -- the Department of Human Services.

Q. Would there be, like, a main point of contact at the Department of Human Services?

A. I've -- I've worked nights my entire career at Wood County, so I'm not sure who the main point of

contact is during the daytime, who they would talk to.

Q. Do you recall the -- the email address of the crisis team?

A. It was the Crisis Watch.

Q. Yeah. But what I -- what I'm asking is, do you know the email address that would have been sent?

A. That's -- that's -- that's what we'd send it to. We'd type in "Crisis Watch" in our thing, and it was a big group thing. And it would just send off to all the emails included -- or all the email addresses inside that group.

MR. JOHNSON: So you don't know of the exact domain or anything like that?

THE WITNESS: No.

MR. JOHNSON: I think that's what he's asking --

THE WITNESS: No.

MR. JOHNSON: -- you.

THE WITNESS: I don't know the exact domain of it, no.

BY MR. CURRAN:

Q. So you're saying that somewhere there should be an email, if it was preserved - I don't know if it

was preserved - but there should be an email reflecting that this special watch form was sent to the crisis team and various other email addresses; is that correct?

A. Correct.

Q. What happens after Crisis Watch is contacted?

A. Are we still back in 2016?

Q. Yes.

A. Okay. I believe they had hours that they come in on Tuesdays and -- or Fridays, and they'd come in and meet with whoever was needed to be seen and was -- had emails sent on them. And then they would -- that was during the daytime again. And then they would make the determination to continue suicide watch or clear them from a watch.

Q. So somebody from Crisis Watch would physically come to the jail; is that correct?

A. Yes.

Q. Is it documented anywhere in the inmate's file when someone from Crisis Watch actually responds and -- and speaks with the inmate?

A. I'm not sure. I believe they usually filled -- I'm sorry. I -- I -- I believe they usually filled out the special watch form with what

it's filled out on, and then they put their recommendations on it, and they would sign off on it. So there should be a copy, I would think, somewhere of it as this one has the discontinued watch on it. Because they have to say if they're going to continue the 15-minute checks/watches for a follow-up session or discontinue or other. And they would put their comments in there.

Q. Well, let -- let me ask you about this. So there's -- there's a section of this form, "Time MH Provider Responded." And then in parens, it says, "by telephone." Do you see that?

A. Yes.

Q. And "MH Provider," I would assume, refers to mental health provider; is that correct?

A. Yes.

Q. And then there's a section next to that, "Time Mental Health Provider Arrived at Jail." Do you see that?

A. Yes.

Q. Okay. So -- and then if we look at the bottom of this form, it -- it appears that there was a mental health provider who dis- -- discontinued the watch; correct?

A. Yes.

Q. And that would have been somebody named Katie -- C-Z-Y-S. How do you pronounce her name?

A. I believe it's Katie Czys.

Q. And it looks like she signed this form on February 16th, 2016, at 8:26 a.m., I would guess; is that correct?

A. Yes.

Q. So reading this form, to me, it looks like she must have seen Amanda at some point on February 16th, 2016. At least that's what I'm assuming. Tell me if I'm wrong there.

MR. JOHNSON: Objection. Form.

Go ahead.

THE WITNESS: Yep. That would be a safe assumption.

BY MR. CURRAN:

Q. Now, the fact that the section of the form that says, "Time Mental Health Provider Responded by Telephone" is blank, should I take that to mean that the mental health provider did not respond by telephone?

MR. JOHNSON: Objection. Form. Foundation.

Go ahead.

THE WITNESS: I would say yes.

BY MR. CURRAN:

Q. And then what -- here's what I'm trying to get at. Who was supposed to fill out that section of the form?

A. From what I'm aware of, working nights, I said, if the crisis person did contact us after we sent the email out, after they were home or whatever, we would fill out that they called us at this time and -- but if they didn't call us by the telephone or --

And then if they -- and then if they show up during the daytime, it's my assumption that they fill out -- the mental health provider fills out that they showed out -- showed up at the jail at that time.

So it -- like, during the daytime, I said, Crisis sometimes would call in when you've got a crisis email, and then you'd write down what time it was.

But on nights, I said, we very rarely ever got a phone call from Crisis or anybody after sending out an email.

Q. There's a section of the form for "Supervisor Contacted." Do you see that?

A. Yep.

Q. To what does that refer?
A. That refers to contacting a jail lieutenant or jail administrator, whether it be an email or by telephone or in person.
Q. And are you supposed to contact a supervisor when you put an inmate on special watch?
A. We're supposed to notify them one -- in one of those three ways.
Q. And I'm sorry. What are -- what are those three ways again?
A. In person, by phone, or via email.
Q. And that is a section of the form that should be filled out by the person who put the inmate on special watch; is that correct?
A. Correct.
Q. And you may not know, but I take it the reason you have these spots on the form is to make sure that protocol is being followed in terms of what's supposed to be done when an inmate is placed on a special watch; is that correct?
MR. JOHNSON: Objection. Foundation.
Go ahead.
THE WITNESS: Yeah. Making sure the email was sent or people were contacted that needed to be contacted.

BY MR. CURRAN:
Q. Now, the fact that it doesn't -- the form doesn't indicate that a supervisor was contacted, from that, should I assume that a supervisor was not contacted?
MR. JOHNSON: Objection. Form and foundation.
Go ahead.
THE WITNESS: I would say it was a -- probably just a miss -- not typing in email part underneath the supervisor contacted part.
BY MR. CURRAN:
Q. And again, if -- if we had a copy of the email, that would verify who was notified and when; correct?
A. Yes.
Q. Now, if Katie Czys -- and I apologize if I mispronounce her name. But if -- if she had responded to the jail to speak with Amanda at some point prior to February 16th, 2016, would that be documented somewhere?
A. It should be.
Q. And where should it be documented?
A. Either in, like, the inmate's scheduled visitations area of the scheduling tab or on a

special watch form like this.
Q. And do you know what it is Crisis Watch does when they respond to the jail to speak with the inmate?
A. I do not. I was not around for any of that.
Q. I mean, but do they perform some kind of assessment, to your knowledge?
A. To my knowledge, yes, I -- I believe they do. They -- I believe they meet with them in the conference room or meet with them at their holding cell.
Q. And is the assessment somehow documented?
A. I would assume Crisis documents it somewhere.
Q. And just to be clear, I'm distinguishing between the fact that an assessment occurred versus the assessment itself. Does that make sense?
A. Yes.
Q. So, for example, if you look at the special watch form, you could at least arguably infer from it that some sort of assessment took place perhaps on February 16th, 2016; correct?
A. Correct.
Q. But I'm talking about the actual assessment,

like, what occurred during the assessment. So that's what I'm trying to get at. Is it your understanding or your assumption that that would be documented somewhere?
A. Yes. It's my assumption it would be documented somewhere.
Q. So once an inmate has been taken off of suicide watch, as a correctional officer, does that affect how you do your job with respect to that inmate?
A. Not fully understanding the question.
Q. Sure. So if you have an inmate who's been placed on suicide watch, that's information that's disseminated to all the correctional officers; is that correct?
A. Yes.
Q. So if you show up and somebody is in --
Holding Cell 5 is the suicide cell; correct?
A. Yes. That's -- would be one of our main ones we use, yes.
Q. Okay. So if you -- if you show up to work and you see an inmate in Holding Cell 5, you know that they've -- or you would -- would that prompt you to ask, hey, why is that person in Holding Cell 5?

Page 61

A. Yes.
Q. And then, at that time, would you somehow obtain information as to why they're in Holding Cell 5?
A. Yes.
Q. So the point I'm trying to make is, if an inmate is placed on suicide watch and you work at the jail while they're on suicide watch, you know that they're on a suicide watch; is that fair?
A. Yes.
Q. So then after they're removed from a suicide watch and they show signs of some sort of mental instability, does the fact that they were previously on a suicide watch impact how you address that concern?
MR. JOHNSON: Objection. Form. Foundation.
Go ahead.
MS. EPSTEIN PUTNEY: Overbroad.
THE WITNESS: I usually take it as, if Mental Health cleared them from a suicide watch, they return to general population, are treated as a general population inmate unless there's extenuating -- more -- more evidence for me to believe that they need to be watched closely again

Page 62

after they're placed back in general population. But if -- I -- I trust them -- our mental health staff. So if they release someone from suicide watch, I believe they're back to general population unless we hear other information later on.
BY MR. CURRAN:
Q. And when you say "other information later on," what do you mean by that?
A. If, all of a sudden, we noticed a change in the inmate or another concerned inmate mentions something, and then we would start monitoring them again a little bit closely and just kind of watching their interactions before placing them on a watch. Or bring them out and talk to them and see how they're doing after they were cleared but --
As I said, if -- if Mental Health clears somebody, I said, I assume they're clear and could return to general population. Otherwise, Mental Health wouldn't be putting them back out into general population.
Q. So if an inmate has been on a mental health watch before -- strike that.
If an inmate has been on a suicide watch before and then the suicide watch is discontinued, but then you notice something that

Page 63

might concern you with regard to a potential suicide risk involving that inmate, the fact that they had been on suicide watch before would influence how you would view the situation; fair?
A. That's fair.
Q. Because a history of suicidal thoughts is one of the things you're -- you're trained to look for; correct?
A. Correct.
MS. EPSTEIN PUTNEY: When it's convenient, a quick break? It's over -- it's over an hour. Nick, could we take a quick break?
MR. CURRAN: Yeah. That's fine.
(A recess was taken.)
BY MR. CURRAN:
Q. Officer Johnson, going back to Exhibit 3, it states towards the bottom that a suicide watch can only be ended with Mental Health approval. So it's true then that an inmate can only be taken off of suicide watch with Mental Health approval; right?
A. Yes.
Q. And again, Mental Health, back in 2016, referred to members of the crisis team; is that fair?
MR. KNOTT: Object. Vague and overly

Page 64

broad.
MR. JOHNSON: Join.
THE WITNESS: Yes. It would refer to the crisis team. And I think there was a psychologist who would come in sometimes too. I'm not sure a hundred percent.
BY MR. CURRAN:
Q. You think that there was a psychologist who would come to the jail?
A. Yes. I believe it was on Tuesdays or Fridays. I said, that's -- those are the times when Crisis came in. And I think it was -- there was some form of doctor or somebody who came in and saw people.
Q. Do you remember the name of that psychologist?
A. I want to say it might have been Dr. Hatfield (phonetic).
Q. Do you know how to spell that?
A. No, I do not.
Q. Was it your understanding that Dr. Hedfield (phonetic) was part of the Department of Human Services?
A. I believe he was, yes.
Q. Do you have knowledge of any inmate ever

Page 65

being taken off suicide watch without Mental Health approval?
A. No, I do not.
Q. Okay. Do you agree that taking an inmate off of suicide watch without Mental Health approval could put the inmate's physical safety in danger?
A. Yes.
Q. Let me ask that same question about a mental health watch. Do you agree that taking an inmate off of mental health watch without Mental Health approval could put the inmate's physical safety in danger?
MS. EPSTEIN PUTNEY: Object as overbroad.
THE WITNESS: It could possibly, yes.
BY MR. CURRAN:
Q. Do you know anything about Katie Czys's credentials as a mental health provider?
A. No, I do not.
Q. And yet, you would trust her judgment as to whether or not an inmate should be taken off of suicide watch --
A. If that was --
Q. -- is that correct?
A. If that was what jail administration put into place following policy and jail

Page 66

administration.
Q. So in other words, you were just trusting the policies that had been put in place by jail administration as to who should make that decision?
MR. JOHNSON: Objection. Form. Foundation.
Go ahead.
THE WITNESS: Yes. I'm -- I'm not someone there -- I can't go and ask everyone for their credentials when I'm not there and they're there, let alone make that decision because I'm not qualified to make that decision or know how someone is schooled or what they're schooled in and where their stuff lies.
So if jail admin puts someone in position to make that decision and trusts them and the -- or -- and the sheriff's department puts someone in that position to make that decision then, yes, I'm going to go with what my administration and policies sets forth.
BY MR. CURRAN:
Q. Have you ever spoken with Katie Czys?
A. A few times.
Q. And what have your conversations with her been about?

Page 67

A. I believe they put on a training one time that we attended. That would be -- the gist of it would be I probably had that training.
And maybe one time in passing in the hallway.
Q. What did that training relate to?
A. I can't recall what it was.
Q. Do you recall approximately when you would have received that training?
A. When I was -- a little bit after I was first employed with Wood County, I want to say.
Q. And do you recall where physically you received that training?
A. I believe it was at the sheriff's department rescue building.
Q. Were there other correctional officers in attendance at that training?
A. Yes, as well as dispatchers.
Q. Did that training have anything to do with inmates in crisis?
A. I don't recall.
Q. If you are the correctional officer who puts an inmate on suicide watch, does the mental health provider reach out to you to ask you any questions about the inmate?

Page 68

A. They can. They know who did the report and what it was. But for the most part, we put down generally why the person was placed on watch, and then --
Are we -- I should say, you know, are we talking about 2016 or now?
Q. 2016.
A. 2016? Back -- I said, I was never reached out to by anybody. I know they could because we assign our name and number on it. So they can reach out to us via email or something and ask us for more information, if they wanted to.
Q. And then would the mental health provider then, when a watch is discontinued, reach out to you to let you know that the -- the inmate has been discontinued from suicide watch?
A. I believe they would reach out to the staff that was currently working at that time as well as administration that was on during that day shift and talk to them and let them know that they were cleared and --
Q. Is there any other information that's conveyed by the mental health provider at that time about the inmate's mental health status?
A. I am not sure.

