**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| ANGELA GLODOWSKI, as the Representative of the Estate of AMANDA GLODOWSKI, Deceased, and as Next Friend of R.G., a minor, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 18-cv-151-bbc |
| KRISTIN M. PAGELS, L.P.N., TERRY JOHNSON, CASSI YOUNG, SHERIFF THOMAS REICHERT, and WOOD COUNTY, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO COUNTY**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Angela Glodowski, as Representative of the Estate of Amanda Glodowski, Deceased, and as Next Friend of R.G., a minor, by and through her attorneys, Kathleen T. Zellner & Associates, P.C., in opposition to Defendants Terry Johnson, Cassi Young, Thomas Reichert, and Wood County's Motion for Summary Judgment, states as follows:

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In making that determination, a court must view the evidence 'in the light most favorable to the

1

opposing party.'" *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

Moreover, it is not simply enough to view the evidence in a light most favorable to the non-moving party.  Indeed, in ruling on a summary judgment motion, the Court is required "to construe all <u>inferences</u> in favor of the party against whom the motion under consideration is made." *Rupcich v. United Food & Commercial Workers Int'l Union*, 833 F.3d 847, 853 (7th Cir. 2016) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)) (emphasis added).  The Supreme Court has reaffirmed this principle, reversing the grant of qualified immunity because the lower court failed to recognize the "importance of drawing inferences in favor of the nonmovant." *Tolan*, 572 U.S. at 657.

Finally, it is critical to appreciate that "inferences are often necessary when the plaintiff's sole eyewitness is dead," bearing in mind that Plaintiff may always prove her case "by circumstantial evidence where direct evidence is unavailable." *Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005) (citing *Murrell v. Frank*, 332 F.3d 1102, 1117 (7th Cir. 2003)).  *See also*, *Cruz v. City of Anaheim*, 765 F.3d 1076, 1077–1080 (9th Cir. 2014) (holding that a police officer's self-serving version of events should be carefully examined because the person most likely to rebut the officer—the one killed—cannot testify).  Such is the case here, where the person most likely to refute Defendants' version of events—Amanda Glodowski—is deceased.

## FACTUAL BACKGROUND:
## DEFENDANTS JOHNSON AND YOUNG

With the foregoing legal principles in mind, the facts most essential to ruling on Defendants' motion for summary judgment are as follows:[1]

Amanda was booked into the Wood County Jail ("the jail") on February 10, 2016.  (PPF ¶ 123).  On February 12, Amanda was placed on a suicide watch after she told a correctional officer that she felt suicidal.  (PPF ¶ 132).  On February 13, Amanda told Officer Grode that she had removed her partial denture and cut her left arm with it.  She also told Officer Grode that because she could not get her denture to cut her arm deeply enough, she tried to swallow it.  (PPF ¶¶ 135–36).  Amanda's denture was removed from her posterior pharynx by an emergency room provider. (PPF ¶ 139).  Defendant Johnson was present when Amanda told Officer Grode that she had cut herself and tried to swallow her partial denture or, if not, Officer Grode would have told him about the incident.  (PPF ¶¶ 137–38).  Amanda was cleared from suicide watch on February 16, and she was released from the jail on February 19. (PPF ¶¶ 141–44).

Amanda was booked into the jail on January 5, 2017.  (PPF ¶ 145).  She informed the booking officer that she had last attempted suicide three years prior by taking pills.  (PPF ¶ 146).  Amanda was booked into the jail again on January 12, 2017, at which time she told the booking officer that she had multiple prior suicide attempts: about a year prior by taking pills, and about three years prior by heroin.

---

[1] Additional facts bearing on Defendants' motion will be set forth where pertinent to address Defendants' legal arguments.

(PPF ¶¶ 150–52).  On January 17, 2017, the jail doctor, Dr. Hekman, noted Amanda looked down constantly, she was tearful, and that she had a flat/sad affect.  Dr. Hekman's assessment was that Amanda was suffering from "Anxiety/Depression." (PPF ¶¶ 157–59).

Amanda suffered several seizures during her January 2017 incarceration. (PPF ¶¶ 147–49, 153–54).  Officer Bohl tried to bring Amanda out of one of her seizures by performing a sternum rub.  (PPF ¶ 155).  Amanda became agitated and started yelling and swearing at the officers.  (PPF ¶¶ 155–56).

Amanda was last booked into the jail on April 7, 2017.  (PPF ¶ 160).  Amanda informed Officer Bohl, the booking officer, that she had a prior psychiatric hospitalization in 2011 for a suicide attempt and that she attempted suicide in 2013 by overdosing.  (PPF ¶¶ 161–63).

Amanda's seizures continued.  On April 15, 2017, officers observed Amanda having a seizure, and she was taken to the emergency room.  (PPF ¶ 168).  The emergency room doctor diagnosed her as suffering from "pseudoseizures."  (PPF ¶ 169).  Amanda was observed having another seizure on April 16, and she was again taken to the emergency room.  (PPF ¶¶ 171).  The emergency room provider diagnosed Amanda as suffering from recurrent seizures.  (PPF ¶ 172).

Amanda frequently expressed feelings of despair and hopelessness to the jail nurse and jail staff.  On April 13, 2017, Defendant Pagels—the jail nurse—observed Amanda crying.  Amanda told Defendant Pagels "no one cares" and she "has no family or friends."  (PPF ¶¶ 163–64).  On April 16, while waiting to be evaluated at the

emergency room, Officer Johannes observed Amanda to be very upset and crying. Amanda told him she was upset because she did not know what was wrong with her, why she was having seizures, and why she was not getting any answers. Amanda told Officer Johannes she had no hope, and she had no friends or family to whom she could go. Amanda further told him she had thoughts of suicide but did not intend to hurt herself. (PPF ¶¶ 175–79).

Given Amanda's behavior and statements, Officer Johannes recommended that Amanda go on a mental health watch upon her return to the jail. Amanda agreed to be placed on a watch. Officer Johannes filled out a special watch form and placed Amanda in holding cell 3 so that she could be more easily monitored. (PPF ¶¶180, 182; CDPF ¶ 22). Officer Johannes also documented the statements Amanda made to him in an incident report. (PPF ¶ 181).

Although most inmates on a mental health watch were not kept in general population, Amanda was moved into the general population—Cellblock X—on April 20, 2016, before she met with a mental health professional. (PPF ¶ 216).

Amanda visited with Constance Virnig, a mental health worker from the Department of Human Services ("DHS"), on April 21, 2017. (PPF ¶ 218). Virnig's primary purpose in meeting with Amanda was to assess her suicidality. (PPF ¶ 234). Amanda was resistant to speaking with Virnig. (PPF ¶ 233). Virnig kept Amanda on a mental health watch after their visit. (PPF ¶ 235).

On April 22, 2017, correctional officers observed Amanda having a seizure. After the seizure, Amanda told the officers that she had hit her head on the wall and

her head hurt; she also told them she wished her head would hit harder on the wall so that the seizures would stop. The officers moved Amanda to a holding cell to keep a closer eye on her. Amanda was agitated about having to move to a holding cell; she started crying, attempted to slam the holding cell door, threw her mattress on the ground, and screamed at the officers. Officer Montag documented the foregoing information in an incident report. (PPF ¶¶ 237–42).

Defendant Johnson later spoke with Amanda in the holding cell. Defendant Johnson explained to Amanda that yelling at the staff was not the way to get what she wants and only causes the staff to become frustrated with her. Amanda told Defendant Johnson she wanted to move back to Cellblock X; Defendant Johnson agreed and returned her to Cellblock X. (PPF ¶¶ 243–46).

Defendant Johnson testified that during Amanda's incarceration he observed her engage in verbal tirades, pound, yell, and scream. He described her as a "difficult inmate" who required more time than other inmates. He testified that she was "very taxing on correctional officers." (PPF ¶¶ 247–48).

