**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| ANGELA GLODOWSKI, as the | ) | |
| Representative of the Estate of AMANDA | ) | |
| GLODOWSKI, Deceased, and as Next | ) | |
| Friend of R.G., a minor, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 18-cv-151-bbc |
| | ) | |
| KRISTIN M. PAGELS, L.P.N., TERRY | ) | |
| JOHNSON, CASSI YOUNG, SHERIFF | ) | |
| THOMAS REICHERT, and WOOD | ) | |
| COUNTY, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT**
**PAGELS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Angela Glodowski, as Representative of the Estate of Amanda

Glodowski, Deceased, and as Next Friend of R.G., a minor, by and through her

attorneys, Kathleen T. Zellner & Associates, P.C., in opposition to Defendant Kristin

Pagels' motion for summary judgment, states as follows:

<u>**INTRODUCTION**</u>

Defendant Pagels' responsibilities for suicide prevention at the Wood County

Jail were simple.  Her duties were to (1) transmit information bearing on inmates'

suicide risk to those responsible for evaluating the inmates' suicidality; and (2)

process inmates' requests to see mental health by placing their names, and the names

of any other inmates she knew to be a suicide risk, on the mental health board to be

1

seen by a DHS therapist.  Tragically, she failed to do both in this case, resulting in the suicide of Amanda Glodowski ("Amanda").

As set forth below, Plaintiff has marshalled more than enough evidence for a reasonable jury to conclude that (1) Defendant Pagels knew that Amanda was a substantial, imminent risk of committing suicide, and (2) Defendant Pagels was deliberately indifferent to the risk.  In summary, Defendant Pagels failed to transmit information bearing directly on Amanda's suicide risk to those assessing her suicidality.  DHS therefore completed two uninformed assessments of Amanda's suicide risk.  Still, DHS told Amanda to reach back out to mental health if her condition continued to deteriorate.  Amanda did so by requesting that Defendant Pagels put her on the mental health board to see DHS on Friday, May 5, 2017, while at the same time expressing to Defendant her extreme emotional and mental distress. Defendant Pagels failed to put Amanda's name on the list, Amanda was not seen on that Friday, and by the end of the following day she had committed suicide.

Defendant's motion for summary judgment misconstrues the facts, omits crucial disputed and/or undisputed material facts, and fails to indulge all reasonable inferences from those facts in favor of Plaintiff as is required by well-established summary judgment standards.  The motion falls far short of establishing that Defendant is entitled to judgment as a matter of law, and it should be denied in its entirety.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In making that determination, a court must view the evidence 'in the light most favorable to the opposing party.'" *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

Moreover, it is not simply enough to view the evidence in a light most favorable to the non-moving party. Indeed, in ruling on a summary judgment motion, the Court is required "to construe all <u>inferences</u> in favor of the party against whom the motion under consideration is made." *Rupcich v. United Food & Commercial Workers Int'l Union*, 833 F.3d 847, 853 (7th Cir. 2016) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)) (emphasis added). The Supreme Court has reaffirmed this principle, reversing the grant of qualified immunity because the lower court failed to recognize the "importance of drawing inferences in favor of the nonmovant." *Tolan*, 572 U.S. at 657.

Finally, it is critical to appreciate that "inferences are often necessary when the plaintiff's sole eyewitness is dead," bearing in mind that Plaintiff may always prove her case "by circumstantial evidence where direct evidence is unavailable." *Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005) (citing *Murrell v. Frank*, 332 F.3d 1102, 1117 (7th Cir. 2003)). *See also*, *Cruz v. City of Anaheim*, 765 F.3d 1076, 1077–1080 (9th Cir. 2014) (holding that a police officer's self-serving

version of events should be carefully examined because the person most likely to rebut the officer—the one killed—cannot testify). Such is the case here, where the person most likely to refute Defendant's version of events—Amanda Glodowski—is deceased.

## FACTUAL BACKGROUND

As the jail nurse, Defendant Pagels managed inmates' medical charts. Whenever an inmate was booked into the jail, Defendant Pagels would look up on the computer to see whether the inmate had been previously incarcerated. If the inmate had prior incarcerations, Defendant Pagels would retrieve the inmate's prior medical records to incorporate into the inmate's medical chart. (PPF ¶ 287).[1]

When Defendant Pagels opened Amanda's medical chart after Amanda was booked into the Wood County Jail ("the jail") on April 7, 2017, she would have retrieved Amanda's medical records from prior incarcerations. (*Id.*) Defendant Pagels would therefore have known that in February of 2016, Amanda was booked into the jail after she claimed to have been sexually assaulted. Defendant Pagels would have also known that Amanda told a correctional officer that she was suicidal and was placed on a suicide watch. Finally, Defendant Pagels would have been aware that while on suicide watch, Amanda attempted suicide by trying to cut herself with her partial denture and then swallowed it. (PPF ¶¶ 123–26, 132–39).