Q. Now, my understanding is that at some point the team from the Department of Human Services was coming in once a week, but you had indicated that they were coming in twice a week. Was there a period of time where they were only coming in once a week?
A. My understanding -- I -- I said -- I said, I just knew it was Tuesdays and Fridays was when people got cleared from watches. I wasn't sure who was coming in at those times, whether it was DHS or if the doctor was affiliated with DHS. But I knew Tuesdays and Fridays were our times to get cleared from watches. So I'm not sure if it was -- if the doctor was separate from the Department of Human Services or what, I'm not sure.
Q. And again, you're not certain that there was a psychologist who would respond to the jail; right?
A. I knew there was a doctor or some -- I -- like I said, I don't know if he was a psychologist. I knew he had -- he was a doctor of something, of some sorts.
Q. And that was Dr. Hedfield (phonetic)?
A. Yes.
Q. Did you ever have any conversations with Dr. Hedfield (phonetic) about an inmate's mental

health?
A. No.
MR. JOHNSON: I think you said -- you thought it was Hatfield (phonetic); right?
THE WITNESS: Hatfield -- Had- -- Hatfield (phonetic) or Hadfield.
MR. JOHNSON: Nick, I thought you were saying Hedfield (phonetic), but I -- I think Officer Johnson is -- thought it was Hatfield (phonetic).
BY MR. CURRAN:
Q. So if an inmate, back in 2016, was having some sort of mental health crisis where they were placed on suicide watch, would they then have to wait until the following Tuesday to be seen by a mental health provider?
A. So if they --
For -- on -- like, what day, if they were having it?
Q. So Friday night; right? Because you told me that --
A. Yep.
Q. -- Crisis or the doctor would respond to the jail to clear inmates off suicide watch on Tuesdays or Fridays; right?
A. Yes.

Q. So if an inmate has an episode or a situation arise on a Friday night and they're placed on suicide watch, they would have to wait until the following Tuesday before they're seen by a mental health provider; correct?
A. Correct.
Q. And that was true as of February of 2016; correct?
A. Yes.
Q. And can you give me an approximate time as to when that changed if it did, in fact, change?
A. It would have changed when we hired on our full-time qualified mental health professional that's now here Monday through Friday. I'm not sure when that started, off the top of my head.
Q. Can you give me an approximation?
A. Middle of last year sometime.
Q. Was it after Amanda Glodowski committed suicide?
A. Yes.
Q. Were there ever situations where a mental health provider would come to the jail on a day other than a Tuesday or Friday?
MS. EPSTEIN PUTNEY: I'll object as overbroad and vague as to time.

BY MR. CURRAN:
Q. Again, I'm asking you before the change.
A. If they were being bonded out and they're on a suicide watch, I know Crisis would come in and speak with them before they were released from the facility. Or they would send a deputy to come do a chapter evaluation review when the deputy would then, in turn, contact Crisis.
Q. So back in 2016 -- and again, I -- all the questions I'm asking you about suicide watch, mental health, that kind of thing, it's understood that I'm asking you before the change was made to where a full-time mental health provider was hired. Okay?
A. Okay.
Q. So back in 2016, when an inmate was discontinued from a suicide watch, to your knowledge, were arrangements made to provide that inmate with some form of mental health treatment?
A. I believe so.
Q. Okay. And -- and how would that happen?
A. I think that would probably be when the -- Dr. Hadfield came into play, and then they would work with the nursing staff or medical staff.
Q. Is it your understanding that, back in 2016, the -- the jail nursing staff would provide mental

Page 73

health treatment?
MR. KNOTT: Object. Foundation.
MS. EPSTEIN PUTNEY: Join.
THE WITNESS: I don't believe they would provide the mental health treatment. They would -- they would communicate with crisis and Dr. Hadfield. And if meds were necessary, they would facilitate the medications and get those set up. But I'm unaware of any time they provided the mental health treatment.
BY MR. CURRAN:
Q. Do you know how it is inmates would receive mental health treatment outside of a crisis situation back in 2016?
MR. KNOTT: Object. Foundation. Vague and overly broad.
MS. EPSTEIN PUTNEY: Join.
THE WITNESS: They could put a -- it would be on a nurse request form. It's a request for mental health treatment. And we could provide that to the nurse. And the nurse would take care of contacting Crisis. Or there was another form that we started using - we only used it for a little bit because it was confusing - that said -- we'd get some initial information from them and then email Crisis

Page 74

saying someone wanted to speak with them.
BY MR. CURRAN:
Q. So then Crisis would at some point respond to the jail and talk to the inmate; is that fair?
A. That was my understanding.
Q. And would that only happen if the inmate requested it?
A. Yes.
Q. What would you do with an inmate who obviously had some form of psychosis who's not able to help themselves?
MR. JOHNSON: Objection. Form. Overbroad. Foundation.
Go ahead.
THE WITNESS: If they're on psychosis, I said they would be placed on a mental health watch, and we would notify Crisis that they need to come talk to somebody.
BY MR. CURRAN:
Q. And help me out here. I'm trying to -- I'm trying to drill down to this. How is it that inmates would receive ongoing mental health care if they needed it back in 2016?
MR. KNOTT: Foundation. Vague. Overly broad. Incomplete hypothetical.

Page 75

THE WITNESS: If they had a -- and we were aware of the mental health issues, I said that they would be referred to Crisis. And then it was Crisis's responsibility to follow up and take care of that because we're not -- we were not equipped to handle that.
BY MR. CURRAN:
Q. So if I'm understanding you correctly, it was then Crisis's responsibility to set up whatever further mental health treatment was required for that specific inmate?
A. Yep. And we would assist in transporting and -- if they had to be transported off site to go to a counselor. Or have a counselor came in, we would assist with scheduling and transporting.
Q. To your knowledge, has a psychiatrist ever responded to the jail to provide treatment to an inmate on suicide watch?
MR. JOHNSON: Before the -- before the program changed, Nick?
MR. CURRAN: Yes.
THE WITNESS: I said I believe Dr. Hadfield.
BY MR. CURRAN:
Q. And again, you don't know Dr. Hadfield's

Page 76

credentials; correct?
A. I do not.
Q. And I just want to be clear. You're not sure who it was who employed him; is that correct?
A. Correct. I'm not sure if it was DHS or if he was a private.
Q. Would it surprise you to know that I have not seen any record of Dr. Hadfield's ever seeing Amanda Glodowski while she was incarcerated at the Wood County Jail?
MS. EPSTEIN PUTNEY: Object to the form.
THE WITNESS: I'm unaware if he ever saw her or talked to her.
BY MR. CURRAN:
Q. Are you aware of any mental health treatment having been provided to Amanda while she was an inmate at the Wood County Jail during any of her incarcerations?
A. As in more than talking to a crisis person or --
Q. Correct.
A. Not that I'd be aware of. They would all have taken place on day shift, if it did.
MR. CURRAN: Monica, if we could move

Page 77

to Exhibit 4 --
BY MR. CURRAN:
Q. Officer Johnson, do you recognize Exhibit 4?
MS. EPSTEIN PUTNEY: What page is that, please?
MR. CURRAN: Wood County 144.
MS. EPSTEIN PUTNEY: Thank you.
THE WITNESS: Yes, I do.
BY MR. CURRAN:
Q. This form is entitled "Request for Evaluation of Inmate at Wood County Jail"; correct?
A. Yes.
Q. What is the purpose of Exhibit 4?
A. That's another form that we complete when we place someone on a suicide watch, a mental health watch. That's us just more showing that we're requesting for evaluation of the inmate because we placed him on a suicide watch and trying to give the person who will be coming in to do the evaluation a little bit more information before they get here.
Q. Have you ever filled out one of these forms before?
A. Yes.
Q. Is it done on a computer?

Page 78

A. Yes.
Q. Is there a specific computer that you use at the jail to -- to fill out a form like this?
A. Any of the computers that can be logged on to CIS.
Q. What is CIS?
A. That's our jail management system.
Q. And I take it that each correctional officer has, like, their own user login and password.
A. Yes.
Q. Is the form then printed out and sent out, or is it all sent out via email?
A. It will be sent attached to the email, and this is also printed out and distributed to the jail administration and nurse.
Q. Is there, like, a location in the jail where you drop off a form like this for the nurse?
A. Either in the nurse's office or the nurse does have a paperwork basket back behind the booking counter.
Q. And again, towards the bottom of the form, it says, "Crisis Interventionist Receiving Report." Do you see that?
A. Yes.
Q. And I would assume, again, that that's

Page 79

referring to the same crisis team we've been talking about.
A. Yes.
Q. Were Exhibits 3 and 4 always filled out when someone was put on a special watch back in 2016?
A. Yes.
Q. And again, this specific form refers to Amanda Glodowski; correct?
A. Correct.
Q. And towards, again, the bottom half of the form, it says, "Briefly describe the problem," slash, "behaviors," slash, "why the inmate was placed on suicide," slash, "mental health watch," and then it indicates, "Inmate stated she felt suicidal"; correct?
A. Yes.
Q. And would the information in this form somehow be conveyed to the rest of the correctional staff?
A. As in current staff that was working or oncoming staff?
Q. Both.
A. Current staff that was working would be aware of it, and the form would be available for oncoming staff to view.

Page 80

Q. Where would the form be available for oncoming staff to review?
A. They could look at it on the inmate's jail management system on the computer. They could pull it up. Or there was a spot in booking for booking reports -- or for reports, whatever, that we place there when there's a report that was done on shift.
Q. I'm sorry. Could you say that last part again?
A. We have a spot behind booking where we place reports that are done during the shift that is available to look at and review.
Q. Would that include incident reports?
A. Yes.
Q. And how long did those reports -- is it -- you said it's, like, a spot. Is it, like, a tray or something?
A. It's a file inside a tray, yeah.
Q. And how long did the reports stay in that file before they're removed?
A. It varies. Sometimes a month. Sometimes it goes longer. It's -- they kind of go by look, and, when it gets really full, administration takes them and removes them.
Q. And are you trained to look in that folder

Page 81

or file when you first start your shift to familiarize yourself with the reports that have been recently completed?
A. It is not something that we're trained to do. It is something that I do, but it's not something that we train.
Q. Is it something that jail administration encourages correctional officers to do?
A. They'll mention it and say, yes, when time permits, take a look at the reports if you have any questions on what's been going on the last couple of days.
Q. I take it that's a system that's in place to help promote the flow of communication between officers on different shifts; is that fair?
A. Yes.
Q. So at the top of the form, there's a series of questions here. Do you see that?
A. Yes.
Q. When you are filling out this form, are you supposed to try to obtain the information needed to answer these questions?
A. What do you mean?
Q. So, for example, there's a question that's listed up there, "Inmate has attempted suicide in the

Page 82

past?" Do you see that?
A. Yep.
Q. And it -- it's -- next to that, it states, "Unknown"; correct?
A. Correct.
Q. Are you -- when you fill out this form, are -- are you supposed to try to figure out or find out the information you need to answer these questions?
MS. EPSTEIN PUTNEY: Object as overbroad.
THE WITNESS: Yeah. To the best of our ability, we're supposed to figure out the answers to these questions.
BY MR. CURRAN:
Q. And from what sources of information are you to try to obtain the answers to these questions?
A. We can ask the inmate, we can go back and look at previous bookings and look for incident reports, or just go off of our previous experiences with that person.
Q. So the booking information for the inmate is something you, as a correctional officer, would have access to if you wanted to look at it?
A. Yes.

Page 83

Q. And my understanding is that, as part of the booking process, there is a medical screening done; is that correct?
A. Yes.
Q. And is that something you would also have access to?
A. Yes.
Q. And it's also my understanding that there's a mental health screening that's performed at the time of the booking process; is that correct?
A. Yes.
Q. And that is something you would also have access to as a correctional officer?
A. Yes.
Q. Do you, as a correctional officer, have access to documents, reports, et cetera, from an inmate's prior incarceration?
A. Yeah. If they were -- since the CIS took place, if they were records entered into the jail management system, you could go back and view those, yes, as well -- there's a -- certain -- certain officers have access to scanned documents as well.
Q. Who has access to scanned documents?
A. I'm not sure who all has access to it, but you -- there's a unique username and password for

Page 84

everyone who has access to it.
Q. Back in 2016, did you have access to scanned documents?
A. I do not believe I did.
Q. What kinds of documents were scanned versus not scanned?
A. The scanned -- everything in their -- in the inmate's paper file that we keep on hand would be scanned after their release.
Q. And then that would be distinguished from other forms that are just maintained electronically on the system?
A. Yes. So in the inmate's file, they have, like, all their court paperwork and stuff. That stuff would be scanned into there. That's not maintained on the electronic one. Just incident reports and scheduling and the -- like, the request for eval and special watch forms are in their electronic one.
Q. So I appreciate that. I want -- I want to just briefly go over that again just to make sure I understand.
So what I'm trying to figure out is, who would have access to, for example, special watch forms?