On April 24, 2017, Amanda submitted a health request slip to Defendant Pagels in which she asked to be added to the list for mental health the following Friday. (PPF ¶¶ 250–51). On April 28, Amanda met with Demaris Losinski, a DHS social worker. (PPF ¶ 253). In Losinski's note summarizing the visit, she indicated that Amanda told her, "I'm just broken. I need to go to a psyche ward to be fixed. I'm fucking broken. I'm a mess." Losinski noted Amanda to be "quite emotional" and

6

"somewhat scattered." Losinski informed jail staff about Amanda's presentation. (PPF ¶¶ 263, 265, 267).

Defendants Johnson and Young knew most, if not all, of the above information about Amanda and her course at the jail leading up to her suicide. Defendants Johnson and Young had access to Amanda's booking sheets with the medical and mental health screening questions. (PPF ¶ 290). Additionally, whenever correctional officers wrote incident reports, the reports were placed in a file in the booking area ("the booking-area file"). The booking-area file included reports from the past month if not longer. (PPF ¶¶ 293–94). Notes from the DHS workers were also sent to the jail and kept in the booking-area file. (PPF ¶¶ 289, 301). Defendant Young testified that officers were trained to review the incident reports from prior shifts, and Defendant Johnson admitted he did review them during his shift. (PPF ¶¶ 295–96). *E.g.*, *Sanville v. McCaughtry*, 266 F.3d 724, 737 (7th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)) ("If the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant official had actual knowledge of the risk.")

Thus, Defendants Johnson and Young knew that Amanda had a history of suicide attempts; in fact, Defendant Johnson responded to Amanda's holding cell on February 13, 2016, after Amanda attempted suicide while on suicide watch. Defendants knew that Amanda had a history of substance abuse. They also knew that Amanda was frequently agitated, and that she was observed on multiple

7

occasions to be sad and crying.  Defendants knew that Amanda was placed on a mental health watch on April 16, 2017 after Officer Johannes observed her to be very upset and crying.  They knew Amanda told Officer Johannes the following: that she was upset about her continued seizures, she had no hope, she had no friends or family, and she was having thoughts of suicide but did not intend to hurt herself.  Defendants knew that Amanda told officers on April 22 that she wished she had hit her head harder during a seizure so that the seizures would go away.  And, finally, they knew that Amanda told Losinski, "I'm just broken.  I need to go to a psyche ward to be fixed.  I'm fucking broken.  I'm a mess."

During the day on May 6, 2017, Amanda's only block-mate was moved out of her cell, leaving Amanda alone in Cellblock X.  At approximately 7:08 p.m., Defendant Johnson heard Amanda crying so loudly that he was able to hear her in the hallway outside the cellblock.  Defendant Johnson entered the cellblock and observed Amanda "sobbing and crying uncontrollably."  Defendant Young arrived at Amanda's cell.  Amanda continued to sob and cry uncontrollably.  (PPF ¶¶ 305–10).

At approximately 7:21 p.m., Defendant Young escorted Amanda to a conference room next to the booking area so that Amanda could make a phone call.  (PPF ¶ 311).  At about 8:05 p.m., Amanda knocked on the conference room door, and Defendant Johnson escorted Amanda back to her cellblock.  (PPF ¶¶ 312–13).  Amanda was still crying as she exited the conference room.  (PPF ¶ 337).

Despite knowing Amanda's mental health history, the fact that she was on a mental health watch, and observing her obvious emotional distress, Defendant

Johnson did not screen Amanda for suicidality.  Officer Johnson did not engage Amanda in conversation to assess her emotional state.  Defendant Johnson did not order more frequent checks of Amanda.  Defendant Johnson did not place Amanda on a suicide watch, and he did not move Amanda to one of four available holding cells where she could be more closely observed.  Instead, Defendant Johnson simply left Amanda by herself in Cellblock X.  (PPF ¶¶ 315, 319–23).

At approximately 8:37 p.m., Defendant Young performed an outside check of Amanda's cellblock.  The check lasted no longer than a second.  Defendant Young did not screen Amanda for suicidality, engage her in conversation to assess her emotional state, order more frequent checks of her, place her on suicide watch, or move her to a holding cell.  Instead, Defendant Young simply left Amanda by herself in the cellblock.  (PPF ¶¶ 326–31).

At approximately 9:05 p.m., Defendant Young observed Amanda hanging by a sheet from the bars of her cell.  Amanda was pronounced deceased at approximately 9:59 p.m.  Her death was determined to be a suicidal hanging.  (PPF ¶¶ 332–33).

**ARGUMENT:**
**DEFENDANTS JOHNSON AND YOUNG**

## I.   PLAINTIFF HAS DEMONSTRATED DISPUTED ISSUES OF MATERIAL FACT THAT PRECLUDE SUMMARY JUDGMENT ON HER FOURTEENTH AMENDMENT CLAIM

Count I of Plaintiff's First Amended Complaint ("FAC") asserts a substantive due process claim under the Fourteenth Amendment.   In order to prevail, Plaintiff must establish (1) that Defendants knew of a substantial risk that Amanda would seriously harm herself, and (2) that Defendants disregarded that risk by failing to

9

take reasonable measures to abate it.  *Estate of Hill v. Richards*, 525 F. Supp. 2d 1076, 1084 (W.D. Wisc. 2007) (citing *Farmer v. Brennan*, 511 U.S. 825, 844 (1994)). The question on summary judgment is not whether Plaintiff has proven these elements as a matter of law, but whether a reasonable jury could find in Plaintiff's favor.  *Id*. (citing *Anderson*, 477 U.S. at 248).

As to Defendants' awareness of the risk that Amanda would harm herself, Plaintiff must show that Defendants were subjectively aware of the risk.  *Id*. (citing *Farmer*, 511 U.S. at 837).  Nevertheless, a "defendant may not prevail simply by professing she was unaware of any danger."  *Id*. (citing *Cavalieri v. Shepard*, 321 F.3d 616, 621 (7th Cir. 2003)).  A plaintiff may prove that the defendant's purported ignorance is feigned.  *Id*.  One way of accomplishing this is to show that the risk was obvious, calling into question the assertion that the risk went unnoticed.  *Id*.  "[T]he more apparent the risk to a reasonable person, the more reasonable it is to infer that the defendant knew as well."  *Id*. at 1085 (citing *Farmer*, 511 U.S. at 846 n. 9).

As to the deliberate indifference prong, a plaintiff need not show that a defendant took no action whatsoever in responding to the risk.  Rather, the deliberate indifference standard may be met by showing either inaction or "woefully inadequate action."  *Hudson v. McHugh*, 148 F.3d 859, 863 (7th Cir. 1998); *Cavalieri*, 321 F.3d at 625, n. 1 ("Deliberate indifference has been found when the state actor did nothing or next to nothing in response to a substantial suicide or health risk.") (collecting cases).

10

**A.    A reasonable jury could conclude that Defendants Johnson and Young subjectively knew that Amanda was a substantial risk of committing suicide the evening of May 6, 2017.**

Plaintiff has marshalled ample evidence that as of May 6, 2017, Defendants Johnson and Young knew Amanda was at substantial risk of committing suicide. Defendants received training through their employment at the jail in suicide prevention. (PPF ¶ 1). Specifically, Defendants were trained that certain factors make an inmate a significant suicide risk, including the following: a history of substance abuse, a lack of familial support, conflict with correctional staff, poor health, anxiety, depression (including expressions of helplessness, hopelessness, sadness, and/or crying), and agitation. (PPF ¶ 7). Defendants Johnson and Young were also trained that prior suicide attempts are the best predictor of whether someone is likely to engage in self harm. (PPF ¶¶ 7–8).