---

[1] Plaintiff shall cite to Plaintiff's Combined Proposed Findings of Fact as, "PPF ¶ __, and to Plaintiff's Response to Defendant Pagels' Proposed facts as, "PRDPPF ¶ __.

Defendant Pagels also received and reviewed the jail booking sheets from Amanda's January 2017 incarcerations, which included the medical and mental health screening questionnaires filled out during the booking process. (PPF ¶¶ 286). She would have known that Amanda reported multiple suicide attempts, including an attempt about a year prior by taking pills, and about three years prior by heroin. (PPF ¶¶ 146, 151–52). Defendant Pagels was present on January 17, 2017 when Dr. Hekman assessed Amanda, during which visit Amanda looked down constantly, was tearful, and had a flat/sad affect. Defendant Pagels knew that Dr. Hekman assessed Amanda as suffering from "Anxiety/Depression" following an "overdose on benzodiazepines," and that he recommended she follow up with mental health to find out the root of Amanda's symptoms. (PPF ¶¶ 157–59).

Per Amanda's April 7, 2017 booking sheets, Defendant Pagels knew that Amanda had multiple prior suicide attempts, at least one prior psychiatric hospitalization, and was previously under the care of a mental health professional. She also knew that Amanda suffered seizures and reported that she would withdraw from benzodiazepine use. (PPF ¶¶ 160–62).

On April 13, 2017, Defendant Pagels observed Amanda crying. Per Defendant Pagels's progress note, Amanda told her "no one cares" and she "has no family or friends." Defendant Pagels testified that based on Amanda's statements she would have added Amanda to the mental health board to be seen by DHS; however, Defendant Pagels did not add Amanda to the board, and Amanda did not see a mental health professional on Friday, April 14, 2017. (PPF ¶¶ 163–67).

5

Defendant Pagels knew Amanda suffered from several seizures and the effect the seizures had on Amanda's emotional state and mental health. On April 16, 2017, Officer Johannes observed Amanda to be very upset and crying; she told him she was upset because she did not know what was wrong with her, why she was having seizures, and why she was not getting any answers. Amanda also told Officer Johannes that she had no hope, no family, and no friends, and, although she did not intend to hurt herself, she was having thoughts of suicide. Amanda agreed to go on a mental health watch due to her mental state. Officer Johannes documented the foregoing information in a watch form and incident report which Defendant Pagels would have put in Amanda's medical chart. (PPF ¶¶ 175–81, ¶¶ 287–88).

Defendant Pagels would have documented if she at any point asked Amanda about her mental state. Despite Amanda having been placed on a mental health watch and Defendant Pagels having almost daily interaction with Amanda from April 16–20, she did not once document asking Amanda about how she was feeling. (PPF ¶¶ 190–91).

Defendant Pagels was present when Dr. Hekman assessed Amanda on April 20, 2017. Dr. Hekman noted Amanda to be "tearful, anxious, dramatic, over-exaggerated [*sic*]." Again, Dr. Hekman's assessment was that Amanda was suffering from "Depression/Anxiety," and he recommended she see mental health for cognitive behavioral therapy. (PPF ¶¶ 192–95). Defendant Pagels never transmitted a copy of Dr. Hekman's referral to DHS or the DHS therapists who subsequently visited with Amanda. (PPF ¶¶ 219, 255).

Later in the day on April 20, Amanda went for a neurology consult related to her seizures. The neurologist, Dr. Sandok, assessed Amanda as "an individual with significant psychiatric disease" who suffered from ongoing psychiatric difficulties, including depression and anxiety, that were not being treated. As to Amanda's seizures, Dr. Sandok diagnosed her as suffering from psychogenic nonepileptic seizures caused by significant sexual abuse. Dr. Sandok noted that the only thing that would treat Amanda's seizures was ongoing psychiatric treatment. He recommended that Amanda work with a psychiatrist "on a very active basis" "as soon as can be reasonable." (PPF ¶¶ 197–207).

Consistent with the urgency of his recommended course of treatment, Dr. Sandok—who dictated his note on the day of the assessment—indicated in the note that he called the jail and left a message with the jail nurse, and "suggested that the patient, in my opinion, would be best served by addressing her psychiatric issues as soon as can be reasonable, and that may even be most appropriately served with an inpatient psychiatric stay." Dr. Sandok also indicated in his note that a copy of it was sent to the requesting provider, Defendant Pagels. The note indicated a fax number for the jail, as well as a fax stamp indicating it was faxed on "04/21/2017 10:02." (PPF ¶¶ 208–10).