Page 85

A. If they were on the -- the JMS, the jail management system, any officer who could log into CIS could go back and look at a special watch form or create a special watch form.
Q. Is it fair to say that anything that's created using JMS could then be accessed by other correctional officers?
A. Yes.
Q. Do you recall approximately when JMS was implemented?
A. CIS was -- they were using the CIS JMS system before I was employed there.
Q. Thank you. Would you agree with me that one of your primary responsibilities as a correctional officer is to ensure the physical safety of the inmates in your custody?
A. Yes.
Q. And that responsibility would include protecting an inmate from herself if she became suicidal; correct?
A. Yes.
Q. And in order to do that, you would agree with me that the more information you have about an inmate's mental health history, the better able you are to identify whether that inmate might be at a

Page 86

serious risk of attempting suicide?
A. Yes.
Q. So, for example, if you have an inmate tell you, like, for example, they feel like they're having feelings of hopelessness, that, on its own, is not something that would necessarily indicate that the inmate is a potential suicide risk; right?
A. Correct.
Q. The inmate might not have any history of depression, prior suicide attempts, or other mental illness; right?
A. Correct.
Q. And if that's the case, you wouldn't necessarily have any reason to suspect that the inmate is suicidal; is that fair?
MR. JOHNSON: Objection. Form. Foundation. Incomplete hypothetical.
MS. EPSTEIN PUTNEY: Overbroad.
MR. JOHNSON: Go ahead.
THE WITNESS: Correct.
BY MR. CURRAN:
Q. But if you know that that same inmate who says they're feeling hopeless has a history of depression, they have a history of multiple suicide attempts, you would probably view that person as at a

Page 87

greater risk of attempting suicide based on their statement of feeling hopeless; is that fair?
MR. JOHNSON: Same objections.
MS. EPSTEIN PUTNEY: Over- -- overbroad.
THE WITNESS: Yes.
BY MR. CURRAN:
Q. So the more information you have about an inmate's mental health history, the better able you are to identify inmates at risk of committing suicide; is that fair?
MR. JOHNSON: Asked and answered. Go ahead.
THE WITNESS: Yes.
BY MR. CURRAN:
Q. So other than what you've already testified to, tell me what systems are in place at the jail to give correctional officers information about an inmate's mental health history.
A. For the most part, an inmate's mental health history -- you would go off of previous experiences that staff has had with them and being able to go back and look at their previous booking screening questions.
Q. Officer Johnson, are you familiar with the

Page 88

notebook system?
A. What do you mean, "the notebook system"?
Q. Like, the notebook pass- -- pass-down system.
A. I know we have a notebook that people write notes in, yes.
Q. Okay. What -- describe that for me. What -- what -- it's just a -- it's just a notebook that people -- correctional officers write notes in? Is that fair?
A. Yep. I believe there was a notebook for correctional officers and one for medical staff to write notes in to pass on to COs.
Q. Were you trained to use that notebook to convey information to other correctional officers?
A. I was not trained to write something in there all the time. But yes. I was aware that if there was something that needed to be passed on or reminded about for a long time, to write a note in there as long as it didn't include -- we couldn't include medical information or anything in -- like that in there because that's HIPAA stuff. And if the notebook got lost or something, that would be bad.
Q. So you couldn't include medical information in the notebook?

A. You could mention "See" -- "See Reports," but you couldn't write down exact things.
Q. How frequently did you write in the notebook, say, starting from 2016?
A. I did not use it very frequently as I briefed and passed stuff on word of mouth and with my reports when I did reports.
Q. Do you have any firsthand knowledge of any officers having been disciplined or reprimanded for not passing along information of importance about an inmate?
A. Not that I'm aware of.
Q. So some of this you've -- you've kind of already testified to, but just to be clear, back in April and May of 2017, was there a mental health provider who worked regular hours at the jail?
A. No.
Q. Has the administration at the jail ever asked for feedback from correctional officers concerning the mental health services provided at the jail?
A. Are we going back to 2016 now or currently?
Q. Yes, yes.
A. 2016?
Q. Yes.

A. Not -- I couldn't tell you if I recall or not.
Q. You don't remember if jail administration ever asked for your opinion about the mental health services available at the jail?
A. As far as I can remember, not in a formal way via email or anything like that. It might have been in passing, talking in the hallway or something like that but --
Q. Do you recall any of those informal conversations in the hallway?
A. No, I do not.
Q. Is there a reason you think some of those informal conversations might have taken place?
A. I would say it's because we're always looking at improving and bettering services, if we can.
Q. Do you have an opinion as to whether the mental health care available to inmates back in 2016 and '17 was sufficient to meet their needs?
MR. JOHNSON: Objection. Competency. Foundation.
MS. EPSTEIN PUTNEY: Yeah.
MR. JOHNSON: Form.
Go ahead.

MS. EPSTEIN PUTNEY: Objection. Calls for an expert opinion.
MR. KNOTT: Join. Foundation.
THE WITNESS: I believe it met -- it met state standards.
BY MR. CURRAN:
Q. And, sir, with all due respect, that -- that's not what I asked you. In your opinion, was the mental health services available to jail inmates back in 2016 and 2017 sufficient to meet their mental health needs?
MR. JOHNSON: Same objections.
MR. KNOTT: Same objections. Asked and answered.
THE WITNESS: In my opinion, it was -- we met state standards. I'm not trained to know what everyone's needs are and how we're supposed to facilitate those needs. I know that the sheriff's department, they are expected to meet a standard. And they wouldn't -- if they didn't meet that standard, it would show up in the yearly jail evaluation.
BY MR. CURRAN:
Q. You are -- strike that.
You've been a correctional officer for

how many years?
A. Going on nine years this year.
Q. And you've received quite a bit of training about how to deal with inmates who are potentially suicidal; correct?
A. At least yearly, if not a little bit more.
Q. And you've received NAMI training; correct?
A. Correct.
Q. And a large segment of the jail population deals with mental health issues; correct?
A. Correct.
Q. And as a correctional officer, you frequently are dealing with inmates struggling with mental health issues; is that fair?
A. Yes.
Q. And I would assume that, in interacting with them, you may hear them complain about their access to medical care; correct?
A. Yes.
Q. And you probably hear them complain about their access to mental health care; correct?
A. Yes.
Q. And again, in order to fulfill your obligations and responsibilities as a correctional

officer, I imagine you're at least somewhat familiar with the mental health services available in the jail; is that correct?

A. Yes.

Q. So again, my question is, back in 2016 and 2017, do you have an opinion as to whether or not the mental health care available to jail inmates was sufficient to meet their mental health needs?

MR. JOHNSON: Same objections as before. Asked and answered.

THE WITNESS: I would say there's always room for more of mental health and medical care. If you could have someone on 24 hours a day, seven days a week, every single day, that would be the perfect place to be. But I said, even -- there's not a facility out -- that -- of a -- of a -- not a facility in a town of less than 500,000 people that can do that. So -- so yes. I would say, yeah, if you could have someone on 24 hours a day, seven days a week, that would be the end-all, be-all awesomeness.

BY MR. CURRAN:

Q. Well, certainly, the jail didn't have someone to provide mental health care and treatment 24 hours a day, seven days a week - correct? --

MR. JOHNSON: Asked and --

BY MR. CURRAN:

Q. -- in 2016 and '17?

MR. JOHNSON: Excuse me. Asked and answered.

THE WITNESS: Correct.

BY MR. CURRAN:

Q. And you would agree with me that there are a whole range of levels of care that could be provided below that; true?

MR. JOHNSON: Objection. Form. Overbroad. Vague. Foundation. And competency again.

Go ahead.

THE WITNESS: I guess those below mental health care?

MR. CURRAN: Yeah.

THE WITNESS: I don't think -- you can't really supplement mental health care with something less.

MR. CURRAN: I think you misunderstood my question.

BY MR. CURRAN:

Q. So my question to you is not whether or not you feel that Wood County should have had a mental

health care provider on staff 24 hours a day, seven days a week. That's not what I'm asking you.

What I'm asking you is, was the care that was provided and available sufficient to meet the mental health care needs of inmates back in 2016 and '17?

MR. JOHNSON: Asked -- asked and answered three times.

MS. EPSTEIN PUTNEY: Yeah. Objection. Asked and answered.

MR. JOHNSON: Go ahead. Answer --

MR. KNOTT: Same objections.

MR. JOHNSON: Answer one more time.

Go ahead.

THE WITNESS: The question was, is 2016, '17, the mental health care -- meet the needs of the inmates that were there?

MR. JOHNSON: No. The question was, what -- were the mental health care services in 2016 and 2017 sufficient to meet the needs of the inmates at Wood County? And then you --

THE WITNESS: Okay.

MR. JOHNSON: Same objections.

THE WITNESS: I would say, yes, it was sufficient to meet the needs.

BY MR. CURRAN:

Q. Okay. Are you familiar with -- or strike that.

To your knowledge, did -- were there several suicide attempts at the Wood County Jail -- or have there been several suicide attempts at the Wood County Jail since -- we'll go back to, say, 2014.

A. Yes.

Q. And, to your knowledge, have any of those individuals who have attempted suicide received ongoing psychiatric care after they attempted suicide?

MS. EPSTEIN PUTNEY: I'll object as overbroad and irrelevant.

THE WITNESS: I don't know that.

BY MR. CURRAN:

Q. Do you have knowledge of any of those inmates receiving ongoing psychiatric care while at the jail after they attempted suicide?

MR. JOHNSON: Yeah. Asked and -- asked and answered. I thought that was the same question.

But go ahead.

THE WITNESS: I do not have any

knowledge of that.
BY MR. CURRAN:
Q. So the answer to the question then is no?
MR. JOHNSON: Oh. Asked --
BY MR. CURRAN:
Q. You don't know of anyone receiving psychiatric care after attempting suicide at the jail?
MS. EPSTEIN PUTNEY: I'll just --
MR. JOHNSON: Asked and answered.
MS. EPSTEIN PUTNEY: Also, object to the form of "ongoing psychiatric care" and what that means.
THE WITNESS: Then, no, I do not. I do not recall. I do not know. I'm not aware of anyone receiving --
BY MR. CURRAN:
Q. What do you remem- -- remember, just generally, about Amanda Glodowski?
A. I know she was a female inmate, and she had possible seizure issues, and she could be a handful at times.
Q. So then would you characterize her as a difficult inmate for correctional staff to manage?
A. Yes. She required more time than others.

Q. I mean, is that based on your experiences with her?
A. Yes.
Q. And what experiences did you have with her that leads you to that belief or that opinion?
A. She would pound, yell, and scream, call staff names, make demands that were -- stuff that was -- we couldn't fulfill or take care of.
She was just a -- she was very taxing on correctional officers and --
Q. Did you ever tell any of your supervisors that you felt that she was very taxing as an inmate?
A. No. I wouldn't use "taxing." But difficult, yes.
She -- she -- I mean, she would -- it would take, like -- the shift -- you'd come in on the shift, and four hours into the shift, I said, everyone would be kind of run down and tired out just because of the verbal tirades and the pounding, yelling, screaming, and all the staff doing their best to calm her down and take care of that. It would just -- it was a -- it was a -- it was a process.
Q. So you mentioned that she made demand- --

demands that correctional staff couldn't fulfill. What -- what kind of demands would she make?
A. When she would demand -- when she was on suicide watch, she would demand to be off suicide watch when she knew correctional staff couldn't take her off of a watch.
She would make demands that she would want to move from one cell to another when there wasn't room to move her at the time.
Q. Do you recall any other demands that she made?
A. Not that I can think of.
Q. Did you dislike her?
A. I don't dislike anybody that I've ever dealt with in the correctional setting, including Amanda. I said, I -- everyone has their own stuff that they're going through and their own backgrounds. I never took anything personally.
Q. Was it your impression that other correctional officers felt the same way about her in terms of her being demanding?
A. Yes.
Q. Do you recall any conversations you might have had with other correctional officers about Amanda?

A. I don't recall.
Q. And this is before the suicide, just to be clear.
THE COURT REPORTER: I'm sorry. Could you repeat that?
MR. CURRAN: I'm sorry.
BY MR. CURRAN:
Q. My question relates to conversations you might have had before her suicide.
A. As I -- there was conversations -- it was along the same line of just, you know -- she's loud, she calls everyone names, swears at everybody, makes a scene when we're trying to book people in. And it's just -- when you're trying to listen to someone and get someone else booked in and make sure we're getting questions answered and stuff figured out and you have someone yelling and screaming and pounding next to you, it makes it hard and makes it for a long nighttime. And those would -- those would have been the conversations that were had. I don't recall any specific times but --
Q. Do you recall which specific correctional officers you would have had these conversations with?
A. No, I do not.

Page 101

Q. Did you get the sense that she had emotional issues?
MR. JOHNSON: Objection. Overbroad. Go ahead.
THE WITNESS: One could assume she had emotional issues.
BY MR. CURRAN:
Q. And that was based on her behavior, I assume.
A. Yes.
Q. Did you have reason to question her mental stability?
A. Yeah. Just based off of her -- her behavior.
Q. Did you have any good interactions with her before the date of her suicide?
A. As a majority of my interactions with Amanda I can -- I mean, thinking way back from wherever it was, I said -- I said, the only ones I ever really remember, I, you know -- you remember the negative ones. The good ones far outweighed the negative ones.
Q. I'm sorry. Say that again.
A. I said, the good ones far -- far outweighed the negative ones. I said, the only ones you ever

Page 102

really can remember and recall are negative ones. So I mean, I -- I know I've had -- there was positive interactions between us. I just -- I couldn't tell you specifics.
Q. Before the date of Amanda's suicide, did you know that she was suffering from seizures in the jail?
MR. JOHNSON: Objection. Form. Foundation. Go ahead.
MS. EPSTEIN PUTNEY: And com- -- objection. Competence.
THE WITNESS: I know there was -- there was notes and stuff that they were trying to figure out what was going on with her. Not -- I shouldn't say "notes," but, like, communication between nursing staff and COs that they were trying to figure out what was going on with her, and she possibly was having seizures. They weren't sure a hundred percent that they were seizures and not pseudoseizures. But yes. There were -- there was stuff going on with Amanda prior to that.
BY MR. CURRAN:
Q. You referenced communications between correctional officers and nursing staff about

Page 103

seizures; is that correct?
A. Yes.
Q. And do you know how it was you became aware of those communications?
A. It would probably -- there are probably incident reports. If she was having a seizure, we would contact the nurse. And the nurse would come down, if the nurse was there, to evaluate her and look at her. And if she had to be sent to the hospital, she'd be sent to the hospital.
Q. Have you heard the term "pseudoseizures" used with regard to Amanda?
A. I believe so.
Q. Other than your attorney - I'm not asking about any conversations you would have had with your attorney - but who -- who have you heard use that term with regard to Amanda?
A. I -- that's so long ago, I said, I couldn't recall who brought that up. I know we had other inmates, I know, that had the -- had the -- the term was used at the same time. So I may be confusing them. But I said, that -- I couldn't tell you where that came up from there.
Q. Have you ever heard anyone refer to Amanda's seizures as pretend seizures?