Prior to April 16, 2017, Amanda had several factors that Defendants knew put her at risk of committing suicide. Amanda reported a history of significant substance abuse. She suffered from recurrent seizures, over which she expressed extreme distress. She was known to have conflict with correctional staff and was frequently agitated (*i.e.*, slamming doors, yelling at officers, swearing, etc.). Amanda showed signs of depression, including frequent crying. Perhaps most importantly, Amanda had a reported history of multiple suicide attempts, one of which occurred in the jail during Defendant Johnson's shift.

In the three weeks leading up to Amanda's suicide, she engaged in other behavior indicative of her substantial suicide risk. On April 16, 2017, Officer

11

Johannes observed Amanda to be very upset and crying. She told him she was upset because she did not know what was wrong with her, why she was having seizures, and why she was not getting any answers. She told him she had no hope, and no friends or family to whom she could turn. And, although she denied a present intent to harm herself, she admitted to Officer Johannes that she was having thoughts of suicide. Officer Johannes appropriately placed Amanda on a mental health watch— a watch from which she was never cleared by a mental health professional and was still in place on the date of her death.

Amanda's mental and emotional state declined over the following weeks. On April 22, she reported hitting her head during a seizure. Amanda told officers she wished she had hit her head harder so that her seizures would go away. Such a statement, whether characterized as a direct or indirect statement of wanting to commit an act of self-harm, was yet another sign of Amanda's suicidal predisposition. In a similar vein, on April 28, Amanda told Losinski that she was "broken" and needed "to go to a psyche ward to be fixed." Losinski reported that Amanda was "quite emotional" and "somewhat scattered." In short, by the time Defendants Johnson and Young discovered Amanda in her cell sobbing uncontrollably, the risk that she would commit suicide was obvious.

Although unnecessary, there is additional evidence from which a jury could draw the inference that Defendants knew Amanda was at substantial risk of committing suicide: their dishonesty about their final interactions with her. "False exculpatory statements are often evidence of consciousness of guilt." *BankDirect*

*Capital Fin., LLC v. Capital Premium Fin., Inc.*, No. 15 C 10340, 2018 WL 1616725,

*11 (N.D. Ill. Apr. 4, 2018) (citing *United States v. Shorter*, 54 F.3d 1248, 1260 (7th

Cir. 1995); *Calderon v. J. Younes Const. LLC*, No. 12 C 3793, 2013 WL 3199985, *4

(N.D. Ill. June 23, 2013) (same).

 In Defendant Johnson's incident report concerning Amanda's suicide, he wrote

as follows:

> At approximately 2004hrs Inmate Glodowski knocked on the
> conference room door and asked to return to X-Block. I escorted
> Inmate Glodowski back to X-block at 2006hrs, where her
> demeanor was much calmer and she was no longer crying.
> Inmate Glodowski was no longer crying and was talking freely
> with me. Upon returning her to cell, I administered Inmate
> Glodowski her meds. I asked Inmate Glodowski if she was doing
> better, to which she replied yes. She also thanked us for letting
> her use the phone. I asked her if she needed anything else besides
> new toilet paper to which she replied no. I left to get toilet paper
> and returned. I then asked Inmate Glodowski that if due to her
> earlier emotional state if she had any thoughts of harming
> herself? Inmate Glodowski stated no and she was fine at this time
> and would let us know if she needed anything.

(PPF ¶ 336). The jail surveillance video refutes Defendant Johnson's report.

Contrary to his report, Amanda can be heard in the "Book In A Video" crying as she

asked for her medications after leaving the conference room.[2] Moreover, far from

Amanda "talking freely" with Defendant Johnson, the video of the walk back to

Amanda's cell shows little, if any, interaction between them. (PPF ¶¶ 337–38).

 The surveillance video from inside Amanda's cellblock is even more damning.

Per Defendant Johnson's report, after administering Amanda's medications, he asked

---

[2] The other surveillance video, including the video from Amanda's cellblock, does not
have audio.

Amanda if she was doing better, and she responded, "Yes." Per the report, Amanda also thanked Officer Johnson for letting her use the phone. Officer Johnson asked Amanda if she needed anything else, and she responded, "No." He then left her cell. (PPF ¶ 336). The video, however, completely refutes that this interaction took place. As seen in the video, after taking her medications, Amanda opened her mouth to show Defendant Johnson that she had swallowed them. Defendant Johnson turned to leave the cell, and Amanda did not say anything to him. There was no exchange between Defendant Johnson and Amanda as he stated in his report. (PPF ¶ 339).

Perhaps anticipating the allegations that would be made against him following Amanda's suicide, Defendant Johnson indicated in his report that upon returning to Amanda's cell with toilet paper, he asked her due to her earlier emotional state if she had any thoughts of harming herself. Per his report, Amanda stated, "No," she was fine, and would let them know if she needed anything. (PPF ¶ 336). Once again, the video contradicts Defendant Johnson's report. As seen in the video, when Defendant Johnson entered the cellblock, Amanda was in her cell. Defendant Johnson placed a roll of toilet paper on the common room table. He briefly stated something in the direction of Amanda and turned to leave. (PPF ¶ 340). Given his obvious fabrications of his exchanges with Amanda leading up to that moment, a jury certainly could conclude based on the video that Defendant Johnson did not ask Amanda if she was having any thoughts of harming herself, and/or that she denied any such inclination.

Defendant Young gave deposition testimony in this litigation that is also demonstrably false based on the video. Defendant Young initially testified that she

14

took Amanda out of the conference, asked Amanda if everything was better, and Amanda "nodded her head" at her.  (PPF ¶ 341).  Yet, the video does not depict Defendant Young in the booking area at the time Defendant Johnson removed Amanda from the conference room.  And, more to the point, Defendant Young cannot be heard on the video asking Amanda if everything was better.  (PPF ¶¶ 342–43).

During her deposition, Defendant Young's testimony changed.  She later testified that she was with Defendant Johnson in Amanda's cellblock when Amanda received her medication.  Per Defendant Young's testimony, she asked Amanda if everything was better, and Amanda nodded her head.  Yet again, the video shows this to be false: the video clearly shows that Defendant Young was not present when Defendant Johnson administered Amanda her medications; on the contrary, she did not reenter Amanda's cell until she discovered that Amanda committed suicide.  (PPF ¶¶ 344–47).

Although deliberate indifference claims are necessarily fact-intensive (*Estate of Miller by Bertram v. Bath*, No. 10-CV-807, 2012 WL 12965720, *2 (W.D. Wis. Sept. 11, 2012)), the foregoing facts bear similarities to *Estate of Hill v. Richards*, 525 F. Supp. 2d 1076 (W.D. Wis. 2007).  In *Hill*, the inmate was incarcerated on numerous occasions and, during a prior incarceration, she was placed on suicide watch after making suicidal comments.  *Id*. at 1079.  At the beginning of her last incarceration, the inmate informed a mental health specialist that she did not have the support of her mother.  *Id*. at 1080.  The inmate was crying but denied suicidal ideation.  *Id*. Nevertheless, the inmate was denied "mental health clearance" because she was

"quite depressed." *Id*.  A few days later, the inmate met with the defendant-social worker.  *Id*.  During the meeting, the inmate told the defendant that she had "poked" herself on her wrist with a thumb tack the day of her arrest and tried to hit a vein or artery so that she would have bled to death.  *Id*. at 1081.  Three days later, the inmate committed suicide.  *Id*. at 1082.

In ruling that a reasonable jury could find that the defendant was aware of a risk that the inmate would attempt to seriously harm herself, the court held that the most important fact supporting the conclusion was the inmate's statement to the defendant that she had tried to kill herself just before she was arrested.  *Id*. at 1084–85.  The court cited several other cases in which courts held or assumed that when an incarcerated person makes an unsuccessful suicide attempt, the jury could find that officials were aware that another attempt was likely to follow.  *Id*. at 1085.  The court further held that other factors supported the defendant's subjective awareness of a serious suicide risk, including the inmate's history of depression, her prior suicidal statements, and her placement in segregation where she could not be easily monitored by staff or other prisoners.  *Id*. at 1086.