Defendant Pagels had no basis to dispute that she received Dr. Sandok's note. However, in the "Plan" section of her narrative progress note from April 20, 2017, Defendant Pagels did not indicate any follow-up relative to Amanda's appointment with Dr. Sandok. (PPF ¶¶ 211–13).

7

DHS therapists trusted that Defendant Pagels would provide them with information bearing on an inmate's suicidality if she possessed any such information. (PPF ¶ 214). Nevertheless, Defendant Pagels did not provide a copy of the note to any of the DHS therapists who subsequently visited with Amanda. (PPF ¶¶ 211–13). Nor did she provide any of the information in Dr. Sandok's note to the DHS therapists or the correctional officers, including the fact that Dr. Sandok recommended Amanda receive ongoing psychiatric treatment. (PPF ¶¶ 215, 231, 256–57).

On April 28, Amanda met with Demaris Losinski, a DHS social worker. (PPF ¶ 253). In Losinski's note summarizing the visit, she indicated that Amanda told her, "I'm just broken. I need to go to a psyche ward to be fixed. I'm fucking broken. I'm a mess." Losinski noted Amanda to be "quite emotional" and "somewhat scattered." (PPF ¶¶ 263–265). Losinski informed jail staff about Amanda's presentation. At the conclusion of the session, Amanda agreed to contact "staff" if things continued to deteriorate. (PPF ¶¶ 266–67). Losinski's note—which contained the foregoing information—was transmitted to Defendant Pagels. (PPF ¶ 289).

On May 2, 2017, Defendant Pagels received a health request from Amanda in which Amanda requested to see someone from "Mental Health." In the health services request form, Amanda wrote as follows:

> So I just found out that I'm going to be basically cut off of my libirum within 3 days 16 pills for a month down to 4 pills for 3 days and then down to 2 pills n [sic] done. That is all that's [sic] keeping me sane Kris and you cant [sic] even start by cutting dose [sic] in half. These meds I need to stay on and you even know this. plz [sic] don't do this. I need meds for anxiety and sleep and you know this. I will go crazy Kris ~ y [sic] know it.

Defendant Pagels did not indicate on the request form that she added Amanda to the mental health board.  Because Defendant Pagels did not put Amanda on the mental health board, Amanda did not see anyone from DHS on Friday, May 5, 2017.  (PPF ¶¶ 273–83).

On May 6, 2017, Amanda committed suicide by hanging herself in her jail cell. Prior to her suicide, Defendants Johnson and Young observed Amanda "sobbing and crying uncontrollably."  (PPF ¶¶ 307–10, 332–33).  During his deposition, Defendant Johnson testified that he would have liked to have known that Dr. Sandok had recommended that Amanda receiving ongoing psychiatric care.  He further testified that had he been aware of the information, Amanda would have ended up on a mental health watch "at the least" that night.[2]  (PPF ¶¶ 324–25).

<u>ARGUMENT</u>

## I.   PLAINTIFF HAS DEMONSTRATED DISPUTED ISSUES OF MATERIAL FACT THAT PRECLUDE SUMMARY JUDGMENT ON HER FOURTEENTH AMENDMENT CLAIM

The law governing Plaintiff's cause of action against Defendant Pagels is set forth in her response in opposition to the County Defendants' motion for summary judgment.  It is reiterated here.

Count I of Plaintiff's First Amended Complaint asserts a substantive due process claim under the Fourteenth Amendment.   In order to prevail, Plaintiff must establish (1) that Defendant Pagels knew of a substantial risk that Amanda would

---

[2] In fact, Amanda was still on a mental health watch on the night of her suicide because she was never cleared off of the watch from April 16, 2017.

seriously harm herself, and (2) that Defendant Pagels disregarded that risk by failing to take reasonable measures to abate it. *Estate of Hill v. Richards*, 525 F. Supp. 2d 1076, 1084 (W.D. Wisc. 2007) (citing *Farmer v. Brennan*, 511 U.S. 825, 844 (1994)). The question on summary judgment is not whether Plaintiff has proven these elements as a matter of law, but whether a reasonable jury could find in Plaintiff's favor. *Id.* (citing *Anderson*, 477 U.S. at 248).[3]

As to Defendant Pagels' awareness of the risk that Amanda would harm herself, Plaintiff must show that Defendant was subjectively aware of the risk. *Id.* (citing *Farmer*, 511 U.S. at 837). Nevertheless, a "defendant may not prevail simply by professing she was unaware of any danger." Id. (citing *Cavalieri v. Shepard*, 321 F.3d 616, 621 (7th Cir. 2003)). A plaintiff may prove that the defendant's purported ignorance is feigned. *Id.* One way of accomplishing this is to show that the risk was obvious, calling into question the assertion that the risk went unnoticed. *Id.* "[T]he more apparent the risk to a reasonable person, the more reasonable it is to infer that the defendant knew as well." *Id.* at 1085 (citing *Farmer*, 511 U.S. at 846 n. 9).