Page 104

A. I never heard the term "pretend seizures" used.
Q. Okay. Did you have a belief as to whether or not Amanda was just faking her seizures?
A. I'm not qualified to have that belief on that or make a determination. That's what the nursing staff and paramedics are for if we have to call the EMTs in after hours.
Q. And I understand you may not be qualified to -- to render a diagnosis, so I'm not asking you for a diagnosis. I'm just asking you for your belief.
A. My belief is -- oops. I'm sorry, sir.
Q. Did you believe that she was just faking her seizures?
A. My belief was, every time some medical issue took place in the jail, it was a real medical issue. I said, in -- in -- when I'm working at the jail, I said, I'm not -- I don't get to have an opinion on certain things. I just have to take it as the fact of the matter, and that's what it is.
Q. So you took it as fact that she was suffering from some kind of seizures --
A. Yes.
Q. -- is that correct?

A. Yes.
Q. Do you recall having any conversations with Amanda during which she expressed frustration about having seizures?
A. Yes. I believe that's in one of my incident reports.
Q. Okay. Did she ever tell you that she was frustrated because nobody believed that her seizures were real?
A. I don't recall ever hearing that unless it's in the incident report, but I don't recall.
Q. Okay. Did she ever tell you that she was frustrated because she was not getting the mental health treatment she felt she needed?
A. I do not recall anything about mental health treatment.
Q. Just to be clear, you don't recall her ever expressing frustration because she felt she was not getting the men- -- mental health treatment she needed?
A. Not mental health treatment. It would just be about -- the thing I recall the most is about the seizures.
Q. And again, that's just that she was frustrated she was having them?

A. Yep.
Q. Before the date of her suicide, did you know that she had issues with substance abuse?
A. Not that I can remember knowing a hundred percent that she did or not, but I'm sure it was on the medical questions if she did. But I -- I don't recall now, being three years later or two years later.
Q. If she was placed on a mental health watch where her substance abuse history was referenced, would you have likely reviewed that incident report?
A. Yes.
Q. Did she ever make any statements to you about her substance abuse?
A. Not that I can recall.
Q. Now, you had this prior encounter with Amanda in February of 2016, which we already talked about; right?
A. Yes.
Q. And presumably, at that time, you would have known that Amanda had tried to cut herself with a partial denture; right?
MR. JOHNSON: Objection. Form. Foundation.

Go ahead.
THE WITNESS: At that time, in February of --
MR. CURRAN: Sure.
THE WITNESS: -- 2016, I would have known that?
MR. CURRAN: Yes.
THE WITNESS: Yes. As it happened, yes.
BY MR. CURRAN:
Q. Okay. And during that incident, again, she tried to swallow her partial denture; correct?
A. Yes, according to the report.
Q. And these are examples of self-harm; right?
A. Yes.
Q. And self-harm is a warning sign that someone might be at a greater risk of attempting suicide; correct?
MS. EPSTEIN PUTNEY: Asked and answered.
THE WITNESS: Yes.
BY MR. CURRAN:
Q. And as we discussed, Amanda was on suicide watch when that incident with her dentures occurred;

correct?
A. Yes.
Q. And she was on suicide watch because she had made statements about wanting to kill herself; correct?
MR. JOHNSON: Objection. Foundation. Form.
Go ahead.
THE WITNESS: Yes.
BY MR. CURRAN:
Q. So is it fair to say then that, before the date of Amanda's suicide, you knew that she had a history of at least one suicide attempt?
A. That's -- would be fair to say, yes.
Q. And is it also fair to say that, before the date of Amanda's suicide, you knew she had a history of depression?
A. History of depression?
Q. Yes.
A. Yes.
Q. Before the date of her suicide, did you know that Amanda had previously been treated at an inpatient psychiatric facility?
A. If it was on her med questions, possibly, but I don't recall myself knowing that.

Page 109

Q. You administered medication to Amanda during her incarceration that led up to her suicide; correct?
MS. EPSTEIN PUTNEY: Object to the form.
MR. JOHNSON: Join.
Go ahead.
THE WITNESS: Yes.
BY MR. CURRAN:
Q. Do you recall what those medications were?
A. No.
Q. Before the date of Amanda's suicide, did you know that she had been sent out to the emergency room for seizures?
A. I believe I did.
Q. Okay. Before the date of her suicide, did you know that Amanda had seen a specialist for her seizures?
A. Yes, I believe I did.
Q. Were you made aware that a neurologist had evaluated her on April 20th, 2017?
A. I was not aware it was a neurologist.
Q. Okay. Did you know that the -- the neurologist felt that Amanda needed ongoing psychiatric treatment?

Page 110

MS. EPSTEIN PUTNEY: Objection. Form and foundation.
MR. KNOTT: Join.
THE WITNESS: No. I was not aware of that.
BY MR. CURRAN:
Q. Did you know that the neurologist felt that Amanda might be best served with an inpatient psychiatric stay to address her psychiatric issues?
MS. EPSTEIN PUTNEY: Same objections.
MR. KNOTT: Same objections.
THE WITNESS: Nope. Was not aware.
BY MR. CURRAN:
Q. Is that information you would have liked to have known on the day of Amanda's suicide?
MR. JOHNSON: Objection. Form.
Go ahead.
MS. EPSTEIN PUTNEY: Objection. Speculation.
THE WITNESS: Yes.
BY MR. CURRAN:
Q. And would that have had any impact on how you responded to her emotional distress on the date of her death?

Page 111

MR. JOHNSON: Objection. Form.
Go ahead.
MS. EPSTEIN PUTNEY: Objection. Speculation.
MR. KNOTT: Join.
THE WITNESS: Yes.
BY MR. CURRAN:
Q. And how so?
A. She probably would have ended up on a mental health watch at the least that night.
Q. Do you have access, as a correctional officer, to an inmate's jail medical records?
A. The stuff that the nurse would keep?
Q. Correct.
A. No.
Q. So that information is not included in the CIS JMS system?
A. No, it is not.
Q. Is information about an inmate's mental health status ever communicated by the jail nurse to correctional staff?
A. You said their mental health status?
Q. Correct.
MR. KNOTT: Object as vague and overly broad.

Page 112

THE WITNESS: The jail nurse wouldn't tell us about mental health status because they're not a mental health professional.
MR. CURRAN: Okay. That's fair.
MS. EPSTEIN PUTNEY: Could we take another break, Nick?
MR. CURRAN: What?
MS. EPSTEIN PUTNEY: Time for a break?
MR. CURRAN: If you need one, yeah, we can take one.
MS. EPSTEIN PUTNEY: Yes, please.
MR. CURRAN: Sure.
MS. EPSTEIN PUTNEY: Five minutes.
(A recess was taken.)
BY MR. CURRAN:
Q. Mr. Johnson, we just had a break; correct?
A. Correct.
Q. Did you have any conversations with either of the other attorneys during the break?
A. The other attorneys?
MR. JOHNSON: Not -- not your --
MR. CURRAN: Correct.
MR. JOHNSON: -- not your attorney.
THE WITNESS: No, no.
MR. CURRAN: Okay. Just checking.

BY MR. CURRAN:
Q. Do you recall that Amanda was placed on a special watch on April 16th, 2017?
A. I do not recall.
MR. CURRAN: Monica, could we show him Exhibit 5, please?
MS. EPSTEIN PUTNEY: Page, please, Counsel.
MR. CURRAN: Wood County 231.
MS. EPSTEIN PUTNEY: Thank you.
BY MR. CURRAN:
Q. Sir, have you had a chance to look at Exhibit 5?
A. I'm currently looking at it.
Q. Okay. Just let me know when you've had an opportunity to review it.
A. Okay.
Q. Does reviewing this form refresh your recollection at all as to whether you had knowledge in -- in April of 2017 that Amanda had been placed on a mental health watch?
A. I can only assume with the report there that she was. I don't recall if I was working then or not working or --
Q. If you had been working during a time when

she was on this mental health watch, would you have received notice of the watch?
A. Yes.
Q. And I notice in the upper right portion of this form, it says, "To Notify Crisis of Special Watch, Send to: Crisis," dash, "Watch through Correction Login." That is what we discussed previously about emailing this form to Crisis; correct?
A. Yes.
Q. That's through that CIS JMS system you had referenced earlier?
A. No. That -- the email is through the -- the county email system.
Q. Okay. I understand. Do you send that email out from your own work email account?
A. No. It's through the general corrections email account because that's the one that has the Crisis Watch subgroup in it.
Q. And what is the general corrections email address?
A. I assume it would be like the -- our personal ones. So it would be, like, corrections@co.wood.wi.us.
Q. I'm sorry. Say that one more time.

corrections@- --
A. -- -@co.wood.wi.us.
Q. Thank you.
A. You're welcome.
Q. And this is Correctional Officer -- is it Johannes?
A. Yes.
Q. I'm pronouncing that correctly?
A. Yes.
Q. He is the one who filled out this form; correct?
A. I would assume he's the one who filled this one out. It just says -- I know when -- it says "Name and Badge Number of Officer Initiating the Watch." Because I -- I know in the report it says that he called and told them. So I'm assuming this is his report or he typed up the report and someone filled it in for him and filled out that he was the one initiating the watch. But having -- not having a signature on it, I don't know who initially filled out this entire form.
Q. Understood. Thank you. I had noticed, if you compare Exhibit 3 to Exhibit 5, that the section on the upper right-hand portion of the form where it says, to notify Crisis of special watch, send to --

that is on Exhibit 5, but it's not on Exhibit 3.
A. Yep.
Q. Is that just because the form changed at some point between when Exhibit 3 was filled out and when Exhibit 5 was filled out?
A. Yes.
Q. But the method of transmitting the special watch form to Crisis was the same in 2016 as it was in 2017; is that correct?
A. Yes.
Q. Do you recall ever reviewing the special watch form?
A. I don't recall if I did or not.
Q. If the special watch form had been placed in the file at the booking counter, would you have reviewed it at some point after April 16th, 2017?
A. Yes.
Q. This special watch form indicates that Officer Johannes was at the ER with Inmate Glodowski with a possible seizure. "While waiting to be evaluated, she became very upset and crying about what is wrong with her and why she was having seizures and not getting any answers." Is that consistent with some of the things you had observed about Amanda based on your own personal interactions

Page 117

with her?
A. I guess, what do you -- what do you mean by that?
Q. So this form indicates that she was upset and crying and expressed concern about what was wrong with her and why she was having seizures and not getting answers; correct?
A. That's what it says, yes.
Q. Did you have any similar interactions with her?
A. I believe the only other interaction that I had with her when she was talking about not getting answers and stuff would be in my incident report.
Q. Do you know if Crisis ever responded to this special watch form filled out on April 16th, 2017?
A. I do not know.
Q. You would agree with me that there's not any indication on this form that Crisis responded; correct?
A. Not on this form, no.
Q. Is there any other way for me to figure out whether or not Crisis ever responded to this special watch form?
A. Contacting our crisis intervention team.
Q. Are you aware of any other documentation

Page 118

that would be in Amanda's file that would indicate whether or not Crisis ever responded to this special watch form?
A. Not that I'm aware of.
Q. Typically, when an inmate is placed on mental health watch, are they seen by somebody in Crisis?
A. For a mental health watch?
Q. Correct.
A. Back in 2016, 2017?
Q. Correct.
A. If they -- they are usually seen by someone from Crisis. But again, I believe the nurse was able to clear off of mental health watch at that time.
Q. There's a reference in this special watch form about Amanda going to see Unified Services on Fridays. Do you see that?
A. Yes.
Q. What is Unified Services?
A. I believe the Unified Services -- that -- that would be where the -- Dr. Hadfield, I think, was out of them, actually. Now that there's a name in front of it, that's what I recognize that as.
Q. So your understanding is that Dr. Hadfield was part of Unified Services?