Although Amanda's in-custody suicide attempt was more remote than in *Hill*, that she previously attempted suicide affected the import of the other risk factors she showed in the weeks leading up to her death.  As in *Hill*, Amanda expressed suicidal thoughts in the weeks leading up to her suicide.[3]  She also stated that she had no

---

[3] The inmate in *Hill* denied suicidal ideation when she was first admitted to the jail, although she later told the defendant about her suicidal ideation on the date of her arrest.  *Id*. at 1080–81.  Similarly, Amanda told Officer Johannes on April 16 that

familial support and she felt hopeless.  Like the inmate in *Hill*, she showed signs of depression (*i.e.*, frequent crying), she was on a mental health watch, and she was isolated (*i.e.*, on the date of her suicide, she was in a cell by herself).  These risk factors (and others) are more than adequate to infer that Defendants Johnson and Young knew Amanda was a substantial suicide risk when they found her sobbing uncontrollably in her cell on May 6, 2017.

Defendants appear to rely on *Collins v. Seeman*, 462 F.3d 757 (7th Cir. 2006), in support of an argument that they lacked knowledge of Amanda's risk of suicide. (ECF No. 82 at 8–9).  In *Collins*, the correctional-officer defendants knew only that the at-issue inmate requested to see a crisis counselor.  *Id*. at 761.  The 7th Circuit held that a request to see a crisis counselor alone was not sufficient to put the defendants on notice that the inmate posed a substantial and imminent risk of suicide.  *Id*.  The 7th Circuit also rejected the plaintiff's attempt to attribute knowledge to the defendant officers in the inmate's medical file absent information they were aware of it.  *Id*. at n. 2.

*Collins* is inapposite.  Plaintiff does not allege that Defendants Johnson and Young had subjective knowledge of Amanda's suicide risk by virtue of her request to see a mental health professional.  Rather, Plaintiff alleges they possessed subjective knowledge of Amanda's suicide risk based on a wealth of information not present in *Collins*.  Moreover, to the extent Defendants rely on *Collins* in support of an argument

---

although she did not intend to hurt herself, she was having thoughts of suicide.  (PPF ¶ 177).

that they were unaware of the information on which Plaintiff relies, such a contention must be rejected. Amanda's prior suicide attempts, her thoughts about suicide, her expressions of hopelessness, her statements about being "broken," and the like were all contained in incident reports or DHS notes which were in the booking-area file that Defendants reviewed. And, Defendants certainly knew Amanda was on a mental health watch; as Defendant Young testified, "It would be very hard for you to not be aware of, as an officer, of who was on watch." (PPF ¶ 298).

Likewise, Defendants' reliance on *Minix* is a non-starter. (ECF No. 82 at 9–10). In *Minix*, the defendant mental health worker only spoke with the inmate one time, and during the visit the inmate denied suicidal thoughts. *Id*. at 828. The defendant had no other information about the inmate, who later killed himself. *Id*. at 829. Here, ss set forth in detail above, Defendants Johnson and Young knew about the factors that made Amanda a substantial suicide risk based on their own interactions with her and the reports they reviewed.

Lastly, Defendants' reliance on their final interactions with Amanda, *i.e.*, that Amanda had calmed down, she told them she was doing better, she denied any thoughts of harming herself, etc., is misplaced because Plaintiff disputes their version of events based on the video. In ruling on a summary judgment motion, the court may not resolve questions of fact; rather, disputed facts must be left for resolution at trial. *Anderson*, 477 U.S. at 242. In summary, there clearly are disputed issues of material fact that Defendants Johnson and Young knew Amanda was a substantial suicide risk in the hours leading up to her death.

18

### B. A reasonable jury could conclude that Defendants Johnson and Young intentionally disregarded Amanda's substantial risk of suicide.

Plaintiff has presented evidence that Defendants did not engage Amanda in conversation to assess her emotional state, they did not ask her if she was feeling suicidal, they did not order more frequent checks, they did not move her to a holding cell where she could be more closely monitored, and they did not place her on a suicide watch. Instead, Defendants left an inmate they knew to be suicidal in a cellblock by herself, and thereby facilitated her suicide. This is more than enough to show a genuine issue of material fact as to whether Defendants intentionally disregarded Amanda's substantial suicide risk. *E.g.*, *Miller v. Harbaugh*, 698 F.3d 956, 963 (7th Cir. 2012) ("If the state officers can observe or are told that their detainee is indeed so disturbed that his next step is likely to be suicide, and yet they do nothing, it is fair to say that they have gone beyond mere negligence and entered the territory of the deliberately indifferent.").

To the extent Defendants rely on the fact that Defendant Young conducted an exterior check of Amanda's cell at 8:37 p.m., Plaintiff strongly disputes the efficacy of any such check. As seen in the video, Defendant Young's "check" consisted of a split-second look through a window pass. And, even if one is to credit Defendant Young's testimony that she looked at Amanda long enough to assess that Amanda was "calm"—a dubious proposition, given that Defendant Young obviously fabricated a prior interaction with Amanda in her cellblock (PPF ¶¶ 344–47)—such evidence is not enough to negate Defendant Young's deliberate indifference. *Cavalieri*, 321 F.3d

at 625, n. 1. (deliberate indifference may be found where the state actor does nothing or "next to nothing").

### C. Defendants Johnson and Young's assertion of qualified immunity must be rejected.

Defendants argue that this Court should ignore clearly established 7th Circuit precedent concerning the applicability of qualified immunity in the context of claims involving deliberate indifference to a substantial risk of suicide. (ECF No. 82 at 26–30). This Court should reject Defendants' invitation to do so.

The 7th Circuit has squarely addressed this issue. In *Cavalieri*, the plaintiff filed suit alleging that the defendant acted with deliberate indifference to her son's risk of suicide. 321 F.3d. at 618. The defendant appealed from the denial of his motion for summary judgment, asserting that he was entitled to qualified immunity. *Id*. On appeal, the 7th Circuit first determined that the constitutional right at issue should be characterized as the right to be free from deliberate indifference to suicide. *Id*. at 622-623. The Court further held that this right was clearly established prior to the plaintiff's son's suicide attempt. *Id*. at 623.

Thus, in the context of a pre-trial detainee's or prison inmate's claim of deliberate indifference to a serious risk of suicide, the qualified immunity analysis is subsumed by the threshold question of deliberate indifference:

> This [qualified immunity] argument is futile, however because once defendants concede that the law is "clearly established" and that the plaintiff must prove deliberate indifference, the issue becomes fact-intensive and any concept of qualified immunity falls out of the equation.

> In its most basic form, qualified immunity means that state actors
> will not be held liable if their actions were objectively reasonable.
> As already stated, the then-settled state of the law told
> defendants that they could not be deliberately indifferent to [the
> decedent's] medical needs and suicidal tendencies if they had
> knowledge of those facts – they had to take reasonable steps in
> response. How, then, was it possible for defendants to be
> objectively "reasonable" if they did not take the required
> reasonable steps in response to an inmate's serious medical needs
> or risk of suicide?
>
> * * *
>
> In other words, qualified immunity is a non-factor in Section 1983
> cases where plaintiffs must prove deliberate indifference.

*Viero v. Bufano*, 925 F. Supp. 1374, 1387 (N.D. Ill. 1996). This same sentiment has

been affirmed several times. *Mombourquette v. Amundson*, 469 F. Supp. 2d 624 (W.D.

Wis. 2007) ("In cases in which the court of appeals has concluded that a reasonable

jury could find that the defendants were deliberately indifferent to a risk that an

inmate would commit suicide, the court has given short shrift to claims of qualified

immunity.") The 7th Circuit has not overruled *Cavalieri* or its related precedent, and

this Court should reject Defendants' invitation to do so.