As to the deliberate indifference prong, a plaintiff need not show that a defendant took no action whatsoever in responding to the risk. Rather, the deliberate

---

[3] For reasons that remain unclear, Defendant Pagels devotes a fair portion of her brief arguing that because Amanda was held at the jail in violation of her probation, she was in "post-conviction custody," and, therefore, the Eighth Amendment applies to her constitutional claim. This is a distinction without significance, at least under the facts of this case. The 7th Circuit has long held that it is "convenient" and "entirely appropriate" to apply the same standard to claims arising under the Fourteenth Amendment and Eighth Amendment. *E.g.*, *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005). Denial of Defendant Pagels' summary judgment motion is required regardless of which Amendment protected Amanda.

indifference standard may be met by showing either inaction or "woefully inadequate action." *Hudson v. McHugh*, 148 F.3d 859, 863 (7th Cir. 1998); *Cavalieri*, 321 F.3d at 625, n. 1 ("Deliberate indifference has been found when the state actor did nothing or next to nothing in response to a substantial suicide or health risk.") (collecting cases).

### A.    Preamble: Defendant's Statement of Facts

Plaintiff is forced to address several assertions raised in Defendant's brief before delving into the substance of her argument. First, Defendant Pagels claims as a relevant fact that Amanda received "extensive medical treatment" while incarcerated. (ECF No. 65 at 3–7). To the extent this is true, medical treatment, at least in the sense relied on by Defendant, is distinct from mental health treatment. The provision of one does not allow the jail to skirt provision of the other. *Rice ex rel. Rice v. Corr. Med. Serv.*, 675 F.3d 650, 676 (7th Cir. 2012) (holding that a jail "certainly" has a constitutional obligation to provide psychiatric care). Amanda received <u>no</u> mental health treatment for her serious mental illness, because no such treatment was provided at the jail. (PPF ¶¶ 39–40).

Second, Defendant Pagel alleges in her brief that Dr. Sandok "did not consider [Amanda] to be suicidal and did not recommend that any precautions be taken." (ECF No. 65 at 7). This is a gross mischaracterization of Dr. Sandok's deposition testimony, during which he testified that he could not recall assessing Amanda for suicidality and because any such assessment is not included in his note, he presumed it did not occur. (PRDPPF ¶ 37). In any event, Dr. Sandok did recommend precautions be taken for Amanda, a person he identified as having "significant psychiatric disease"—

he strongly recommended to Defendant Pagels that Amanda receive ongoing psychiatric care. (PPF ¶ 205–07). Of course, Amanda never received such care, in part because Defendant Pagels never passed Dr. Sandok's note on to Amanda's mental healthcare providers.

Next, Defendant Pagels asserts that DHS therapists "could obtain" documentation from an inmate's medical file. (ECF No. 65 at 9). Although there is a factual dispute on this point (PRDPPF ¶ 52), it was the custom and practice for DHS therapists not to review documents not given to them because there was limited time for them to see inmates. (PPF ¶¶ 40, 48–49). Of course, Defendant Pagels knew that DHS therapists had a limited amount of time to see inmates because, at times, she would help the therapists prioritize inmates. (PPF ¶ 47). Instead, DHS therapists trusted Defendant Pagels and other staff to provide them with information bearing on an inmate's suicidality if they possessed it. (PPF ¶ 214).

Other factual misstatements or disputed issues of fact require clarification. Defendant claims that when Amanda met with Virnig on April 21, Virnig "did not believe [Amanda] was suicidal and did not recommend any precautions." (ECF No. 65 at 11). This assertion is simply untrue; Virnig continued Amanda on a mental health watch. (PPF ¶ 235). Whether Virnig subjectively believed that Amanda was a serious suicide risk is beside the point, given that Plaintiff has shown DHS therapists had insufficient information with which to make their assessments. (PPF ¶ 259).

Defendant's characterization of what Losinski knew when Losinski met with Plaintiff also rests on disputed issues of fact, as is the assertion that Amanda "adamantly" denied suicidal thoughts during their session.  (PRDPPF ¶¶ 77, 79). Moreover, Defendant's reliance on the fact that DHS therapists knew how to conduct client interviews relevant to their assessments is a nonstarter because, again, as Defendant Pagels knew, DHS therapists did not have the time to conduct an intake as they would in an outpatient setting.  (PRDPPF ¶¶ 77, 79).