Page 119

A. Yes.
Q. And does Unified Services fall under the umbrella of Wood County, to your knowledge?
A. I am not sure.
Q. Do you have any recollection of Dr. Hadfield responding to the Wood County Jail in the time frame of April or May of 2017?
A. Like I said, on -- on -- on Fridays was when the other -- besides Crisis was when the other services came in, whether it was Dr. Hadfield or somebody else from Unified Services. So I would assume they were there on the Fridays as that's what was set up.
Q. In a situation like this where a correctional officer suggests that an inmate see Unified Services, is there any follow-up done to make sure that that actually happens?
A. Not that I'm aware of.
Q. The special watch form also indicates that Amanda was moved from Holding Cell 1 to Holding Cell 3. Is that correct?
A. Yes.
Q. Do you offhand know why she would have been moved from Holding Cell 1 to Holding Cell 3?
A. I would assume it was just to get her closer

Page 120

to the booking counter and be able to keep a closer eye on her as, if the cell was open, we like to have people closer up where someone is sitting kind of on a consistent basis.
Q. How much closer is Holding Cell 3 to the booking counter than Holding Cell 1?
A. How do you want the measurement? Steps?
Q. I mean, is it just a matter of feet?
A. Yeah. It's probably 20 feet closer.
Q. And are you saying that it just creates an easier line of sight from the booking area to Holding Cell 3?
A. Yes.
Q. Can you think of any reason why Amanda would not have been seen by a member of Crisis or Unified Services after this special watch form was completed?
MR. JOHNSON: Objection.
MR. KNOTT: Foundation. Speculation.
MR. JOHNSON: Join.
THE WITNESS: I can think of no reason why she wouldn't be seen.
BY MR. CURRAN:
Q. Now, you had mentioned earlier that you did have an incident report with Amanda from a day prior

Page 121

to the day of her suicide; correct?
A. The day prior? I don't believe it was the day prior.
Q. No. I'm -- I'm sorry. Not the day prior. But on a date prior to the date of her suicide.
A. Yes.
Q. And my understanding from reviewing your report is that that incident occurred on April 22nd, 2017. Does that sound about right?
A. Yes.
Q. I'm going to show you your incident report in a second, but tell me what you just can independently recall about that interaction with Amanda.
A. I remember coming on to shift, and Amanda was kicking, hollering, yelling, screaming, calling names.
After I completed my initial checks, I went over, and I spoke with her. She was up in a holding cell. And I was speaking with her and trying to figure out what was going on and trying to get her to calm down. I talked with her for a bit, and she mentioned that she just wanted her seizures to stop. And then that -- I explained to her that it wasn't a way to get our attention or to get us to work with

Page 122

her if she's just going to yell and scream at everybody because, when someone is yelling and screaming at you, you can't talk to them. So she needed to calm down and talk.
And I believe she wanted to be moved back -- she wanted to go back to her cell because she liked the cell that she was at. She kept asking for a roommate. She was going to have a roommate then.
So eventually, after she calmed down and stuff, I went back and talked to her. And we were able to get her moved back to her cell with her roommate. And I didn't have any other issues with her.
Q. Do you recall having any other conversations with correctional officers before this interaction with Amanda about how she had been doing earlier that day?
A. Yes. Coming on shift, they mentioned why she got moved up to the holding cell and that she was having -- stated she was having seizures. And they wanted to be able to keep an eye on her and see when -- if the seizures were starting and when they were starting and how long they were. And she didn't demonstrate any of those seizures while she was up there and -- and wanted to move back to her cell

Page 123

to -- she -- she -- Amanda never liked being up in holding so...
Q. Did she ever explain to you why she didn't like being up in holding?
A. No.
Q. Do you recall ever making any recommendations to her about how she could go about getting more treatment for her seizures?
A. I don't recall.
Q. Do you recall her telling you that she liked the cell she was in before -- prior to this interaction you had with her on April 22nd, 2017?
A. I don't recall.
Q. We'll get to your re- -- report in a second, but she mentioned wanting to have a cellmate or at least you mentioned that in your incident report. Do you recall that?
A. Yes.
Q. Do you have an independent recollection of her telling you at some point before this interaction with her that she wanted a cellmate?
A. Not independently. I don't know -- I don't know if it was me that knew it or if it was just passed on from staff that she kept saying she wanted to have a cellmate. Didn't like being alone.

Page 124

Q. Is it your memory that she was in X Block prior to being moved to the holding cell on April 22nd?
A. Yes, I believe so.
Q. Now, I take it one of the reasons you do incident reports is just to document things of significance that happened while you're on shift; is that fair?
A. Yes.
Q. And I take it you try to be as accurate as possible in preparing your incident reports.
A. Yes.
Q. And obviously everything you write in an incident report is truthful to the best of your knowledge; correct?
A. Yes.
MR. CURRAN: Monica, if we could show him Exhibit 6 --
MS. EPSTEIN PUTNEY: Number?
MR. CURRAN: Wood County 46.
MS. EPSTEIN PUTNEY: Thank you.
BY MR. CURRAN:
Q. Sir, do you recognize Exhibit 6?
A. Yes.
Q. What is Exhibit 6?

A. My incident report.
Q. And that's your incident report concerning Amanda Glodowski dated April 22nd, 2017 --
A. Yes.
Q. -- true?
A. Yes.
Q. Had you ever heard Amanda express prior to this that she felt like she was being punished by her moving to holding for her seizures?
A. Not that I can recall.
Q. Sometimes inmates are placed in segregation for disciplinary reasons; correct?
A. Correct.
Q. When an inmate is placed in segregation at Wood County Jail, where are they placed?
A. They're -- on disciplinary segregation or segregation in general?
Q. Good question. How about disciplinary segregation?
A. Disciplinary segregation, they'll be placed in a holding cell, or they could be placed in one of our small two-man blocks.
Q. How many small two-man blocks are there?
A. We have three two-man blocks and one three-man block.

Q. Is Cell Block X one of the two-man blocks?
A. Yes, it is.
Q. So the cell in which Amanda was held on the date of her suicide was also a cell that was used for disciplinary segregation; is that correct?
A. It could be used for disciplinary segregation, yes.
MR. CURRAN: Monica, if we could move to Exhibit 7 --
That's Wood County 181.
BY MR. CURRAN:
Q. Officer Johnson, if you could, please review that exhibit and tell me, when you've had a chance to look at it, whether this is a note that you've seen before.
Have you had a chance to review the exhibit?
A. Yes.
Q. Now, this, to me, appears to be a consultation note of a meeting between Amanda and, it appears, a social worker by the name of Demaris Losinski. You would agree with that?
A. Yes.
Q. And the date of the consultation appears to be, at least according to the note, April 28th, 2017;

true?
A. Yes.
Q. Now, in this note, Ms. Losinski indicates that Amanda reported, quote, "I'm just broken. I need to go to a psych ward to be fixed. I'm fucking broken. I'm a mess," end quote. And then, "Throughout the session, Amanda was quite emotional and somewhat scattered." Do you see that?
A. Yes.
Q. And then at the bottom, next to "Recommendations," it states that, "Writer did follow up with the jail staff after today's consultation to make them aware of her presentation." Do you see that?
A. Yep.
Q. Now, my impression having read this is that Ms. Losinski called the jail and would have spoken with someone on staff regarding her visit with Ms. Glodowski. Is that a fair assumption?
MR. KNOTT: Foundation. Calls for speculation.
MS. EPSTEIN PUTNEY: Join.
MR. JOHNSON: Join.
THE WITNESS: It's on day shift. I'm not sure how that worked.

BY MR. CURRAN:
Q. Have you ever had any communication with a social worker about the mental state of an inmate?
A. I did not.
Q. So you've never had that kind of communication before?
A. Not me, no.
Q. So I would assume that the reason Ms. Losinski would contact the jail staff about her visit with Amanda is to let them know that Amanda was making some of these statements that might indicate she was experiencing some emotional distress; is that fair?
MR. KNOTT: Foundation. Speculation.
MS. EPSTEIN PUTNEY: Join.
MR. JOHNSON: Join.
THE WITNESS: I would assume to let them know that and give the recommendation that's at the bottom.
BY MR. CURRAN:
Q. If you were -- strike that.
As a correctional officer, would you want the social worker in this situation to provide you with the information in this report?
MR. JOHNSON: Objection. Form.

Speculation. Incomplete hypothetical.
Go ahead.
THE WITNESS: Yes.
BY MR. CURRAN:
Q. And why is that?
MR. JOHNSON: Same objections.
Go ahead.
MS. EPSTEIN PUTNEY: Also, overbroad.
THE WITNESS: It's just another piece to the puzzle that we can use.
BY MR. CURRAN:
Q. Now, if someone on day shift received this information from Ms. Losinski, how would you expect this information to then be transmitted to the night shift?
MR. KNOTT: Foundation. Speculation.
MR. JOHNSON: Yeah. Overbroad.
Go ahead.
THE WITNESS: I don't know. In a discussion or briefing as you're coming on shift.
BY MR. CURRAN:
Q. Have you ever had a discussion or a briefing coming on shift where another staff member had told you about information conveyed to them by a mental

health provider?
A. Yes.
Q. That is something you've experienced?
A. Yes.
Q. Is creating an incident report another way of conveying this information from the social worker?
A. Are we basing it off of this progress note or just in general?
Q. Well, let's start with this progress note.
A. This progress note, I would say --
MR. JOHNSON: Hold on. Objection. Foundation. Form.
Go ahead. If you can answer, go ahead.
THE WITNESS: I would say, being that it was -- she was returned to general population, I don't feel an incident report would be needed as she was found to be -- by a professional that she could be in general population.
If the recommendation was for a suicide watch or something, there would be an incident report created.
BY MR. CURRAN:
Q. Okay. But you have a professional here who thought that there was information that needed to be

passed on to jail staff; correct?
A. Correct.
MR. JOHNSON: Objection.
MR. KNOTT: Foundation. Speculation.
MR. JOHNSON: Same objections. The answer can stand. It was, "Correct." Go ahead.
THE WITNESS: Correct.
BY MR. CURRAN:
Q. And you would agree with me then that it would be important that that information would be passed along to the night shift; correct?
MR. JOHNSON: Same objections.
Go ahead.
THE WITNESS: Yes.
BY MR. CURRAN:
Q. And you're telling me the only way that would really be done is through a discussion or a briefing at the shift change; is that fair?
MR. JOHNSON: Objection. Misstates prior testimony.
Go ahead.
THE WITNESS: Done at shift change or with this progress note.
BY MR. CURRAN:
Q. Okay. So could the progress note then be

placed in that file at the booking counter?
A. Yes.
Q. And that would be the responsibility of the person who received the progress note, I take it.
A. Yes.
Q. Are you familiar with the fax number listed at the top of this form?
A. I believe that's the Wood County Jail's fax number. I always have to look it up when I go to give someone the fax number, so I'm not sure.
MR. JOHNSON: Yeah. If you don't know, then you don't know.
BY MR. CURRAN:
Q. Where is the fax machine located in the jail, if there is one?
A. At Door Control.
Q. Have you ever been in Door Control and received a fax like this?
A. I have not.
Q. If you were in Door Control and received a faxed progress note like this one, what would you do with it?
A. Inform the staff on -- who's working and place it in the booking reports area.
Q. In that file we've discussed before in the

booking area?
A. Yes.
Q. As you sit here today, do you have any recollection of ever having received any information related to this consultation between Amanda and Ms. Losinski?
A. I don't recall.
Q. Were you ever aware that Amanda hit her head during some of her seizures?
A. I believe I was aware, yes.
Q. Now, Mr. Johnson, I want to move to the date of Amanda's suicide. Tell me what you remember -- what's your earliest memory of any interactions you had with Amanda on that day?
A. The earliest recollection would be completing my inside checks, seeing her on the phone talking, and then --
A lot of it -- the stuff I remember is in the incident report.
So then it was coming back. And after I completed checks, I could hear someone crying. Went and found where the crying was. Found it to be Amanda sitting on her bunk. Went in and tried to communicate with her to figure out what was going on, why she was crying. She wasn't responding to me.

I radioed for help, that maybe she would talk with somebody else.
CO Young arrived. Began talking with her.
Didn't know if she wanted her meds or snacks. So I left to go get her meds or snack while CO Young continued talking with her.
And by the time I was coming back with meds and snack, CO Young and Wolosek were escorting her up to the conference room to let her use the phone.
And then she was in the conference room until I -- that was almost, like, an hour, 45 minutes.
And then I remade contact with her as she was done using the phone and talked with her. She was talking freely with me, laughing. Made her way back to X Block.
I asked her if she was okay. She said, yeah. And she thanked us for letting her use the phone. Got her some toilet paper. Asked her, just with how emotional she was, if she had any thoughts of hurting herself, harming herself. She replied, no. She stated she'd let jail staff know if she ever had those kind of feelings.

Then she -- and then that ended my contact with her until later on that evening when CO Young found her hanging in the cell block. And then I performed CPR on her.
And Rapids paramedics showed up and took over care.
MR. CURRAN: All right, Monica. If we could show him Exhibit 8 --
MS. EPSTEIN PUTNEY: What page? Page, please?
BY MR. CURRAN:
Q. Do you recognize Exhibit 8, Officer Johnson?
MS. EPSTEIN PUTNEY: Counsel, page number, please.
MR. CURRAN: Oh. Wood County 42.
MS. EPSTEIN PUTNEY: Thank you.
THE WITNESS: Yes.
BY MR. CURRAN:
Q. And is this a true and correct copy of your incident report from May 6th, 2017?
A. Yes.
Q. Do you recall approximately how long after Amanda's suicide that you would have filled out this incident report?