Even if this Court undertakes a qualified immunity analysis, it is apparent

that Defendants are not entitled to qualified immunity. The law is "clearly

established" when "various courts have agreed that certain conduct is a constitutional

violation under facts not distinguishable in a fair way from the facts presented in the

case at a hand." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). Finding that a right is

clearly established is not predicated upon the existence of a prior case that is directly

on point. *Green v. Butler*, 420 F.3d 689, 701 (7th Cir. 2005). "Although earlier cases

involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Rather, even where there are notable factual distinctions between the precedents relied on and the case before the court, if the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights, the decisions can demonstrate clearly established law. *Id.* "The salient question is not whether there is a prior case on all fours with the current claim but whether the state of the law at the relevant time gave the defendants fair warning that their treatment of the plaintiff was unconstitutional." *McGreal v. Ostrov*, 368 F.3d 657, 683 (7th Cir. 2004).

In May of 2017, it was clearly established that a correctional officer's failure to actively intervene when he or she has knowledge that an inmate is on the verge of suicide violates the Eighth and/or Fourteenth Amendments. *Miller*, 698 F.3d at 963 ("If the state officers can observe or are told that their detainee is indeed so disturbed that his next step is likely to be suicide, and yet they do nothing, it is fair to say that they have gone beyond mere negligence and entered the territory of the deliberately indifferent."); *Sanville*, 266 F.3d at 738 ("The Eight Amendment does not allow officials to turn a blind eye to the activities of an inmate, particularly one who is suicidal.") Defendants' qualified immunity argument therefore holds no water.

## II.   DEFENDANTS ARE NOT ENTITLED TO IMMUNITY WITH RESPECT TO PLAINTIFF'S STATE LAW CLAIMS.

Counts VI and VII of Plaintiff's FAC assert state-law negligence and wrongful death claim against Defendants stemming from Amanda's death. Defendants

maintain that they are entitled to statutory immunity. Specifically, Defendants claim that they were acting in a discretionary, as opposed to ministerial, capacity in responding to Amanda's risk of suicide. (ECF No. 82 at 3–4).

Defendants are not entitled to immunity because the ministerial duty exception applies. "[A] public officer or employee is not shielded from liability for the negligent performance of a purely ministerial duty." *Umansky v. ABC Ins. Co.*, 769 N.W.2d 1, 7 (2009) (quoting *Kimps v. Hill*, 546 N.W.2d 1, 10 (1996)). In turn, a duty is purely ministerial if it is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Id*. (quoting *C.L. v. Olson*, 422 N.W.2d 614, 717 (1988)). It is appropriate to look to departmental policies in determining whether a duty involves the exercise of discretion. *Pries v. McMillon*, 784 N.W.2d 648, 656 (2010) ("Where there is a written law or policy defining a duty, we naturally look to the language of the writing to evaluate whether the duty and its parameters are expressed so clearly and precisely, so as to eliminate the official's exercise of discretion.").

In 2017, Jail Policy 211.12(G)(5)(c) provided that a "crisis" exists where there is an indication that an inmate is about attempt suicide. ECF No. 75-2, p. 15. Jail Policy 211.12(G)(5)(g)(1) further provided, "To ensure that the mental health care needs of inmates are met . . . officers shall evaluate, assess, and properly document all inmates for indication of possible mental or emotional problems and shall

supervise said inmates[.]"  ECF No. 75-2, p. 11.  Finally, Jail Policy 211.12(G)(5)(g)(1) provided, "Any Corrections Officer who observes behavior of an inmate indicating that a crisis situation exists, or may exist in the near future, shall, in addition to all other steps, see to it that all other staff on duty are aware of this situation so they can act accordingly."  ECF No. 75-2, p. 17.  Based on the policy, any officer who observes behavior of an inmate indicating that a crisis situation exists shall respond in a prescribed manner.  The use of the imperative "shall" removes any discretion from the duty, and thus makes it ministerial.  *Pries*, 784 N.W.2d at 657 (citing *Noffke v. Bakke*, 760 N.W.2d 156 (2009)).

As set forth above, Defendants were subjectively aware that Amanda was an imminent risk to commit suicide, and therefore in a "crisis situation."  Per the policy, Defendants had no discretion in how to respond.  Rather, the policy dictated that Defendants make all other staff on duty aware of the situation.  This duty was ministerial, and therefore Defendants are not entitled to immunity for failing to carry it out.  Defendants' assertion of immunity must therefore be rejected.

## FACTUAL BACKGROUND:
## DEFENDANTS WOOD COUNTY AND SHERIFF REICHERT (*MONELL*)

In 2016 and 2017, the Wood County Jail was an approximately 120-bed facility. Inmates with mental health issues were pervasive at the jail.  As Defendant Johnson testified, he regularly encountered inmates with drug addiction, schizophrenia, depression, bipolar illness, anxiety, and other forms of psychosis.  Officers dealt with inmates suffering from mental health problems daily.  (PPF ¶¶ 21–23).

Inmates regularly engaged in acts of self-harm at the jail. From 2011 through 2015, inmates committed acts of self-harm by attempting to hang themselves, cutting themselves, placing their head in a toilet bowl, striking their head on the wall repeatedly, and diving off a bunk head-first. (PPF ¶ 15). In 2016 and 2017, acts of self-harm and/or suicidal gestures included an inmate who held a pen to his neck and threatened to stab himself with it; an inmate who cut his writs and banged his head against the wall; inmates who tried to suffocate themselves with electrical cords and/or sheets; and an inmate who cut his neck with a razor. (PPF ¶ 16). From May 6, 2012 through March 29, 2019, there were six suicides and 40 suicide attempts at the jail; one of the completed suicides occurred March 4, 2016. (PPF ¶ 27).

Of course, inmates exhibited signs of mental illness apart from acts of self-harm. In 2016 and 2017, for example, several inmates reported hearing voices, suffered delusions, and exhibited signs of severe depression. (PPF ¶ 20).

On February 7, 2014, Sheriff Reichert—the sole policymaker at the jail at all times relevant to this lawsuit—entered into a written agreement with Advanced Correctional Health ("ACH") for the provision of inmate health services at the jail ("the ACH Agreement"). Apart from referring inmates to crisis intervention services when indicated, the ACH Agreement did not require ACH to provide mental health services to inmates at the jail. Instead, Wood County—through Defendant Reichert—attempted to provide mental health services to jail inmates through the County Department of Human Services ("DHS"). (PPF ¶¶ 25–28).

The services DHS provided to the jail were spelled out in a written interagency agreement signed by Defendant Reichert on May 15, 2015 ("the 5/15/15 interagency agreement").  In short, the 5/15/15 interagency agreement stated that DHS was to assist jail staff in meeting the standards required by Department of Corrections Chapter 350.17 Suicide Prevention.  In practice, DHS performed the following services at the jail: on Tuesday afternoons, a member of DHS Legal Services would assess inmates on suicide watch to determine whether they should stay on watch; and, on Fridays, a DHS therapist from the outpatient clinic went to the jail for "about" three hours to assess inmates on suicide or mental health watch and, if time allotted, meet with other inmates who signed up for mental health.  (PPF ¶¶ 28–30, 36–37).

DHS's primary role at the jail was to evaluate inmates on suicide and mental health watches to ascertain whether they could be taken off watch.  In 2017, DHS was not providing any treatment to inmates at the jail because it did not have enough resources to do so.  When asked how often she was able to provide therapeutic treatment to inmates at the jail, DHS worker Jennifer Borchardt testified, "Never. That wasn't our—that's why—not why we were there.  Sometimes we would have time to maybe provide them, you know, or discuss about some coping skills or touch briefly on that.  But otherwise, no.  No therapy ever."  Moreover, in 2017, DHS did not send any psychiatrists or psychologists to the jail.  (PPF ¶¶ 38–41).