Lastly, Defendant contends that DHS "employs" a psychiatrist—-Dr. Steven Andrews—and that neither Virnig nor Losinski referred Amanda to him.  This assertion fails because Defendant has not cited any competent evidence to establish that Dr. Andrews was available to see inmates in 2017.  On the contrary, as of April 2016, therapists were not referring inmates to Dr. Andrews because he was not taking any additional clients.  (PRDPPF ¶ 89).

To the extent any other distortion of the facts is material to Plaintiff's response, it is pointed out below.

### B.   A reasonable jury could conclude that Defendant Pagels subjectively knew that Amanda was a substantial risk of committing suicide by, at the latest, May 2, 2017.

A risk is deemed "substantial" when it is more than a "mere possibility," but less than a certainty.  *Mombourquette ex rel. Mombourquette v. Amundson*, 469 F. Supp. 2d 624, 637 (W.D. Wis. 2007) (citing *Pinkston v. Madry*, 440 F.3d 879, 889 (7th Cir. 2006); *Collingnon v. Milwaukee Cty.*, 163 F.3d 982, 990 (7th Cir. 1998)).  The

meaning is in part a function of the potential harm; the more serious a possible injury, the lower the threshold for showing that risk is substantial.  *Id*.

Plaintiff has demonstrated more than enough evidence to create a triable issue of fact that Defendant Pagels knew Amanda was a substantial risk of committing suicide by, at the latest, May 2, 2017.  Based on Amanda's booking sheets, Defendant Pagels knew that Amanda had a history of prior suicide attempts and prior psychiatric hospitalizations.  Defendant Pagels also knew that Amanda had a history of significant substance abuse; in fact, she was present on January 17, 2017, when Dr. Hekman diagnosed Amanda as suffering from "Anxiety/Depression" following an overdose on benzodiazepines.

Defendant Pagels knew that Amanda suffered from frequent seizures, and that the seizures caused her distress.  Defendant Pagels observed Amanda crying on April 13, and Amanda told her, "no one cares" and she "has no family or friends."  Amanda reiterated these statements to Officer Johannes a few days later, and she also told him she was having thoughts of suicide (although she did not intend on hurting herself).  Officer Johannes documented this information on a special watch form which was given to Defendant Pagels for inclusion in Amanda's medical file.  Although by that point Amanda's baseline risk was obvious, Defendant Pagels was present on April 20, 2017, when Dr. Hekman assessed Amanda again as having "Anxiety/Depression."

Against that backdrop, Amanda went to see Dr. Sandok on April 20, 2017.  Dr. Sandok determined that Amanda's seizures were nonepileptic and were, in fact,

psychosomatic. In Dr. Sandok's opinion, Amanda was suffering from nonepileptic psychogenic seizures caused by significant sexual abuse. Dr. Sandok indicated in his note that the only form of treatment for Amanda's seizures was ongoing psychiatric treatment. Dr. Sandok opined that Amanda suffered from "significant psychiatric disease." Dr. Sandok not only sent a copy of his note to the jail, but he also called and left a message for Defendant Pagels telling her that, in his opinion, Amanda would be best served by having her psychiatric issues addressed as soon "as can be reasonable" and that she may "even be most appropriately served with an inpatient psychiatric stay."

By the time Defendant Pagels received Amanda's health services request on May 2, 2017, Amanda's substantial risk of suicide was obvious. Amanda expressed tremendous distress over the discontinuation of her Librium, informing Defendant Pagels via the request slip that she needed to stay on the medication for anxiety and sleep. Amanda went on to state that she would go "crazy" without the medication. And, of course, she asked to see someone from mental health the following Friday.

Although Amanda's risk of suicide was readily apparent—and, for that reason, a jury question exists for whether Defendant Pagels subjectively appreciated it— Defendant Pagels conceded during her deposition that prior suicide attempts, a history of depression, and complaints of severe anxiety are factors to take into consideration in assessing an inmate's suicide risk. More importantly, Defendant Pagels agreed that based on Amanda's health history, she would have been a high priority to be seen by a DHS therapist on May 5. Thus, although it is unnecessary

for purposes of summary judgment, Defendant Pagels has conceded the obviousness of Amanda's suicide risk.

Defendant Pagels relies on a number of cases to argue that the evidence is insufficient to show subjective knowledge of an imminent threat. (ECF No. 65 at 29–32). These cases are all inapplicable.