A. A few hours. I know we got busy while Rapids was tending to her -- the paramedics were tending to her. So we were busy, so I didn't get a chance to complete it right away. But it was within a few hours. Before I left shift that morning.
Q. So your incident report indicates in the first full paragraph, last sentence - and you mentioned this before - that, as you were approaching the short hallway which contained block X, Y, and Z, you heard someone crying heavily?
A. Yes.
Q. So my -- my question is, like, how easy is it to hear into the cells or the cell blocks from out in the hallway?
A. How easy is it to hear?
Q. Right. Can you hear, like, normal conversation?
A. For jail normal, yeah. A normal conversation in the jail. I said, it's really echoey in there. So everyone talks louder than they need to.
But yeah. It's -- you can -- you can hear conversations going on.
Q. And explain to me again with the -- the -- there's a door that enters into the cell block;

Page 137

correct?
A. Yes.
Q. And then I'll ask specifically about Block X. There's, like, a small common area; correct?
A. Correct.
Q. And there is a -- almost like a picnic bench-type small table in the common area; correct?
A. Yes.
Q. And then there's a phone above the table -- or approximately above the table; is that right?
A. Yes.
Q. And then kind of above that and to the left, in the corner of the room, there's a television; is that right?
A. Yes.
Q. And then there's -- is there a bathroom to the left as you come in?
A. There's a shower.
Q. And is that to the -- I'm sorry. Is that to the left as you enter the cell block?
A. Yes.
Q. And then there are two cells; correct?
A. Yes.
Q. And the two cells are right next to each other?

Page 138

A. Yes.
Q. So the door that leads into the cell block, when you just walk by it, can you see into the -- the cell block?
A. When you're just walking by it?
Q. Yes.
A. There is a cover that goes over the window that you have to open up to see in.
Q. Okay. And then there is a -- there's some -- there's another way of looking into the cell; is that correct?
A. There is another view port built into the wall.
Q. And then the -- the cells within the cell block, you have the -- the -- the cell walls, and then the cell opening is -- is bars; is that correct?
A. Correct.
Q. Between the two cells, is that a solid wall, or are there bars there?
A. A solid wall.
Q. When you radioed for CO Young, do you recall approximately how long it took for her to arrive to offer assistance?
A. I don't recall, but it wasn't very long.

Page 139

Q. And your incident report states that you informed her of what was going on up to that point; correct?
A. Correct.
Q. So I would assume you -- you essentially just told her that you heard Amanda crying, and she's very upset, and she's still upset, something along those lines.
A. Yeah. "I heard Amanda crying. She was upset. I haven't got -- she hasn't been talking to me. Maybe she'll talk to you better."
Q. And then it appears to me that you went and got Amanda's medications and her evening snack; correct?
A. Correct.
Q. And then you returned to X Block where CO Young was still trying to communicate with Amanda; is that fair?
A. Yes.
Q. And Amanda did not want her meds at that time, so you left to return them to Door Control so they were secure; is that correct?
A. Yes.
Q. Is that where medications are normally kept, in Door Control?

Page 140

A. Medications are kept in the nurse's office. And then, if we're out dispensing meds and we have to secure them and lock them somewhere, we have to lock them in Door Control because it's a secured entrance.
Q. Do you recall who was working Door Control on -- during the shift?
A. Not off the top of my head.
Q. And then did you return to X Block pretty quickly thereafter, or did you do some other things before going back to X Block?
A. Nope. I turned around and started heading back to X Block.
Q. And I'm just going to ask you for a very rough estimate, but how many feet is it from Door Control to X Block?
A. Rough estimate, 120, 145, if I -- I'm not sure.
MR. JOHNSON: If you know. If you don't know, then say so.
THE WITNESS: Yeah. I --
MR. JOHNSON: The best you can.
BY MR. CURRAN:
Q. So are you saying it's about 100 -- maybe 150 feet between Door Control and X Block?

MR. JOHNSON: No.
THE WITNESS: I -- I would say probably about a 25-second walk would be my best way to --
MR. CURRAN: And that's fair. I'm -- I'm not trying to nitpick or trip you up. I'm just trying to -- I've never been to the jail, so I'm trying to figure out how everything is laid out.
THE WITNESS: Yeah. Probably about a 25-second walk, 25-, 30-second walk.
BY MR. CURRAN:
Q. Okay. And then as you're returning to X Block, you cross paths with CO Young and CO -- is it Wolosek?
A. Yes.
Q. Did you have any conversation with them at that time?
A. No. Not at that time.
Q. Did you know that they were taking Amanda to the conference room?
A. Yes. After they put her in there, I figured that out.
Q. So what did you do then after you crossed paths with CO Young and CO Wolosek?
A. Probably went and completed checks, if they were needed.

And then I may have come across to the sheriff's department side and went and spoke with some deputies.
Q. Do you recall how it is you figured out that CO Young and CO Wolosek had taken Amanda to the conference room so she could use the phone?
A. After they put her in the conference room, we -- they -- we did talk about and -- about what she was up there for.
Q. Do you recall the substance of that conversation at all?
A. No, I do not.
Q. Do you recall either CO Young or CO Wolosek explaining to you why it was they were allowing Amanda to use the phone?
A. I believe -- I believe it was mentioned that she couldn't get ahold of somebody and needed to get ahold of them. That's why she was so upset.
Q. Was there a reason that they thought that she might have better luck on the conference phone as opposed to the phone in her cell or her cell block?
A. The conference room phone, we used to allow for -- if someone really couldn't get ahold of someone and really needed to, we would allow them a free phone call to use the jail phone, the booking

phone. She was allowed access to the free jail booking phone that wasn't a collect call.
Q. And is that something that is routinely done in the jail?
A. Back then, yes.
Q. You say "back then." Is that something that has since changed?
A. Yes.
Q. Okay. When did that change occur?
A. Last year sometime.
Q. And was that a directive that came from jail administration, that inmates could no longer use the conference room phone?
A. Yeah. It came down from the lieutenant. They could use the phone for -- to get medications or bond.
Q. What do you mean, "to get medications"?
A. So if they had to call someone to get medications set up or get medications brought in to the jail, if there's meds they're supposed to be on so we could give them to the nursing staff, they could use the free phone call -- or free phone to contact someone to bring meds in for them.
Q. You said that was handed down by the lieutenant?

A. Yes.
Q. Is that Lieutenant Knapp?
A. Yes.
Q. Do you recall, was there an email that was circulated in that regard?
A. I believe it was an email.
Q. Did she explain in the email the reason for that change in policy?
A. I don't recall.
Q. Do you recall ever having any conversations with anyone as to why there was a change in policy?
A. I believe it centered -- what we could come up with, it centered around they were attempting to do some investigation for drug stuff, and they wanted people who were using the phone to be recorded.
Q. Is it your understanding that outgoing calls from that conference room phone are not recorded?
A. Correct. From the free phone call, yes.
The conference room one on the wall, it is recorded.
Q. And which phone was Amanda using?
A. Amanda was using our booking telephone, which was a cordless phone that we brought her out for her to use.
Q. So then is it your understanding that phone

Page 145

call that she placed would have been recorded or would not have been?
A. I don't believe that was recorded at that time because it was our -- it was our booking phone. It wasn't connected to the recording system.
Q. Do you know who it was that gave her the booking phone?
A. Not off the top of my head. I would assume it was CO Young, but I don't know for sure.
Q. How far is the conference room from the booking desk?
A. It is right next to the booking desk.
Q. So they're fairly contiguous to each other?
A. Yep. They're separated by just one wall. And you can see the conference rooms from the booking desk as they're reflective windows, and you can see into them. They're reflective windows.
Q. When you say "reflective windows," do you mean that you could see in one way, but not through the other direction?
A. Correct.
Q. So you can see into the conference room, but someone in the conference room cannot see out; is that correct?

Page 146

A. No. The conference room windows are see-through on both sides.
It's the -- Door Control is directly across, and they have reflective windows, and you can see from the reflective window into Door Control right -- or the conference room right next to you.
Q. Oh, I see. So you can see directly into the conference room from Door Control?
A. Yep. And you can see into the -- you can see directly into the conference room from Door Control, and you can see through -- from looking at the reflection into the conference room from booking. And the conference room, you can see in and out.
Q. So then did somebody stay, like, at the conference room door to -- to monitor Amanda while she was on the phone?
A. I don't believe so.
Q. Was -- to your knowledge, was there any communication with the officer at Door Control about Amanda being allowed to use that phone?
A. Not to my knowledge, but I would assume there was.
Q. I take it a lot of your communication in the jail happens via radio.
A. A fair amount of it.

Page 147

Q. Do you have any recollection of communication going out over the radio about Amanda being permitted to use that conference room phone?
A. I do not have any recollection.
Q. So then was somebody assigned to sort of keep an eye on her while she was using that phone?
A. Our usual procedure was the -- if someone was in the conference room, the person in Door Control keeps a little bit closer of an eye while they're in the Door -- while they're in there in case they need anything.
Q. So you're saying, typically what would happen is the person in Door Control would keep a little closer eye on the pers- -- the inmate in the conference room?
A. Yep. We'd let them know that someone is in there using the phone and that -- just to keep an eye on them. If they knock or need anything, let us know, and we'll come over and talk to them.
Q. Now, can you hear what's going on in the conference room from outside of it if the door is closed?
A. You have to be listening really closely.
The conference rooms are also where attorneys meet with their clients, so it's a little

Page 148

more soundproofed in there so people can't overhear. It doesn't pick up on our audio recorders out.
Q. When you say "pick up on audio recorder," what do you mean by that?
A. I know recen- -- or not sure how recently it's been, but we do have a videocamera in booking that's got audio that shows over booking.
Q. Okay. So there is -- I'm aware that there's a camera in the booking area. You're saying that, at some point, that video also had audio capability?
A. Yep. At some point, they started it with audio. I don't know when.
Q. Do you -- okay. You don't know when?
A. No.
Q. That was going to be my next question.
Do you have a rough idea? And it's not something I'll hold you to. I'm just curious if you have any sense for when that change was made.
A. Nope. I couldn't tell you. I have no clue.
Q. Do you recall being in the booking area at all while Amanda was on the phone in the conference room?
A. I don't recall.
Q. Do you have any memory of checking on her

while she was in the conference room?
A. I do not recall.
Q. Do you have any memory at any point -- excuse me.
Do you have any memory of, at any point, stepping into the conference room with Amanda?
A. No, I do not.
Q. Do you remember anything that occurred between the time that Amanda was taken to the conference room and the time that she was removed from the conference room other than what you've testified to?
A. I do not.
Q. So your incident report says that, at approximately 2004 hours, which, I guess, is, what, 8:04 p.m., if I'm doing my math correctly --
A. Yes.
Q. -- Amanda knocked on the conference room door and asked to return to X Block. So were you in a location where you could hear her knock on the conference room door?
A. Yes. I would assume I was up around the booking area.
Q. And would she have just stuck her head out the door and said, I'm done; I'm ready to be taken

back, something along those lines?
A. She would have knocked. I would have went over to the door, opened it, and asked her what she needed. And she would say, I'm ready to go back; I'm all done.
Q. Okay. So -- and that's the question I should have asked earlier. The -- the conference room door locks?
A. Yes.
Q. And so when Amanda was placed in there, obviously then the door would have been locked?
A. Correct.
Q. So then you indicate that you "escorted Inmate Glodowski back to X Block at 2006 hours where her demeanor was much calmer, and she was no longer crying." And then, "Inmate Glodowski was no longer crying and was talking freely with me"; correct?
A. Correct.
Q. So is this conversation that you're referencing -- or her talking freely with you, is that happening as you're walking her back to X Block?
A. Yes.
Q. Did you at any time have a conversation with her just outside the conference room door?

A. Not that I recall.
Q. When you say she was talking freely with you, what do you mean by that?
A. She was openly communicating, asking questions, answering questions, sharing about herself, just -- just being -- freely and openly communicating compared to her early -- earlier state of not communicating with me at all.
Q. And again, I'm -- I'm focusing on the -- the walk between the conference room back to X Block. Okay?
A. Uh-huh.
Q. So do you recall any questions you might have asked her during that walk?
A. No.
Q. Do you remember any of the things she may have said to you during that walk?
A. No, I do not.
Q. Were you walking by her side or behind her? In front of her? Do you recall?
A. I would have been slightly behind her and off to her side.
Q. So you remember that she was communicating with you, but you don't remember the substance of any of that communication; is that fair? And again, I'm

talking about between the -- the walk between the conference room and X Block.
A. Yes.
Q. And then you indicate, "Upon returning her to cell, I administered Inmate Glodowski her meds." So would you have had to have retrieved her meds from Door Control?
A. Nope. I -- because our med pass is usually at 8:00. So I went back into Door Control and had them ready and with me when she was done with her phone call.
Q. Okay. You're going to have to explain that to me again. My understanding is that earlier you had tried to give Inmate Glodowski her medications; right?
A. Yes.
Q. And she refused them; correct?
A. Correct.
Q. And so then you went and secu- -- secured her medications in Door Control; right?
A. Yes.
Q. So at the time that you escorted her from the conference room to X Block, were her medications still in Door Control?
A. No. I would have went and retrieved those

Page 153

before escorting her.
Q. Thank you. So you would have gone and retrieved the medication in anticipation of giving them to her; is that fair?
A. Yes.
Q. So you had the medication with you as you're escorting her. And then once she gets back in the cell, you give her her meds; is that correct?
A. Correct.
Q. Did she need water or anything to -- to take those?
A. I believe she went and got a cup of water from her cell when she got in there.
Q. Okay. And then you indicate that you asked Inmate Glodowski if she was doing better, to which she replied yes; correct?
A. Correct.
Q. And then she also thanked you for -- or collectively all of you for letting her use the phone; correct?
A. Yes.
Q. And then you asked her if she needed anything else besides new toilet paper, to which she replied no; correct?
A. Correct.