In 2017, if an inmate wanted to see a mental health professional, she would submit a request form to a correctional officer, who would then submit the form to the jail nurse.  The jail nurse would then write the inmate's name on a dry erase

26

board located behind the main office ("the mental health board").  The jail doctor and corrections officers could also put inmates' names on the board.  DHS workers responding to the jail on Fridays would prioritize the inmates on watch, while other inmates on the mental health board were the lowest priority.  (PPF ¶¶ 42–46).

The DHS worker did not always have time to see every inmate on a watch, and, moreover, the DHS worker did not always have time to see every inmate who was on the mental health board.  As reflected in the jail rules, inmates were told only that Unified Services—a former name for DHS—"attempts to see inmates as practicable during the week on a priority basis."  (PPF ¶¶ 48–54).

The jail's practice was not to provide DHS workers with any records pertaining to an inmate, other than a watch form if an inmate was placed on a suicide or mental health watch.  DHS workers were not given and did not review the inmate's medical file.  Thus, DHS workers were not provided and did not review records related to the inmate's mental health history.  And, DHS workers were not given and did not review the medical / mental health screening questions asked of inmates during the booking process.  Moreover, if an inmate was referred to mental health by the jail doctor, the DHS worker did not receive any paperwork related to the doctor's request, such as the written referral.  (PPF ¶¶ 56–62).

The jail had several written policies that were not followed.  For example, jail policy required it to have a designated "Responsible Health Authority" ("RHA") to "arrange for all levels of care and to assure quality, accessible, and timely health services for inmates."  Per policy, the RHA's responsibilities were to be documented

in a written agreement.   However, the 5.15.15 interagency agreement did not designate DHS as the jail's RHA, nor did it require DHS to "assure quality, accessible, and timely health services for inmates."  (PPF ¶¶ 69–72).

Jail policy also required that clinical judgments were to rest with a single, designated physician and, where there was a separate organizational structure for mental health services, there was a "designated mental health clinician."   DHS worker Constance Virnig testified during her deposition that she had never heard the term used in relation to the jail, and that no one from DHS was acting as a "designated mental health clinician" in 2017.  (PPF ¶ 73–76).

Other express policies were routinely ignored.  Jail policy required that all appropriate staff was to have access to written documentation for the delivery of healthcare services.  (PPF ¶ 77).  As noted above, DHS workers—assuming they had time to review other records (which they did not)— were never given the medical files of inmates whom they were assessing.  (PPF ¶ 78).  Policy required clinical performance enhancement reviews, which were never performed.  (PPF ¶¶ 79–82). Policy also required that inmates with chronic mental illnesses were to be seen as prescribed in their individual treatment plans; again, however, because DHS workers did not provide treatment there were no treatment plans for mentally ill inmates. (PPF ¶¶ 83–87).

Finally, jail policy recognized the importance of "evaluation, treatment, and intervention" in preventing suicide.  The policy stated, "Treatment plans addressing suicidal ideation and its reoccurrence are developed, and patient follow-up occurs as

clinically indicated."   Again, despite jail policy, DHS workers did not provide treatment or therapy to inmates at the jail, and treatment follow-up "as clinically indicated" did not occur.  (PPF ¶¶ 93–95).

Defendant Reichert was aware of the jail's unconstitutional policies, customs, and practices.  For example, Defendant Reichert agreed during his deposition that the ACH agreement did not require ACH to provide mental health treatment to inmates, and he also knew that the 5/15/15 interagency agreement did not require DHS to provide mental health treatment to inmates.  (PPF ¶¶ 96–98).

Moreover, in December of 2016 Defendant Reichert received a letter from the regional nurse manager for ACH, dated December 3, 2016, which enclosed the minutes from the Continuous Quality Improvement ("CQI") meeting which occurred on November 10, 2016.  The CQI meeting minutes indicate that ACH provided information to the jail about "Mental Health" hours.  The meeting minutes also indicated:  Due to Wood County having Mental Health provided by county workers, there is inconsistencies in care provided; however, at this time, Wood County Administration does not want to go with ACH Mental Health provider."  "Wood County Administration" referred to Defendant Reichert, as he alone had final decision-making authority over whether or not to contract with ACH for the provision of mental health services at the jail.  (PPF ¶¶ 103–07).

Additionally, in 2017, Stephanie Gudmunsen was the Behavioral Health and Long-Term Support division administrator for DHS.  Katrina Czys was the manager of Legal Services within DHS and reported to Gudmunsen.  On March 20, 2017, Czys

circulated an email to members of DHS, including Gudmunsen, stating: "[W]e do not provide more than just suicide assessments on Tuesdays and suicide assessments and some individual sessions on Fridays[.]"  Czys's email further stated, "My concern is that the jail is not doing enough to provide for mental health concerns for inmates at this time and in the event something would happen, I feel like not having everyone on the same page could come back to become problematic."  Gudmunsen shared Czys's concern that the jail was not doing enough to provide for the mental health concerns of inmates as of March 2017.  Asked what her concerns were, Gudmunsen testified, "Primarily that we didn't have enough time to meet the needs.  So our services were limited to the hours that—that we designated to go there.  And I felt that the needs were more than what we could do."  (PPF ¶¶ 110–15).

Gudmunsen also had concerns that the 5/15/15 interagency agreement implied that DHS would "essentially meet the needs of jail inmates," which was not an accurate description of what DHS was doing because it had limited hours to provide. Gudmunsen therefore reached out to Captain Ashbeck at the jail about revising the interagency agreement.  (PPF ¶¶ 116–18).  Captain Ashbeck brief Defendant Reichert on important matters involving the jail "several times a week," which included the subject of mental healthcare and the services that DHS could provide.  (PPF ¶ 109). On May 18, 2017, Defendant Reichert signed a new interagency agreement with DHS, which clarified that DHS would "assist" the jail in providing mental health staff to assist the jail in meeting its standards under Department of Corrections Chapter 350.17 Suicide Prevention.  (PPF ¶¶ 119–20).

The jail's unconstitutional policies repeatedly denied Amanda access to proper mental health evaluation, treatment, and intervention. For example, on February 11, 2016, the jail nurse received a health services request form from Amanda asking that Amanda be seen by someone from mental health. Inexplicably, Amanda did not see anyone from DHS the next day, Friday, February 12, even though a DHS worker would have normally been scheduled to be at the jail on that day. Later in the evening, Amanda made suicidal statements and was placed on a suicide watch. Amanda attempted suicide on February 13, 2016. Inexplicably, Amanda was not seen by a mental health professional until three days later—February 16, 2016—at which time she was cleared off suicide watch without any treatment being provided or any treatment plan put in place. (PPF ¶¶ 127–44).

At the time Amanda was booked into the jail on April 7, 2017, she told the booking officer that she had a history of substance abuse, psychiatric hospitalization, and prior suicide attempts. (PPF ¶¶ 160–62). Amanda was not screened by a mental health professional at that time. On April 16, 2017, Amanda was placed on a mental health watch. Amanda did not see a mental health professional on Tuesday, April 18, although DHS Legal Services ostensibly reported to the jail on Tuesdays to assess inmates on watches.

On April 20, 2017, Amanda saw the jail doctor, Dr. Hekman. During the visit Amanda was "tearful, anxious, dramatic, over-exaggerated [sic]." Dr. Hekman's note indicates he assessed Amanda as suffering from "Depression/Anxiety" and he ordered

her to see "mental health" for cognitive behavioral therapy.[4] (PPF ¶¶ 192–95). Later that day, Amanda went for a neurology consult related to her seizures. The neurologist, Dr. Sandok, assessed Amanda as "an individual with significant psychiatric disease" who suffered from ongoing psychiatric difficulties, including depression and anxiety, that were not being treated. As to Amanda's seizures, Dr. Sandok diagnosed her as suffering from psychogenic nonepileptic seizures caused by significant sexual abuse. Dr. Sandok noted that the only thing that would treat Amanda's seizures was ongoing psychiatric treatment. He recommended that Amanda work with a psychiatrist "on a very active basis" "as soon as can be reasonable." (PPF ¶¶ 197–207).