In *Davis-Clair*, the inmate told several of the defendants that if he was transferred to a different prison, he would commit suicide *after* the transfer. *Davis-Clair v. Turck*, 714 Fed. Appx. 605, 606 (7th Cir. 2018) (emphasis in original). The 7th Circuit held that inmate's allegations disproved the existence of an imminent risk of suicide, because they indicated that he would attempt suicide at some unspecified time after being moved to a different facility. *Id.*

Here, Plaintiff's assertion that Defendant Pagels knew of the risk to Amanda is not based on Amanda having told Pagels that after some designated point in time she would commit suicide. More important, however—and what distinguishes these facts from *Davis-Clair*—is that the inmate *Davis-Clair* did not have a history of psychiatric hospitalizations, depression, anxiety, chronic illness (*i.e.*, seizures), and prior suicide attempts. In particular, "the cases are legion in which courts have held or assumed that when an incarcerated person makes an unsuccessful suicide attempt, a jury could find reasonably that officials were aware that another attempt was likely to follow." *Estate of Hill v. Richards*, 525 F. Supp. 2d 1076, 1085 (W.D. Wis. 2007). Defendant Pagels had far more information showing that Amanda was an imminent risk of committing suicide than did any defendant in *Davis-Clair*.

Defendant's reliance on *Richter* is a complete non-starter. *Richter v. Vick*, No. 17-C-1595, 2018 WL 68139207 (E.D. Wis. Dec. 27, 2018). In *Richter*, the *pro se* inmate did not respond to the defendants' motion for summary judgment. *Id.* at *1. The district court concluded, based on the unrebutted evidence offered by the defendants, that the inmate "was simply engaged in drug-seeking behavior and used his claim of mental illness and threats to harm himself as the means of obtaining the kind and amount of the drug he was seeking." *Id.* at *8. In other words, the court concluded there was no actual risk of harm to the inmate. *Id.* at *10. Indulging, for a moment, the allegation that the inmate did have a significant mental health issue, the court held that the defendant's health services request, "which stated only vaguely that he was having a lot of suicidal thoughts lately," was not enough to establish the nurse's knowledge of an imminent suicide risk. *Id.* at *9. The court based its decision in part on the fact that the inmate's subsequent suicide attempt—which the court viewed as a form of manipulation—did not occur until two weeks later, during which time the inmate submitted other health services request that did not reflect any suicidal thoughts. *Id.*

Here, Defendant Pagels has not introduced any evidence that Amanda was feigning a mental illness. She has not offered any basis to dispute Dr. Hekman's assessment that she was suffering from "Depression/Anxiety," nor Dr. Sandok's diagnosis that Amanda was an individual "with significant psychiatric disease." And, again, Defendant Pagels had access to a wealth of information concerning Amanda's mental health history that put her on notice of Amanda's imminent suicide risk not

17

possessed by the nurse in *Richter*.  Finally, given that Amanda actually committed suicide, Defendant Pagels would be hard pressed to claim that Amanda's risk of suicide was not real.

Defendant Pagels' attempt to compare this case to *Miller* also fails.  *Miller v. Kozel*, No. 10 C 5381, 2011 WL 5024554 (N.D. Ill. Oct. 19, 2011).  In *Miller*, the juvenile inmate had a number of historical factors that indicated a suicide risk, including prior suicide attempts.  *Id*. at *2, 12.  In April of 2009, he was placed on a suicide watch for 5 days when, after fighting another youth, he made the statement, "I'm going to make it worse for myself."  *Id*. at *4.  More than 30 days later, the inmate was assessed, and it was determined that he was not suffering from suicidal ideation. *Id*.  On August 9, 2009, the inmate was evaluated by a psychiatrist and again he did not have any suicidal thoughts.  *Id*. at *5.  He also denied feelings of depression.  *Id*. On August 31, 2009, the inmate hung himself after a brief confrontation with a guard. *Id*. at *6–7.  In granting the defendants' motion for summary judgment, the district court held that a history of or predisposition for suicide is not the same as a present risk of suicide.  *Id*. at *12.

*Miller* is simply inapplicable.  Although the inmate in *Miller* had a history of suicide attempts, he repeatedly denied suicidal ideation or even depression in the months leading up to his suicide.  The defendants in *Miller* had no reason to think that the inmate was anything other than stable.  Here, on the other hand, there is a mountain of evidence that Amanda was a present risk of attempting suicide, and that her mental state was in decline.  In the weeks leading up to her death she was

18

observed frequently crying.  She was assessed by multiple doctors (Dr. Hekman and Dr. Sandok) to be depressed and in need of treatment.  She was placed on a mental health watch after making statements about not having any hope and admitting that she was thinking about suicide.  On April 28, 2017, she told Losinski that she was "broken" and "a mess."  A reasonable jury could certainly find that by the time Defendant Pagels received Amanda's request slip indicating that Librium was the only thing keeping her sane and she would go "crazy" without it that Defendant Pagels knew Amanda was a substantial, imminent risk of committing suicide.