Page 154

Q. So this is all conversation you're having with her inside of X Block?
A. Yes.
Q. Do you remember how it was you knew that she needed new toilet paper?
A. She had a toilet paper core ready to hand back in.
Q. Is that -- you're going to have to explain that to me.
A. So at the jail, when inmates need a new roll of toilet paper, they have to exchange the core from the previous roll they had, and we'll give them a new roll of toilet paper. So she had her toilet paper --
Q. Understood.
A. She had her toilet paper core ready to go.
Q. Was that just, like, on the table or something?
A. Yeah. It was somewhere on the table, or she handed it to me. I'm not -- I can't recall exactly. But it was somewhere visibly where I could see that she needed more toilet paper.
Q. And then, again, you asked her if she needed anything else, and she replied no. And then you left to get the toilet paper, and you returned. Do you recall how long it was between leaving to get the

Page 155

toilet paper and returning to X Block?
A. 10 seconds.
Q. Okay. Up to this point when you're having, you know, this -- this conversation with Amanda where she said she was feeling better and she thanked you for using the phone, do you remember where she was at in the -- the cell block?
A. Standing near the table.
Q. And when you returned, you then asked Inmate Glodowski that if, due to her earlier emotional state, if she had any thoughts of harming herself; correct?
A. Correct.
Q. And you did ask her that?
A. Yes.
Q. Why did you ask her that?
A. I ask that to anybody who was upset and crying and -- before assuring my decision to put them back in general population.
Q. So is it fair to say that, earlier, Amanda had been emotionally distraught?
A. Yes.
Q. And based on everything you knew about her mental health history, at least as -- insofar as information was available to you, you wanted to be

Page 156

sure that she wasn't having thoughts of harming herself; is that fair?
A. Yes.
Q. And that's because, knowing her history, the fact that she was very emotionally distraught, was sort of a red flag that she might potentially harm herself?
MR. JOHNSON: Objection. Form. Foundation.
Go ahead.
THE WITNESS: Not even knowing her history, that's something I would ask anybody who was crying and I was taking them back to the cell would be if they're okay and have any thoughts of hurting or harming themselves. Just because I -- there was information out there wasn't -- that wasn't the reason I was asking it. That's just what I do with anybody.
BY MR. CURRAN:
Q. Right. But to be fair, you knew a lot more about Amanda; correct?
A. Yes. Due to previous interactions.
Q. In fact, I think -- without pulling them out, I think, in your interrogatory responses, you mentioned having several interactions with her over

Page 157

her multiple incarcerations at the jail; is that correct?

MR. JOHNSON: Asked and answered.

Go ahead.

THE WITNESS: Yes.

BY MR. CURRAN:

Q. And you knew about her seizures; correct?

A. Yes.

MR. JOHNSON: Asked and answered.

Go ahead.

BY MR. CURRAN:

Q. You knew that she had been placed on mental health watch previously?

A. Yes.

Q. And you would have, at least at one time, known that she had been placed on suicide watch during a prior incarceration; correct?

A. That's safe to assume.

Q. And so knowing all those things about her, when you see her being emotionally distraught, that would put you on notice that, hey, I need to follow up with her because she might be at risk of trying to hurt herself; correct?

A. Yes.

Q. You indicate that, "Inmate Glodowski stated

Page 158

no, and she was fine at this time and would let us know if she needed anything"; is that correct?

A. Correct.

Q. And again, do you recall where she was standing in the cell block when she said that to you?

A. If my recollection serves me, she was standing up by the table somewhere in the day room.

Q. How long was this exchange you had with her? I mean, was it pretty quick, or did you take time to -- to really talk to her? Or what do you remember?

MR. JOHNSON: Objection. Form. Overbroad. Vague.

Go ahead.

THE WITNESS: I don't recall how long the discussion was.

BY MR. CURRAN:

Q. I mean, can you approximate for me?

A. Two to four minutes. Two to three.

Q. Do you recall having any conversations with Correctional Officer Young or Correctional Officer Wolosek before Amanda was found hanging in her cell?

A. I do not recall.

Page 159

Q. Is there a reason why you didn't give additional consideration to putting Amanda on a mental health watch even though she said that she didn't have any thoughts of harming herself?

MR. JOHNSON: Objection. Form. Misstates prior testimony.

MR. KNOTT: Form.

MR. JOHNSON: Go -- overbroad.

Go ahead.

THE WITNESS: It would just be the fact that, at the time, that there wasn't -- besides her previous emotional state, she was -- appeared fine, was freely answering questions. My gut, which is a huge part of it, wasn't telling me there was anything wrong at the time and --

BY MR. CURRAN:

Q. What was it about her demeanor other than what you've already testified to, if anything, that contributed to that gut feeling that everything was fine?

A. Well, she was laughing and talking, smiling, didn't hesitate when answering any of the questions.

Q. Do you agree with me that, based on everything you knew about her and then her emotionally distraught state, that at the time you

Page 160

placed her back in her cell block, it was incumbent upon you to ask her if she had any thoughts of hurting herself?

MR. JOHNSON: Objection. Form. Vague.

Go ahead.

THE WITNESS: Can you rephrase the question?

MR. CURRAN: Sure.

BY MR. CURRAN:

Q. Based on all the training you've received, based on your experience, and based on everything you knew about Inmate Glodowski up to that point, at the time that you put her back in X Block, did you feel it was your responsibility to ask her if she was having any thoughts of harming herself?

A. Yes. It was my responsibility. I was the one who was moving her back.

Q. Do you recall any other inmates being in the area of the cell block at the time that you were escorting Amanda back to it?

A. No, I do not.

Q. Are there inmates who are assigned various kind of odd jobs in the jail?

A. Yes. We have inmate workers.

Q. Do you have any recollection of inmate workers sort of milling about during this period of time in which Amanda was taken to the conference room and then brought back to X Block?
A. Not that I recall.
Q. Do you recall the names of any of the inmate workers who would have been working at that time?
A. No, I do not.
Q. And then at some point you received a radio communication that CO Young needed immediate assistance in X Block; correct?
A. Correct.
Q. Did she, at that time, tell you why she needed immediate assistance?
A. She did not.
Q. Okay. It says in here that you responded to X Block, only stopping to grab the medical shears out of the control panel between J and L block and a pair of gloves. Do you see that?
A. Yep.
Q. Do you know why you would have grabbed the medical shears and the gloves if you didn't know why she needed immediate assistance?
A. It was just something in her voice over the radio, having been a part of a previous time when we

needed the medical shears and --
Q. And that was when Eric Casperson committed suicide by hanging?
A. Yes.
Q. You -- when you walked into the cell block, you observed Amanda hanging against the metal bars of her cell opening; correct?
A. Yes. With CO Wolosek there.
Q. Do you recall how high the -- the sheet was tied up on the -- the bars?
A. Six and a half -- it's over my head. I'm 6'2. So it was over my head where the sheet was tied up.
Q. You would agree with me that hanging sheets or towels or anything of that nature from cell bars is strictly prohibited at the jail; correct?
A. Correct.
Q. And that, in part, is due to the fact that an inmate could potentially try to harm themselves that way?
A. Yes.
Q. So, again, if -- if you see an inmate with something hanging by the bars of their cell, that requires an immediate response from you as a correctional officer; correct?

A. Yes.
Q. After Wisconsin Rapids paramedics arrived and they took over Amanda's care, do you recall what you did for the remainder of that shift?
A. Resumed my normal correctional officer duties, doing safety/security checks, book-ins, if they showed up, completing incident report.
Q. Did you, at any point during that shift, have a conversation with CO Young about what had taken place with Amanda?
A. I'm sure sometime during the night we talked about it.
Q. Do you remember the substance of that conversation?
A. Probably just a little bit of going over what -- how we responded to it and how we took care of it, if we did everything right with our response to the medical emergency taking place.
Q. Do you remember any of the specifics of that conversation?
A. No, I do not.
Q. When you entered the cell block and saw that Amanda was hanging, do you recall what thoughts were running through your mind?
A. I do not recall.

Q. Do you remember anything you might have said at that time?
A. I do not. I know we were talking about taking -- performing CPR and contacting who we needed to contact. And that was the sole -- if any discussion took place, that was the sole stuff of what was going on was handling the medical emergency.
Q. And in a med- -- medical emergency like that, is it Door Control that calls for paramedics?
A. Yes. After they get radioed by staff who is responding, they're the ones who call and let dispatch know we need paramedics.
Q. And you were the one who radioed control to contact Wisconsin Rapids Fire Department; is that correct?
A. I believe I was.
Q. And then do you remember having any other conversations concerning Amanda after her suicide during that shift?
A. No. Not that I recall.
Q. Do you remember talking to, is it, Lieutenant Hoogesteger about what had happened?
A. I don't recall, but I'm -- he was the investigating officer. So I believe I talked to him

Page 165

and spoke with him.
Q. Is it fair to say then that you don't have any independent recollection of your conversation with him?
A. No, I do not.
Q. Do you know whether or not you spoke with him before or after you completed your incident report?
A. I can't remember.
Q. Do you know if you and CO Young filled out your incident reports at the same time?
A. I don't know.
Q. Do you remember collaborating at all with her in filling out your incident report?
A. No.
Q. Do you recall any specific conversations you may have had with CO Wolosek after Amanda's suicide?
A. No, I do not.
Q. Have you ever reviewed CO Young's incident report concerning Amanda's suicide?
A. I think I did after she had it completed that night. I don't think I've looked at it since then.
Q. So at some point then, you would have

Page 166

reviewed her incident report the night that she completed it, if I understand you correctly?
A. Yep.
Q. Do you know whether or not she reviewed your incident report?
A. I'm not sure.
Q. Did you, at any point, have a conversation with Captain Ashbeck about Amanda?
A. Not to my recollection.
Q. Did you ever have any conversation with Lieutenant Knapp concerning Amanda after her suicide?
A. Not to my recollection.
Q. Is that not typical? I mean, I would think you would talk to somebody in jail administration after there's been a suicide at the jail. Is that not correct?
A. Yeah. You talk to them and give them a run -- quick rundown of what happened, and then you'd complete your report and go off your report. I just thought -- I don't remember having the conversation. Like I said, it probably happened. I just don't remember it.
Q. Do you believe that you would have had that conversa- -- and would it -- would it have been with

Page 167

Captain Ashbeck?
A. I would think it would be with Lieutenant Knapp.
Q. Would you have called her at home during your shift?
A. Yes. I believe she -- the -- Captain Ashbeck and Lieutenant Knapp both came into the facility sometime that morning or night.
Q. Do you ever remember sitting in an office and -- and speaking with them about the -- the suicide?
A. No.
Q. Do you recall there being any kind of follow-up with jail administration in the days after Amanda's suicide about her suicide?
A. Not that I can recall.
Q. Do you recall watching any recorded video in Door Control on the night of Amanda's suicide?
A. Yes. I went back and reviewed it just so I could get a timeline of the events leading up to our response and when paramedics arrived and --
Q. Do you recall anybody else being in Door Control when you went back to look at the video?
A. I don't recall. Maybe the Door Control officer.

Page 168

Q. And again, at this time, you don't remember who that Door Control officer was?
A. No, I do not.
Q. Was there a reason you felt like you had to look at the video to establish the timeline of what occurred?
MR. JOHNSON: Objection. Misstates prior testimony.
Go ahead.
THE WITNESS: When I do an incident report, I like it to be true as best of my ability with timelines. So if people do have to go back and review camera, they have a general idea of where they can go back to look at video footage on. Instead of just giving them a vague, between the hours of this time and this time, I like to have a time stamp to be able to give people to look at it.
BY MR. CURRAN:
Q. And I take it then you must know how to pull up video -- recorded video while you're in Door Control.
A. Yes.
Q. Do you know how far back recorded footage goes?
A. I do not.

Q. Do you recall from what camera or cameras you viewed video?
A. The camera in X Block and the camera over booking, I would say, would be what I used.
Q. Do you have any memory of CO Young looking at that video footage?
A. No, I do not.
Q. So you were working the night shift on the date of this incident; correct?
A. Correct.
Q. And your normal hours were, what, 8:00 to 8:00 or --
A. 6:00 p.m. to 6:00 a.m.
Q. So we talked about CO Young, CO Wolosek. Do you recall anybody else who might have been on shift at that time?
A. The other people on my shift who may have been there were CO Grode and CO Beyer.
Q. I'm sorry. Did you say Beyers?
A. Beyer, B-E-Y-E-R.
Q. Thank you. Do you remember who would have been the lead correctional officer or if there even was one during that shift?
A. If CO Beyer was there, he would have been the acting lead. We didn't have a lead assigned to

us at that time so...
Q. And during this period of time - and I'm referring generally to the month of April and May 2017 - is it true that you were working nights?
A. Yes.
Q. Did you ever work days during that period of time?
A. I can't recall. There were days here and there throughout each year where I'd end up on day shift for a little bit, but I can't recall when.
Q. So is it fair to say that, for quite a while after you were hired, you were on night shift; is that right?
A. Yep. I was on afternoons, and then I was on nights.
Q. What is the afternoon shift?
A. That was when we -- when we first started, we had three separate shifts. So that would have been 3:00 to 11:00.
MR. CURRAN: Monica, could we go ahead and show the witness Exhibit 9?
(Discussion held off the record.)
BY MR. CURRAN:
Q. Officer Johnson, have you been handed Exhibit 9?