Amanda finally saw Constance Virnig on April 21, 2016. Virnig did not have a copy of Dr. Hekman's note assessing Amanda as having "Depression/Anxiety," nor did she have a copy of Dr. Sandok's note recommending that she work with a psychiatrist on a very active basis. However, even if she had been aware of that information, "there was no time" for Virnig to develop a treatment plan for Amanda. (PPF ¶¶ 228–29, 236).

Likewise, when Amanda met with Demaris Losinski on April 28, 2017, Losinski was unaware of Dr. Hekman's referral and Dr. Sandok's evaluation and assessment of Amanda. (PPF ¶ 255–57). Losinski's primary purpose in meeting with Amanda was to assess her suicidality, although she candidly admitted that she did

---

[4] Of course, DHS did not provide therapy, so it was unable to fulfill Dr. Hekman's order. (PPF ¶ 43).

not have all the information she needed to properly do so.  (PPF ¶¶ 259, 262).
Losinski did not provide any treatment for Amanda, and she did not arrange any
follow-up treatment after their session.  (PPF ¶¶ 268–69).  Amanda did not see
another mental health professional from DHS before committing suicide on May 6,
2017.

**ARGUMENT:**
**DEFENDANTS WOOD COUNTY AND SHERIFF REICHERT (*MONELL*)**

**I.   PLAINTIFF HAS DEMONSTRATED DISPUTED ISSUES OF MATERIAL FACT THAT PRECLUDE SUMMARY JUDGMENT ON HER *MONELL* CLAIM**

A local governing body may be liable for monetary damages under § 1983 if the
unconstitutional act complained of is caused by: (1) an official with final policy-
making authority; (2) a governmental practice or custom that, although not officially
authorized, is widespread and well settled; and (3) an official policy adopted and
promulgated by its officers.  *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303
(7th Cir. 2010).

To demonstrate that a municipal entity is liable for a harmful custom or
practice, the plaintiff must show that the entity's policymakers were deliberately
indifferent to the known or obvious consequences.  *Id*.  "In other words, they must
have been aware of the risk created by the custom or practice and must have failed
to take appropriate steps to protect the plaintiff."  *Id*.  Absent an express policy,
*Monell* liability is appropriate where the plaintiff can introduce evidence
demonstrating that the unlawful practice was so pervasive that acquiescence on the
part of policymakers was apparent and amounted to a policy decision.  *Phelan v. Cook*

33

*County*, 463 F.3d 773, 790 (7th Cir. 2006).  Additionally, for there to be liability, the causal relationship between the policy or practice and the harm must be such that the policy was the "moving force behind the constitutional violation." *City of Canton v. Harris*, 489 U.S. 378, 379 (7th Cir. 2012).[5]

### A. A reasonable jury could conclude that the County's express policy of providing mental health services through DHS denied Amanda access to mental health treatment.

When a state imposes imprisonment as a punishment for crime, it accepts the obligation to provide persons in its custody with a medical care system that meets minimal standards of adequacy.  *Estate of Adams by Drew v. Christian Cty.*, No. 13-3300, 2017 WL 937146, *11 (C.D. Ill. Mar. 9, 2017).  A jail "certainly has an obligation to provide for the psychiatric care of its inmates pursuant to its constitutional obligation to address their serious medical needs."  *Rice ex rel. Rice v. Corr. Med. Serv.*, 675 F.3d 650, 676 (7th Cir. 2012).  Mental illnesses, such as depression and suicide attempts, have been recognized to be objectively serious medical conditions.  *Smith v. Hallberg*, No. 11 C 0188, 2012 WL 4461704, *8 (N.D. Ill. Sept. 25, 2012) (citing *Sanville*, 266 F. 3d at 733–34); *Schultz v. Dart*, 13 C 3641, 2013 WL 5873325, *4 (N.D. Ill. Oct. 31, 2013).

Here, Defendant Reichert attempted to meet the jail inmates' mental health needs through DHS.  However, DHS was unable to meet the mental health needs of the inmate population.  Specifically, DHS was wholly unable to provide mental health

---

[5] Plaintiff does not oppose dismissal of Defendant Reichert on the basis that the claim is against him is redundant.  (ECF No. 82 at 3).

<u>treatment</u> to inmates. Thus, inmates with serious mental health disorders, like Amanda, did not receive, or have access to, constitutionally adequate care.

That this is true is beyond reasonable debate. First and foremost, the County's agreement with ACH did not require ACH to provide mental health treatment to inmates. However, the 5.15.15 interagency agreement with DHS also did not require DHS to provide mental health treatment to inmates. Therefore, who was left to provide actual mental health treatment to inmates who required it? The answer, as tragically seen in Amanda's situation, is no one.

Plaintiff has marshalled other evidence verifying that DHS was not providing treatment to jail inmates, consistent with the 5.15.15 interagency agreement. As a practical matter, one DHS therapist went to the jail once per week. The therapist arrived at the jail at 8:00 a.m. Her first appointment at the outpatient clinic was at 11:00 a.m. The DHS therapist was expected to perform all activities connected with the jail—including see the inmates, consult with jail staff, and dictate their notes— before their 11:00 a.m. outpatient appointment. One therapist testified this meant that she typically left the jail by 10:00 or 10:30 a.m.; a correctional officer testified that the therapists tried to leave by 10:00 a.m. During this time, the primary focus was on evaluating inmates on watches to determine whether they could be taken off watch. (PPF ¶¶ 34–38).

Gudmunsen—the division administrator for behavioral health at DHS— affirmatively testified that DHS was not providing actual treatment to inmates. Per Gudmunsen, there were insufficient resources, including insufficient time, to provide

35

treatment.  Gudmunsen's testimony was corroborated by DHS therapist Jennifer Borchardt who testified that DHS "never" provided treatment, testifying, "that's [not] why we were there."  (PPF ¶¶ 42–43).

To reiterate, an express policy that, when enforced, causes a constitutional deprivation is actionable pursuant to *Monell*.  *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000).  When a *Monell* claimant alleges that a particular municipal action itself violates federal law, resolving issues of fault and causation is straightforward:  "[T]he conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.  *Bd. of Cty. Comm'r of Bryan County v. Brown*, 520 U.S. 397, 404–05 (1997).  Here, a reasonable jury could conclude that the County is liable because Defendant Reichert, in executing the agreements with ACH and DHS, intentionally deprived Amanda access to mental health treatment.

**B.  A reasonable jury could conclude that the County maintained customs or practices that were the moving force behind the violation of Amanda's constitutional rights.**

There is ample evidence from which a jury could conclude that the County is liable for maintaining customs or practices that led to the violation of Amanda's constitutional rights.  Specifically, there is evidence that (1) the jail maintained several deficient widespread customs and practices, (2) Defendant Reichert, as the jail's policy maker, was deliberately indifferent to the obvious risks of the customs

and practices, and (3) the widespread customs or practices were the moving force behind the violation of Amanda's constitutional rights.

### 1.   Widespread customs or practices

As set forth above, the jail's policy of providing mental health services through DHS denied Amanda access to timely mental healthcare and treatment.  DHS did not have the time or resources to treat inmates and, in fact, it did not provide any mental health treatment.  DHS's lack of resources and the attendant lack of mental health treatment coincided with other customs and practices as set forth below the net effect of which was to deny inmates' constitutional rights.