Lastly, Defendant Pagels argues that "it is undisputed that [Amanda] committed suicide moments after an argument with her fiancé on the evening of May 6, 2017" and, because Defendant was not present when the call occurred, she could not have been aware that Amanda was imminently suicidal.  (Br. at 31–32). Defendant's argument is a non sequitur.  Simply because Amanda was a substantial risk of committing suicide <u>after</u> the call does not mean that she was also not a substantial risk of committing suicide <u>before</u> the call.  Another fundamental flaw in Defendant's argument is that Amanda was observed sobbing uncontrollably <u>before</u> the call and, based on the record, Defendant cannot credibly claim that she was not a substantial, imminent suicide risk at that time.

To the extent Defendant Pagels contends that the risk was not imminent based solely on the four days that elapsed between her last interaction with Amanda and Amanda's suicide, such an argument fails as a matter of law.  *E.g.*, *Mombourquette*, 469 F. Supp. 2d at 645 (rejecting claim that a substantial risk of

19

harm no longer existed where there was no suspicious behavior for four days) *Hill*, 525 F. Supp. 2d at 1081–82 (a question of fact existed on whether defendant violated inmate's constitutional rights where the defendant and inmate's last interaction occurred 3 days before the suicide); *Belbachir v. Cty. Of McHenry*, 726 F.3d 975, 981 (7th Cir. 2013) (same).

### C.   A reasonable jury could conclude that Defendant Pagels intentionally disregarded Amanda's substantial risk of suicide.

Defendant Pagels claims that summary judgment must be awarded in her favor because she simply made a "mistake" by forgetting to put Amanda on the list for mental health.  (ECF No. 65 at 32).  Defendants' argument must be rejected because there is ample other evidence from which a reasonable jury could conclude that Defendant Pagels' actions were the result of deliberate indifference and not mere negligence.

On April 13, 2017, Defendant Pagels observed Amanda crying.  Amanda told her "no one cares" and she "has no family or friends."  Defendant Pagels conceded that Amanda's presentation should have prompted her to add Amanda's name to the mental health board.  Yet, Defendant Pagels failed to do so.  On April 16, Amanda was placed on a mental health watch and moved into a holding cell.  Although Defendant Pagels assessed Amanda on April 17, 18, and 19 for seizure activity, at no time did she ask Amanda how she was feeling or if she was having any thoughts of harming herself.

On April 20, Defendant Pagels was present when Dr. Hekman ordered that Amanda receive cognitive behavioral therapy for depression and anxiety. Yet, Defendant Pagels did not notify DHS of the referral.

On April 20, Defendant Pagels received a message from Dr. Sandok suggesting that Amanda would be best served if her psychiatric issues were addressed as soon as reasonable, and that Amanda might be best served with an inpatient psychiatric stay. Defendant later received Dr. Sandok's note with his diagnosis of psychogenic seizures and impression that Amanda suffered from "significant psychiatric disease." Incredibly, Defendant Pagels did not provide Dr. Sandok's note to any of the therapists at DHS, the individuals ostensibly responsible for managing Amanda's mental health care.

Finally, even if Defendant Pagels did not receive Dr. Sandok's note until after Amanda's meeting with Virnig, she certainly had it before Amanda's meeting with Losinski. Once again, in possession of critical information bearing directly on Amanda's mental health and need for treatment, Defendant Pagels failed to do something as simple as give a copy of Dr. Sandok's note to Losinski. Nor did she meet with Losinski to discuss Amanda. On the contrary, as Losinski testified, she could not recall having "much interaction" with Pagels during any of Losinski's visits to the jail.

Given that Defendant Pagels repeatedly failed to pass along information critical to Amanda's mental health care, a reasonable jury could easily reject her claim that when she failed to add Amanda to the mental health board she did so by

21

"mistake." *Lockett v. Cox*, 2018 WL 1108703, *4 (W.D. Wis. Feb. 27, 2018) (jury could reject physician's claim that the failure to provide antibiotics to an inmate was a mistake). Moreover, the jury could conclude that Defendant Pagels' failure to transmit Dr. Sandok's note to DHS also constitutes deliberate indifference. *Sowell v. Dominguez*, No. O9-cv-47, 2017 WL 1151088, *14–15 (N.D. Ind. Mar. 27, 2017) (denying summary judgment where a jury could find deliberate indifference based on defendant's failure to keep an inmate with a known suicide risk on suicide watch with paper clothing and bedding); *Belbachir*, 726 F.3d at 981 ("[W]hen the adverse consequence is very great, the failure to take a simple, inexpensive, and even prescribed measure to avert it is inexcusable.")