A. Yes.
Q. So I will represent to you that this, to me, appears to be a transcription of some radio communication from the night of Amanda's suicide.
MS. EPSTEIN PUTNEY: What's --
MR. JOHNSON: Nick --
MS. EPSTEIN PUTNEY: -- what's the number, please?
MR. JOHNSON: Yeah. Nick, the numbers aren't clear on this end, so could you please read the Bates number?
MR. CURRAN: Yeah. It's Wood County 1656 through 1657.
MR. JOHNSON: Thanks.
BY MR. CURRAN:
Q. And I just had a question about this. So if you refer to the second page, do you see where it says, "Saturday, May 6th, 2017"?
A. Yeah.
Q. And the time, 10:19 p.m. So there's a statement there -- it's -- I -- I think it's attributed to you. That says, "Is there any porn movies backed around on the booking side or on the floppy side?" Do you know what that means?
A. I have no clue. There's a -- quite a few on

these on here that don't make any sense.
Q. Okay. It doesn't make any sense to me, which is why I asked you.
A. Yeah. It's -- I'm looking at this transcription. I said, like -- I said, we didn't have someone who was numbered 462 where it says -- on Saturday, May 6th, 2017, at 8:50, where I said "Control to 462," we didn't have anybody numbered 462.
Q. Understood.
A. So there's a lot of stuff on here that's not either transcribed right or whatever. This is --
Q. So your belief is that this is likely an inaccurate transcription with regard to the entry at 10:19 p.m.?
A. 100 percent.
Q. Okay. Thank you.
MR. CURRAN: And then, Monica, if we could show him Exhibit 10 --
BY MR. CURRAN:
Q. So, Officer Johnson, if you could take a look at Exhibit 10, I think that this is some sort of data entry showing when you worked on various dates in April.
MR. CURRAN: And I'm sorry. Counsel,

this is Wood County 1762.

BY MR. CURRAN:

Q. Are you familiar with page 1, this -- this chart?

A. Yep. That's April's schedule.

Q. What is -- next to your name, it says, "Johnson 720." 720 is your, I guess, correctional officer's number --

A. Yes.

Q. -- is that right?

A. Yes.

Q. And the Xs would indicate days on which you worked; is that correct?

A. The Xs are days off.

Q. Oh. Thank you. That's helpful.

What does 6DC, for example, on April 3rd mean? What does that mean?

A. 6DC means the first six hours are in Door Control. And then DC6 means the second 12 -- or the second six hours are in Door Control.

Q. Ah. Okay. And then S4, what does that mean?

A. "S" means sick time. When it's highlighted red, that means they were sick, called in sick.

Q. Does the -- the number 4 have any

significance?

A. With our -- the way our pay period works out, every 28 days, we have one four-hour shift. So that would be our four-hour shift.

Q. Okay. And I'm not seeing any S4 along your row, but I just saw it, and I was wondering what it meant.

So then where there's a number 4 indicated, for example, on April 18th next to your name, does that mean that was a four-hour shift for you?

A. Yep. On April 17th, it was four hours.

Q. And when you work a four-hour shift, is it always the same four hours?

A. Yep.

Q. And what are those four hours?

A. The four hours are usually 6:00 p.m. to 10:00 p.m.

Q. So you told me that the -- the blank spots are actually days that you're assigned to work; correct?

A. Yes.

Q. And since you worked nights, I would assume that -- for example, Monday, April 3rd, that's indicating that your shift started on Monday at 6:00

p.m.?

A. Correct.

Q. And then what does SD indicate?

A. SD is special duty.

Q. What does that mean?

A. That's if we would be assigned for something other than our normal shift, we'd get a special duty day. It's -- we're not -- it's not -- we're not working our normally scheduled hours.

Q. And then what does the H stand for that I'm seeing here and there?

A. That stands for Huber. So they were the Huber officer that night.

Q. And can you explain what the Huber officer is?

A. The Huber officer takes care of the Huber wing of the jail. It's his main -- that's the main pur- -- his main purpose that night. So that's checking in inmates who return from work, releasing inmates to go out to work, handle the supplies that come from the Huber side. They dispense meds on the Huber side. Anything to do with the Huber side of the jail, it's -- it's their main responsibility.

Q. Is X Block in the Huber side of the jail?

A. No, it is not.

Q. Do you know offhand what blocks are on the Huber side?

A. Huber side consists of M, Mary, N, Nora, P, Paul, R, Richard, S, Sam, and T, Tom.

MR. CURRAN: Could we just take a short two-minute break for me to look over my notes?

MR. JOHNSON: Sure.

MR. CURRAN: Thanks.

(A recess was taken.)

BY MR. CURRAN:

Q. Officer Johnson, did you have any contact with the Wisconsin Department of Corrections concerning Amanda's suicide?

A. No, I did not.

Q. Can you recall any other specific conversations you may have had about Amanda's suicide that you have not testified to here today?

A. No, I cannot.

MR. CURRAN: I don't have any other questions.

MS. EPSTEIN PUTNEY: I don't have any.

MR. JOHNSON: I just have a few questions, Nick, that I want to clarify just a couple things.

EXAMINATION BY MR. JOHNSON:

Page 177

Q. Officer Johnson, you remember Mr. Curran asking you questions about a neurologist's report or evaluation of Amanda Glodowski?
A. Yes.
Q. You never saw that report; is that true?
A. Correct.
Q. And you know -- and I think you had testified that you typically don't have access to the medical records in your capacity as a CO at Wood County?
A. Yes.
Q. That's true?
A. That's true.
Q. And you wouldn't have regular access to mental health treatment records either, again, because you're a CO at Wood County?
A. Correct.
Q. Are you aware one way or another if Amanda Glodowski underwent any additional medical or mental health assessment after she was seen by the neurologist?
A. I am not aware.
Q. Again, because you don't have access to that information?
A. Correct.

Page 178

Q. Assuming that she was assessed by other mental health or medical professionals after she was seen by a neurologist, I think you testified before that, in your role as a CO, you would defer to them for their mental health or medical rec- -- or their medical opinions or assessments of Ms. Glodowski; right?
A. Yes.
Q. Those types of decisions were left to their profession -- professional purview; right?
A. Correct.
Q. So when you were asked before about whether you want -- whether you would have liked to have seen the neurologist's report or -- or opinions and whether that information would have changed how you would have conducted your job, you were -- that -- your response or your answer to those questions were based upon incomplete information, assuming, again, that she was assessed by other medical or mental health professionals after that neurologist's report? Is that a fair assessment?
A. Yes.
MR. KNOTT: I just have a --
MR. JOHNSON: Okay. I don't -- I don't have any other questions. Thank you. Sorry.

Page 179

EXAMINATION BY MR. KNOTT:
Q. This is Doug Knott. I just have a couple of questions in follow-up.
Sir, as a correctional officer, I assume that you're expected to respect the privacy of an inmate's medical information; is that correct?
A. Correct.
Q. And you don't expect medical or mental health to share confidential patient information or inmate medical information with you; true?
A. Correct.
Q. And so medical or mental health information about an inmate is typically not shared with a correctional officer; true?
A. Yes. For the most part, that's -- unless it immediately affects something.
Q. Right. And if it did immediately affect something then -- and this is on the, say, mental health. If it did immediately affect something you were doing, that would come to you as a correctional officer as a recommendation from the mental health team; fair?
A. Correct.
Q. Okay. It wouldn't come directly from a doctor on the outside, for instance; right?

Page 180

A. Correct. It would not. It would come from our jail staff, medical health crisis.
Q. And then I -- I just wanted to follow up about that term, "crisis." And I think that it was used a couple of different ways during the deposition.
But initially, I think we were talking about an email list of -- of recipients as the Crisis Watch. And you listed the nurse and, like, the jail administration as the Crisis Watch. Is --
And then later, I think we were referring to Crisis as maybe the people from DHS.
So I'm trying to -- I'm not -- I don't know what question to ask you, but I'm trying to clarify. When you say Crisis would respond, what -- what people are you talking about?
A. In -- in that email, in that -- the subfolder of that email, it was jail administration, nurse, and then the crisis members from DHS were included all in that email group.
Q. Okay.
A. So when we sent that email out saying there was someone to be seen, all of them got a report, that same email and an attachment, saying that they need to see someone. And then Crisis would respond

their next day they came in with -- they'd bring those forms with or something like that. And they would go, here -- here -- we are here; we're to see whoever was on the email.

Q. But, like, the jail administration is not Crisis when you refer to that; right?

A. Yep. That -- yeah.

Q. You're referring to the outside people who come in and -- and provide the -- the mental health assessment or services?

A. Correct. The crisis people are from DHS.

And we just have the Crisis Watch email that says, these are everyone who's going to get a report and know -- so they know what's going on in the jail. And the --

Q. So the --

A. -- jail administration is included in that. So they get a copy of the report.

Q. And you can look at the exhibit again, but the -- from my recollection, the jail nurse is listed as a cc on that -- that form. So the jail nurse would be -- like the jail administration, would not be Crisis, as you're referring to it; right?

A. Correct.

Q. Okay. And then just, finally, sir, you're

wearing a T-shirt that says "Fire and EMS," I think. Are you an EMS?

A. I -- a lot of friends and family.

MR. KNOTT: Okay. All right. That's it.

EXAMINATION BY MS. EPSTEIN PUTNEY:

Q. I actually have a couple.

Counsel showed you and marked certain exhibits from the jail file, but not others.

He did show you Exhibit 7, which you were questioned about, and the date on that is April 28th, 2017; correct?

A. Correct.

Q. And that's from one of the outside DHS mental health workers; correct?

A. DHS or Unified Services, whoever they were contracting with at the time that --

Q. Okay.

A. -- do that stuff.

Q. So you're not quite sure who Demaris Losinski works for. But in any event, would that person fall within the Crisis denomination you've given as a mental health worker?

A. Yes, I believe so.

Q. Okay. And do you know if Ms. Glodowski was

seen by any other mental health workers or counselors during this jail stay?

A. Not that I'm aware of.

Q. Okay. And if -- counsel did not show you another note from April 21st, 2017, from a counselor named Constance Vernig, V-E-R-N-I-G. As you sit here, just from your memory, you don't know whether Ms. Vernig also saw Amanda about a week or so before Demaris Losinski saw Amanda; true?

A. True.

Q. And you would need to look at that record to -- to say one way or the other whether Amanda was seen not only by Demaris Losinski on April 28th, but also by Constance Vernig on April 21st; fair?

A. True.

Q. And --

A. Fair.

Q. -- counsel has not marked or shown you that document; true?

A. True.

Q. And do you have any idea the date of the neurology appointment with a Dr. Sandok that counsel asked you about, although he did not show you that note?

A. No clue.

Q. And do you have any idea whether that visit to the neurologist predated both of the mental health visits that Amanda had in April and May of 2017?

A. I do not know that.

MS. EPSTEIN PUTNEY: Okay. Thank you.

EXAMINATION BY MR. CURRAN:

Q. I have some follow-ups based on that.

Officer Johnson, you alluded to the privacy of medical and mental health records within the jail; correct?

A. Correct.

Q. But you also would expect those with access to that information to share it with correctional officers to the extent they deemed it necessary to protect the inmates' health and safety; correct?

A. Correct.

Q. So, for example, the progress note, which I referenced as Exhibit 7, it -- it appears, at least based on the printing on it at the top, that that was faxed to the jail; correct?

MR. JOHNSON: Objection. Misstates prior testimony.

Go ahead, if you know.

THE WITNESS: I believe so. I said, I'm not familiar with the fax number off the top of

my head.

BY MR. CURRAN:

Q. And again, this is Amanda reporting to a social worker, not a psychiatrist, not a psychologist, but a social worker that she was broken and needed to go to a psych ward to be fixed and that she was a mess and that she was quite emotional and somewhat scattered. So that is information that it appears was conveyed to jail staff; correct?

MR. JOHNSON: Objection. Form. Foundation.

MS. EPSTEIN PUTNEY: Asked and answered.

MR. JOHNSON: Go ahead.

THE WITNESS: It would appear so on -- from this progress note.

BY MR. CURRAN:

Q. And you would expect, as a correctional officer, that if there was an inmate who a mental health worker identified as potentially -- potentially being at harm of trying to commit suicide -- strike that. That's a bad question.

In a situation like this, is there anything that would prevent that information from being shared with the correctional staff so as to

keep a little bit closer eye on Amanda?

MR. JOHNSON: Objection. Form. Speculation. Overbroad.

Go ahead.

MR. KNOTT: Object. It's vague.

THE WITNESS: The -- the progress note would be -- expectation that it would be placed in the booking report area that we talked about before so it would be able -- there to be shared.

MR. CURRAN: I don't have anything else based on that.

MR. JOHNSON: Okay. Thanks.

(Proceedings concluded at 1:47 p.m.)

* * * * * *

STATE OF WISCONSIN )
WOOD COUNTY )

CERTIFICATION PAGE

I, MONICA M. HUNKINS, RPR, Notary Public in and for the State of Wisconsin, do hereby certify:

That prior to being examined, the deponent named in the foregoing deposition, TERRY JOHNSON, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth. Said deponent did not request the opportunity to read and sign the transcript.

That said deposition was taken before me at the time, date, and place set forth; and I hereby certify the foregoing is a full, true, and correct transcript of my shorthand notes so taken and thereafter reduced to computerized transcription under my direction and supervision.

I further certify that I am neither counsel for nor related to any party to said action, nor in any way interested in the outcome thereof; and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, or that requires me to provide any service not made available to all parties to the action.

IN WITNESS WHEREOF, I have hereunto subscribed my name this 27th day of May, 2019.

Monica M. Hunkins, RPR
Notary Public - State of Wisconsin

My Commission Expires July 19, 2019