The jail had a custom and practice of not timely assessing inmates for suicide risk.  As set forth above, acutely suicidal inmates went days without being evaluated. If, for example, an inmate went on suicide watch Friday afternoon, they would not be evaluated by DHS until, at the earliest, the following Tuesday.  There were also instances where a DHS worker was not able to evaluate all inmates on a watch on Friday, leading to the possibility that an inmate placed on a suicide watch on Wednesday would not be seen by a mental health professional until the following Tuesday.  Likewise, inmates on a mental health watch were only seen on Fridays. Therefore, an inmate on a mental health watch could go a week or longer after being placed on a mental health watch before seeing a mental health professional.  The jail's practice vilated Wisconsin  which violates Wis. DOC 350.17(5), which requires that assessment of a potentially suicidal inmate to be completed "as soon as practicable."

In contravention of its written policies, the jail had a custom and practice of not identifying a designated mental health clinician. Jail policy required that clinical judgments were to rest with a single designated mental health clinician. The purpose of such a policy is to ensure continuity and coordination of care. The absence of such a designated clinician results in a "pass the buck" approach in which none of the providers perform a thorough intake and/or develop a plan of care. *See* **ECF No. 108, Moss Report at pp. 23–24.**

The jail's written policy that "all appropriate staff will have access to written documentation for the delivery of healthcare services" was customarily ignored. DHS therapists did not have ready access to inmates' medical records, including the inmates' medical screening questionnaire filled out during the booking process. If the jail doctor referred an inmate to mental health, the written referral was not provided to DHS. And, critical information regarding an inmate's mental health failed to be transmitted from the jail nurse to the DHS therapists ostensibly responsible for managing the inmate's mental healthcare.

Although there are many other ways in which the jail's customs and policies violate its own written policies, one in particular stands out: Jail Policy 235-G-05, titled "Suicide Prevention Program," recognized that a "key" component to suicide prevention is <u>treatment</u>. The policy required the development of treatment plans to address suicidal ideation and its reoccurrence, as well as patient follow-up as clinically indicated. Coming full circle, DHS was simply unable to—and did not—develop treatment plans for any of the inmates it saw.

The 7th Circuit has made clear, having a written policy that is not followed is not a defense to a *Monell* claim.  "For all intents and purposes, ignoring a policy is the same has having no policy in place in the first place." *Woodward v. Cor Med. Servs Inc.*, 368 F.3d 917, 929 (7th Cir 2004) (citing *Boncher v. Brown Cty.*, 272 F.3d 484, 486 (7th Cir. 2001) (internal quotation marks omitted).  In other words, the jury could reasonably find that the jail lacked policies to provide treatment, timely assessments, and the communication needed to provide constitutionally adequate care.

### 2.    **Final policymakers deliberately indifferent**

"To demonstrate that [a municipal entity] is liable for a harmful custom or practice, the plaintiff must show that [the municipal entity's] policymakers were 'deliberately indifferent as to [the] known or obvious consequences.'" *Thomas v. Cook Cty. Sherr's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (quoting *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002)). "In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Thomas*, 604 F.3d at 303.

Plaintiff can establish awareness of the risk created by their customs or practices by showing either that the policy maker was in fact subjectively aware of the risk or that a risk of serious harm was so patently obvious that the municipality must have been aware of the risk. *Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995); *Farmer*, 511 U.S. at 841 (noting that allegations that individual officers violated Eighth Amendment rights are examined using a subjective awareness

39

standard while allegations of municipal misconduct are examined using an objective analysis).

Plaintiff has adduced more than sufficient evidence to demonstrate that Defendant Reichert was subjectively aware of the risk wrought by his policies, customs, and practices. As noted above, Defendant Reichert <u>knew</u> mental health treatment was not being provided at the jail. He executed the written agreement with ACH pursuant to which ACH had no obligation to provide mental health treatment. Moreover, he singed the interagency agreement with DHS that did not require DHS to provide mental health treatment to inmates. There were no other options for providing mental healthcare at the jail. Defendant Reichert therefore subjectively knew the risk of using DHS to provide mental health services at the jail.

Defendant Reichert was put on notice that the care—or lack thereof—provided by DHS was deficient. The November 2016 CQI CQI study determined that due to Wood County having mental health provided by DHS, there were "inconsistencies" in care provided. Moreover, in March of 2017, Stephanie Gudmunsen reached out to Captain Ashbeck to notify him of concerns she had that DHS was unable to meet the needs of the inmates. Defendant Reichert subsequently executed a revised interagency agreement that clarified the limitations on DHS services at the jail.

The written policies Defendant Reichert issued—and knew were being customarily violated—recognized the importance of the transmission of information between caregivers, coordination of care, and mental health treatment (including treatment plans) to preventing suicide. The risk of harm flowing from a complete

lack of treatment is readily apparent: the deterioration of mentally ill inmates to the point of suicide. *E.g.*, *Estate of Adams by Drew v. Christian Cty.*, No 13-3300, 2017 WL 937146, *11 (C.D. Ill. Mar. 9, 2017). Similarly, "a clear consensus had been reached indicating that a prison official's failure to remedy systemic deficiencies in medical services akin to those alleged in the present case constituted deliberate indifference to an inmate's medical needs." *Smith v. Hallberg,* No. 11 C 0188, 2012 WL 4461704, *8 (N.D. Ill. Sept. 25, 2012) (quoting *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 431 (7th Cir. 1989).

### 3.    Causation

Finally, there is more than sufficient evidence to support a jury finding that Defendant Reichert's customs or practices were the moving force behind the violation of Amanda's constitutional rights. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997) (a Monell plaintiff must demonstrate a direct causal link between the municipal action and the deprivation of federal right). Each of the deficient practices or customs that Plaintiff discusses affected Amanda during her stay in the jail: her mental health providers were not given the information (*i.e.*, records) needed to properly treat her; no single clinician was responsible for managing her care, resulting in a lack of proper follow-up; and, most importantly, she was not given any treatment to address her serious mental illness.

Plaintiff's expert, Dr. Moss, is a board-certified psychiatrist with experience in correctional medicine. Dr. Moss's report is incorporated herein. The most salient portion of his report, however, is that the failure to treat Amanda's serious mental

illness was the moving force behind her suicide.   In particular, a component of appropriate treatment would have been an ongoing assessment of Amanda's suicide risk by an individual fully aware of her mental health history as reflected in her jail medical file.  Any qualified mental health clinician fully apprised of Amanda's mental health history would have appreciated her deteriorating condition and substantial risk of suicide.  Once the risk of suicide was identified, the clinician, in concert with jail staff, would have taken protective measures to prevent Amanda's suicide. This would have included standard jail suicide prevention practices such as placing Amanda in a holding cell where she could be monitored on camera, conducting more frequent checks, and removing the means for her to harm herself.  *See* ECF No. 108, p. 27.

Dr. Moss further opines, "Proper treatment also would have entailed communication between the mental health clinician managing Amanda's care and jail staff about her ongoing risk. Had correctional officers been properly notified that Amanda's baseline risk of suicide was high due to her prior attempts and mental disorders, they would have known to take greater precautions after observing her in acute distress on May 6, 2017.  Had correctional officers been properly informed, they would have initiated appropriate protective measures.  Instead, the officers left her unobserved in a cellblock by herself.  Being isolated greatly enhanced the risk that Amanda would successfully complete suicide without being detected." *Id*.

Plaintiff has demonstrated a triable issue of fact on her *Monell* claim, and the Defendant County and Defendant Reichert's motion for summary judgment must be denied.

<u>CONCLUSION</u>

For the reasons stated herein, Plaintiff requests that this Court deny the County Defendants' motion for summary judgment.

Respectfully submitted,

Dated: January 27, 2020

/s/ Nicholas Curran
Nicholas Curran
One Attorney for Plaintiff
Admitted *pro hac vice*
Kathleen T. Zellner & Associates, P.C.
1901 Butterfield Road, Suite 650
Downers Grove, Illinois 60515
(Ph) (630) 955-1212
(E) attorneys@zellnerlawoffices.com