### C.   Defendant Pagels' putative reliance on Dr. Hekman's treatment decisions does not absolve her of her deliberate indifference.

Finally, Defendant Pagels attempts to sidestep her deliberate indifference by arguing that she was entitled to rely on Dr. Hekman's "chosen course of treatment." She points to the fact that Dr. Hekman extended Amanda's Librium another six days and prescribed Fluoxetine and Buspar. Defendant Pagels speciously contends that Dr. Hekman "explained to [Amanda] that he intended to replace [the Librium] with two other medications to treat her anxiety." She maintains that because Dr. Hekman fully addressed Amanda's concerns, "it was not obvious that his plan could have caused [Amanda] harm." (ECF No. 65 at 33).

Defendant Pagels' argument distorts the record. In her own motion, Defendant Pagels notes that "ACH's contract with Wood County did not include providing mental health services," and that DHS "oversaw, managed, and provided mental

health services to inmates." (ECF No. 65 at 7–8). As Defendant Pagels testified during her deposition, "Wood County . . . was providing the mental health services. Hence, the visits on Friday morning." In short, Defendant Pagels cannot defer to Dr. Hekman's "course of treatment" because she knew he was not managing Amanda's mental health treatment. (PPF ¶ 27).

Moreover, Defendant Pagels testified during her deposition that she had a responsibility to identify inmates who might be at risk of committing suicide and referring them to mental health. (PPF ¶ 64). Defendant Pagels knew that an inmate needed to be referred to mental health if they had complaints of severe anxiety, as did Amanda. (PPF ¶ 65). Defendant Pagels—not Dr. Hekman—was responsible for conveying information that she obtained about an inmate's mental state to the DHS therapists that came to the jail. (PPF ¶ 64). Thus, Defendant Pagels knew that under these circumstances she was required to add Amanda to the mental health board and inform the DHS therapists of important information related to Amanda's mental state.

Defendant Pagels' reliance on her retained expert's opinion that her actions "were consistent with the standard of care for an LPN" is a non-starter.[4] The proposition that Defendant Pagels made a clinically appropriate decision to not transmit information about Amanda's mental state to the mental health workers

---

[4] There is some question as to whether expert testimony is admissible as to Defendant Pagels' deliberate indifference. *E.g.*, *Elcock v. Davidson*, 561 Fed. Appx. 519, 524 (7th Cir. 2014) (holding that deliberate indifference is a subjective test that expert testimony would not have helped resolved).

managing her care is dubious at best.  Indeed, Defendant Pagels' expert does not appear to address the issue.  ECF No. 99 at 16–19.  It would be difficult to credit an expert defending Defendant Pagels on that point and, of course, a jury would be free to reject any such expert testimony.  *E.g.*, *Richman v. Sheahan*, 415 F. Supp. 2d 929, 948 (N.D. Ill. 2006).

Finally, although it is unnecessary to defeat Defendant Pagels' motion, it should be noted that Plaintiff strongly disputes that either Dr. Hekman or Defendant Pagels told Amanda that her Librium was extended six days, and/or that the plan was to replace it with two other medications.  As noted in Plaintiff's response to Defendant Pagels' proposed facts, the verbiage on the request slip—"We <u>did</u> extend the meds 6 additional days"—suggests that the notation was added after the slip was transmitted back to Amanda or even, perhaps, after her death.  (Emphasis added).  Moreover, Defendant Pagels' narrative progress notes show that Fluoxetine and Buspar were not prescribed until May 4, suggesting that it was not the "plan" to substitute them for the Librium when the Librium was extended on May 2.  Additionally, Defendant Pagels' note does not show that she met with Amanda when she received the telephone order from Dr. Hekman on May 4, a fact she was unable to explain during her deposition.  A jury could conclude based on this that whatever plan Dr. Hekman had with regard to Amanda's medications, it was not explained to her.

In any event, Plaintiff has adduced substantial evidence that Defendant Pagels was aware that Amanda was a substantial risk of suicide, and that she was

deliberately indifferent to the risk.  Defendant Pagels' motion must therefore be denied.

<u>C</u>ONCLUSION

For the reasons stated herein, Plaintiff requests that this Court deny Defendant Pagels' motion for summary judgment.

Respectfully submitted,

Dated: January 27, 2020          /s/ Nicholas Curran
                                 Nicholas Curran
                                 One Attorney for Plaintiff
                                 Admitted *pro hac vice*
                                 Kathleen T. Zellner & Associates, P.C.
                                 1901 Butterfield Road, Suite 650
                                 Downers Grove, Illinois 60515
                                 (Ph) (630) 955-1212
                                 (E) attorneys@zellnerlawoffices.com